ACCEPTED
15-25-00051-cv
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/21/2025 6:22 PM
CHRISTOPHER A. PRINE
CLERK

**NO. 15-25-00051-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/21/2025 6:22:20 PM
CHRISTOPHER A. PRINE
Clerk

In The Court of Appeals 15th Judicial District of Texas
Austin, Texas
Originating out of the Court of Appeals 5th Judicial District, Dallas, Texas

---

IN THE INTEREST OF J.L.H., A CHILD

MARIBEL L. HILL, APPELLANT
Respondent Below

Vs.

DWIGHT L. HILL, APPELLEE
PETITIONER BELOW

---

Appeal of Judgment in Cause No. DF-22-14398
From the 302nd Judicial District Court
Dallas County, Texas
Honorable Sandra Jackson, Presiding Judge

---

APPELLANT MARIBEL L. HILL'S ORIGINAL BRIEF ON APPEAL

---

Respectfully submitted,

*/s/Marisol Lopez*
Marisol Lopez
State Bar No. 24050952
301 W. Avenue D
Garland, Texas 75040
972-205-1110 (phone)
1-866-232-2077 (facsimile)
Marisol@lawyerforu.com

# IDENTITY OF THE PARTIES

**APPELLANT/RESPONDENT:**     Maribel L. Hill

**TRIAL AND APPELLANT COUNSEL:**     Marisol Lopez
Lopez Law Firm
State Bar No. 24050952
301 W. Avenue D
Garland, Texas 75040
972-205-1110 (phone)
1-866-232-2077 (facsimile)
marisol@lawyerforu.com

**APPELLEE/PETITIONER:**     Dwight L. Hill

**TRIAL AND APPELLATE COUNSEL:**     ORSINGER, NELSON,
DOWNING & ANDERSON, LLP
Richard R. Osinger
State Bar NO. 15322500
425 Soledad, Suite 550
San Antonio, Texas 78205
210-225-5567
richard@ondafamilylaw.com

EPSTEIN FAMIL LAW, PC
5949 Sherry Lane, Ste 1070
Dallas, Texas 75225
Robert D. Epstein
State Bar NO. 24065206
robert@epsteinpc.com
Jordan C. Watson
State Bar NO. 24110895
jordan@epsteinpc.com
214-692-8200

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL...................................................i

TABLE OF CONTENTS................................................................ii

TABLE OF AUTHORITIES............................................................iv

STATEMENT OF THE RECORD......................................................vi

STATEMENT REGARDING ORAL ARGUMENT....................................vi

STATEMENT OF THE CASE.........................................................vii

ISSUES PRESENTED..................................................................viii

APPENDIX ............................................................................. ix

STATEMENT OF FACTS..............................................................1

SUMMARY OF THE ARGUMENT...................................................2

ARGUMENT AND AUTHORITIES..................................................2

I.    THE TRIAL COURT ERRED AND ABUSED HER DISCRETION
      IN DIVESTING RESPONDENT'S COMPLETE INTEREST IN
      DHIA THEREBY CREATING AN UNEQUAL DIVISION OF
      THE MARITAL ESTATE ...... ..............................................5

            A.    THE MARITAL ESTATE OVERALL...........................5

            B.    DWIGHT HILL INSURANCE AGENCY, INC..............10

                  1. EVIDENCE IGNORED BY THE COURT...............24

            C.    UNEQUAL DIVISION OF MARITAL ESTATE CAN
                  EASILY BE REMEDIED......................................29

II.   THE TRIAL COURT ERRED, MISAPPLIED THE LAW AND
      ABUSED HER DISCRETION IN REDUCING THE VALUE
      OF RESPONDENT'S EXTENDED TERMINTION
      PAYMENTS (RETIREMENT BENEFITS) WHEN A CLEAR
      VALUE EXISTED AT THE TIME OF DIVORCE ......................31

III.  THE TRIAL COURT ERRED AND ABUSED HER DISCRETION
      IN DENYING SPOUSAL MAINTENANCE.................................36

IV.   FOLLOWING A BENCH TRIAL, RESPONDENT TIMELY
      FILED HER FINDINGS OF FACT AND CONCLUSIONS OF
      LAW AND HER NOTICE OF PAST DUE FINDINGS OF FACT
      AND CONCLUSIONS OF LAW.  DESPITE AN OBLIGATION TO
      DO SO, THE TRIAL COURT NEVER MADE FINDINGS OF
      FACT AND CONCLUSIONS OF LAW........................................42

V.    PRAYER.............................................................................44

CERTIFICATE OF COMPLIANCE................................................45

CERTIFICATE OF SERVICE.......................................................46

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795
(Tex. App.-Austin 2023, no pet.)................................................................4

*Berry v. Berry*, 647 S.W.2d 945, 947 (Tex.1983)........................ 21,32,33,35

*Boyd v. Boyd*, 131 S.W.3d 611 (Tex. App.-Fort Worth 2004).....................3

*Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex.2004).........................3,4

*Cherne Indus., Inc. V. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989).......... 43,44

*Craig v. Craig*, 31 Tex. 203, 204 (1868)....................................22

*Espe*, 2021 WL 2021137, at *2.............................................3,4

*Evaristo Gabriel Vazquez V. Jessica Lynn Bailey*, No. 03-22-00290-CV at *3
(Tex. App. Apr 25, 2024, no pet.).........................................3,4

*Hancock v. Hancock*, No. 2-06-376-CV (Tex. App. 7/31/2007,
No. 2-06-376-CV (Tex. App. Jul 31, 2008)................................28,29

*Landerman v. State Bar of Texas*, 247 S.W.3d 426, 430 (Tex. App. – Dallas 2008,
pet denied)...............................................................44

*Murf v. Murf*, 615 S.W.2d 696, 698 (Tex.
1981).....................................................................3,31

*In re C.A.S.*, 405 S.W.3d 373, 384 (Tex. App. – Dallas 2013, no pet.)..................4

*Tenery v. Tenery*, 932 S.W. 2d 29, 30 (Tex. 1996). .....................44

*Sharma vs. Routh*, 302 S.W. 3d 355, 360 (Tex.App.-Houston, [14th District]
2009, no petition)......................................................5, 23

*Warren Baker, JR and Dorris J. Baker vs. Commissioner of Internal Revenue,*

No. 02-3262 *5 US Court of Appeals (2003)...........................................11, 28

*In the Matter of William C. Wade and Frances Carol Wade*, 923 S.W.2d 735 (1996) ............................................................................12,32,33

*Zeifman v. Michels*, 212 S.w.3d 582, 588 (Tex. App.-Austin 2006, pet. Denied)....4

## STATUTES

Tex. Fam. Code § 7.001 (Vernon 2006)..................................................3

Tex. Fam. Code § 8.051.  (Vernon 2006).........................................36,41,42

Tex. Fam. Code § 8.052 (Vernon 2006) ...........................................36,41,42

Tex. Fam. Code § 8.053 (Vernon 2006).........................................36,41,42

Tex. Fam. Code § 8.054 (Vernon 2006)......................................36,41,42,43

## RULES

Tex. R. Civ. P. 297...................................................................44

Tex. R. Civ. P. 298...................................................................44

## STATEMENT OF THE RECORD

The Clerk's Record:

>CR P. X = OEC (clerks first record submitted)
>SCR P. X = Supplemental Court Record

The Reporter's Record:

>TRV2 P. X, Lines X = Volume 2 Trial on the Merits/Exhibits
>TRV3 P. X, Lines X = Volume 3 Trial on the Merits/Exhibits
>ME P. X, Lines X = Motion to Enter
>SME P. X, Lines X = Supplemental Motion to Enter
>SRSM P. X, Lines X = Supplemental Record Spousal Maintenance

EX X = main exhibits pulled from record due to large volume of trial exhibits

Respondent is Appellant – wife/mother

Petitioner is Appellee – husband/father.

## STATEMENT REGARDING ORAL ARGUMENT

The Court should grant oral argument because it would give the Court a more complete understanding of the facts presented by her case, and although this is not a terribly complicated case, oral argument would allow the Court to better analyze the legal issues presented by appeal.

## STATEMENT OF THE CASE

Nature of the case: This is an appeal from an unequal division of a martial estate in which Respondent was not awarded one half the value of the community business, nor was that value accounted for elsewhere, where Respondent was awarded a lower value of retirement benefits than what the value was as of the date of divorce, and Respondent was not awarded any spousal maintenance though the evidence showed her to be a stay at home wife and mom for 23 years.

District Court: Hon. Sandra Jackson, Presiding Judge 302nd Judicial District Court in Dallas County.

Course of Proceedings: Petitioner, Dwight Hill, filed for divorce because the marriage had become irreconcilable. Respondent, Maribel Hill, filed an answer and a counter-petition for cruelty in the marriage. The child had turned 18 prior to the divorce.

District Court Disposition: Following a bench trial on June 17th and June 20th of 2024, Respondent, after three attempts, had a motion for spousal maintenance heard but the Court never issued a ruling. Respondent and Petitioner had various hearings regarding the decree and the Court's rulings. The Court showed much partiality to Petitioner's attorneys and attempted to create and censor the record to match her predetermined rulings. This is not unusual as there are many cases on appeal regarding the 302nd. Respondent filed requesting Findings of Fact and Conclusions of Law and the late notice but the Court never issued any Findings of Fact and Conclusions of Law.

The Court ordered that Petitioner receive 63% and the wife 37% of the marital community estate, not counting the reduction of retirement benefits, all which can easily be remedied by this Honorable Court.

# ISSUES PRESENTED

I.   THE TRIAL COURT ERRED AND ABUSED HER DISCRETION IN DIVESTING RESPONDENT'S COMPLETE INTEREST IN DHIA THEREBY CREATING AN UNEQUAL DIVISION OF THE MARITAL ESTATE.

II.  THE TRIAL COURT ERRED, MISAPPLIED THE LAW AND ABUSED HER DISCRETION IN REDUCING THE VALUE OF RESPONDENT'S EXTENDED TERMINTION PAYMENTS (RETIREMENT BENEFITS) WHEN A CLEAR VALUE EXISTED AT THE TIME OF DIVORCE.

III. THE TRIAL COURT ERRED AND ABUSED HER DISCRETION IN DENYING SPOUSAL MAINTENANCE.

IV.  FOLLOWING A BENCH TRIAL, RESPONDENT TIMELY FILED HER FINDINGS OF FACT AND CONCLUSIONS OF LAW AND HER NOTICE OF PAST DUE FINDINGS OF FACT AND CONCLUSIONS OF LAW. DESPITE AN OBLIGATION TO DO SO, THE TRIAL COURT NEVER MADE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

# APPENDIX

**EX A: Wife's Amended Property Division**

**EX B: State Farm Termination and Extended Termination Payments Valued as of June 20, 2024, Attached to Exhibit C (Divorce Decree)**

**EX C: Divorce Decree**

**EX D: Current Mortgage on Elsby (Respondent's Separate Property Which Is Paying Mortgage on 1211 Velasco)**

**EX E: Elsby Mortgage Prior to Marriage ($ 78,527) With a Water Claim Being Paid of $ 83,583.52, Made Prior to Marriage**

**EX F: Fuqua Report Valuing Business at $ 728,000 as of 2022**

**EX G: Restore Agreement – Community Joint Venture**

**EX H: DHIA Articles of Incorporation**

**EX I:  Note Showing Respondent as Vice President of DHIA**

**EX J: DHIA/State Farm Contract**

**EX K: Tax Return Showing Sample K-1**

**EX L: Tex. Fam. Code § 7.001 (Vernon 2006)**

**EX M: Tex. Fam. Code § 8.051.  (Vernon 2006)**

**EX N: Tex. Fam. Code § 8.052 (Vernon 2006)**

**EX O: Tex. Fam. Code § 8.053 (Vernon 2006)**

**EX P: Tex. Fam. Code § 8.054 (Vernon 2006)**

**EX Q: Tex. R. Civ. P. 297**

**EX R: Tex. R. Civ. P. 298**

## STATEMENT OF FACTS

On June 17th and 24th, 2024, a non-jury trial took place in the matter of Hill vs. Hill. The parties were married from October 19, 2001 to June 20, 2024. (CR P. 85, 99) Final rulings were rendered on December 10, 2024. (CR P. 99) Respondent timely filed her request for Findings of Fact and Conclusions of Law (FFCL) (CR P. 113-118) and timely filed her past due notice of FFCL (CR P. 164-166) FFCL were never filed by the Court. The trial Court, successfully and unsuccessfully, sought to craft the record to fit her predetermined rulings of divesting Respondent of her share of Dwight Hill Insurance Agency, Inc (DHIA), (TRV3 P. 92, lines 19-22), spousal support (TRV3 P. 102, lines 2-21), and of lowering the value of her future retirement benefits, the most valuable assets of the marital estate.[1] (TRV3 P. 7, lines 17-25 & P. 8, lines 1-16, P. 72, lines 18-19; TRV2 P. 180, lines 1 – P. 186, line 9, as some examples) Petitioner was allowed to provide long winded answers while

---

[1] TRV3 P. 7, lines 17-22 – Maribel Hill testimony - Q: "So the property at Fort Velasco, right now, there's a house on that property, true? A: That's flooded right now, yes. Q: Objection, nonresponsive. A: yes Court: sustained" Q: It's got a house.." Court: "Mrs. Hill, he's going to ask you questions."; P. 8 line 6 "Don't add anything else."; P. 8 line 10-14, Ms. Lopez: "Objection, Your Honor. I asked questions to Mr. Hill he added a lot of other things. The Court: "And I object---listen, don't your start with me. Sit down." Ms. Lopez: "I'm just objecting, your Honor."; P. 72, lines 17-20 Ms. Lopez: "How long have you been a stay at home mom and wife? A: Almost 23 years. Q: And were you allowed to work outside the home? The Court: okay. That's redundant, Counsel. She's said it before."

Respondent's testimony was limited. (TRV2 & TRV3) *Petitioner received 63% of the marital estate and Respondent received 37% of the marital estate.*

## SUMMARY OF THE ARGUMENT

The trial Court committed reversable error, abused her discretion, misapplied the law, did not understand some of her own rulings when she rendered an unequal division of the marital estate in favor of Petitioner. The court misapplied the law, and did not understand her own ruling, when she reduced the value of Respondent's share of the future retirement benefits, known as extended termination payments, to be received by Respondent as, if and when received by Petitioner. The Court abused her discretion and committed clear error by divesting Respondent of $ 364,000, her share of the value of the marital estate community business, DHIA, without equalizing Respondent's share elsewhere. The Court abused her discretion in not awarding Respondent, a stay-at-home wife and mother of twenty-three (23) years, who has been denied one job after the other, any spousal maintenance and left her without any income. Respondent is living off of a retirement account that charges penalties and taxes every time money is pulled out and said account will soon be exhausted.

## ARGUMENT

2

A trial court is charged with dividing a community estate in a "just and equitable" manner, considering the rights of BOTH parties. Tex. Fam. Code § 7.001 (Vernon 2006). A trial court's division of a martial estate is reviewed for an abuse of discretion. *Murf v. Murf,* 615 S.W.2d 696, 698 (Tex. 1981). "A trial court abuses its discretion if it acts without reference to any guiding rules and principles such that the ruling is arbitrary or unreasonable." *Espe,* 2021 WL 2021137, at *1 (Citing *Cire v. Cummings,* 134 S.W.3d 835, 838-39 (Tex.2004); *Evaristo Gabriel Vazquez V. Jessica Lynn Bailey,* No. 03-22-00290-CV at *3 (Tex. App. Apr 25, 2024, no pet.) In determining whether the trial court abused its discretion by deciding an issue without sufficient support, the court uses a two pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion and (2) did the trial court err in its application to that discretion. *Boyd v. Boyd,* 131 S.W.3d 611 (Tex. App. - Fort Worth 2004) The division need not be equal, and an unequal division will be upheld on appeal so long as a *reasonable* basis exists for it. *Murf,* 615 S.W. 2d 696, 698, 699 (Tex. 1981). In exercising its discretion in dividing the estate, the trial court may consider many factors, commonly known as the "Murf factors," including, but not limited to, *the* nature of the property, the disparity of incomes or earning capacities, the parties business opportunities, the parties relative financial condition and obligations, the parties education and physical condition, the benefit the innocent spouse would have received had the marriage continued and the

3

probable need for future support. *Id.* at 699; *In re C.A.S.*, 405 S.W.3d 373, 384 (Tex. App. – Dallas 2013, no pet.)

The abuse of discretion standard overlaps with traditional sufficiency standard of review in family law cases. *Evaristo*, No. 03-22-00290-CV at *3 (Tex. App. Apr 25, 2024, no pet.).; *Zeifman v. Michels*, 212 S.w.3d 582, 588 (Tex. App.-Austin 2006, pet. Denied) Challenges to legal and factual sufficiency do not constitute independent grounds for asserting errors but are instead relevant factors in determining whether the trial court abused its discretion. *Evaristo*, No. 03-22-00290-CV at *3 (Tex. App. Apr 25, 2024, no pet.); *Espe*, 2021 WL 2021137, at *2 (Citing *Cire*, 134 S.W.3d 835, 838-39 (Tex.2004) "Evidence is legally sufficient when it would enable reasonable and fair minded people to reach the verdict under review and is factually insufficient only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Evaristo*, No. 03-22-00290-CV at *3 (Tex. App. Apr 25, 2024, no pet.); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.-Austin 2023, no pet.) "A trial court does not abuse its discretion if there is at least some substantive, probative evidence that "exists to support the trial court's decision." *Evaristo*, No. 03-22-00290-CV at *3 (Tex. App. Apr 25, 2024, no pet.); *Espe*, 2021 WL 2021137, at *2 (Citing *Cire*, 134 S.W.3d 835, 838-39 (Tex.2004). "To convince this court to disturb the trial court's division of property, Timothy must show the trial court clearly abused its discretion by a

4

division or **an order that is manifestly unjust and unfair.**" *Sharma vs. Routh*, 302 S.W. 3d 355, 360 (Tex. App.-Houston, [14th District] 2009, no petition). The Court's division was manifestly biased, unjust, against the weight of the evidence, unfair, clear error, misapplication of law and had *no reasonable basis* to render an unequal division of a **LARGE** estate in favor of Petitioner. Fair minded reasonable people would never reach such an unfair verdict.

Respondent hereby incorporates all paragraphs together within this brief as much is interrelated.

## I. THE TRIAL COURT ERRED AND ABUSED HER DISCRETION IN DIVESTING RESPONDENT'S COMPLETE INTEREST IN DHIA THEREBY CREATING AN UNEQUAL DIVISION OF THE MARITAL ESTATE

### A. THE MARITAL ESTATE OVERALL

The community estate had total assets of approximately **$ 3,046,898 (EX A; TRV3 P. 133-140)**, excluding future retirement benefits (termination and extended termination payments), agreed children's distributions, deemed separate property nor small personal property with unsupported values, such as jewelry, guns, and used furniture. Community assets awarded to the **Petitioner was $ 1,918,203.50** and to **Respondent was $ 1,128,694.50, a 63/37 split.** Had Respondent received her share of DHIA, the correctly characterized community property business (TRV3 P. 88, lines 8-10), Petitioner would have received 51% of the community estate and

5

Respondent 49%, a more equal division. Of course, the future retirement benefits are not in play in this breakdown. The breakdown is as follows (EX A & EX C):

1) **Real property** (beach property = Velasco & Nesmith (5 lots on Nesmith) $961,000.00 - $ 265,000.00 (Velasco) = **$ 696,000.00 total**

   Velasco's mortgage rests on Elsby (EX D; TRV3 P. 39, Lines 11-25, P. 40 - P. 41, Lines 1-5, P. 174-187), Respondent's separate property. (TRV3 P. 85, Lines 23-25) Of note, during the bench trial, Velasco and all beach property was being inundated by the current hurricane. Petitioner continuously leveraged Elsby (TRV3 P. 38, lines 24-25, P. 39 – P. 41, line 11) to acquire beach property free and clear of loans. Petitioner benefited from this strategy because all property he received is free and clear of loans. Petitioner, knowing he was going to file for divorce, paid off everything, including all vehicles, and left Respondent's separate property, Elsby, she and her college kids need to live in, with a hefty mortgage. (EX A & D) This makes Velasco a wash and not a credit to Petitioner. Elsby's mortgage is now three times higher post marriage. (TRV3 P. 156-160, EX E) Elsby had a $ 78,522 mortgage on it, prior to marriage, and was being paid $ 83,583.52 for a claim that originated, prior to marriage, to repair the downstairs. (TRV3 P. 37, lines 18-25, P. 38, lines 1-2; EX E) The insurance company paid the contractors as they repaired the home. (TRV3 P. 38, lines

6

3-5) Within months of marriage, Petitioner began leveraging the property by refinancing it over and over in order to gain cash to buy other properties. (TRV 3 P. 38, lines 24-25, P. 39 lines 1-7; EX E) Upon divorce, Elsby is the only asset encumbered, and since the Court wrongfully divested Respondent of her share of the income of the community business (TRV3 P. 92, lines 2-21), though she agreed fifty percent (50% ) of the business income belonged to Respondent,[2] and denied spousal maintenance (TRV3 P. 102, lines 2-21), Respondent cannot qualify to assume the now higher mortgage herself. With that, the Court ordered Respondent to sign the Assumption Deed of Trust, attached to the decree (EX C), as of September 15, 2025 (SME p. 31, lines 18-25, P. 32 – P. 40, line 11), which was not only not a ruling at trial (TRV3 Pg. 85-111), this places a lot of power on Petitioner to acquire Respondent's separate property home if she misses a single payment. Respondent signing said assumption to her separate property home is injustice when the Court divested Respondent's interest in DHIA and no spousal maintenance, leaving her without an income, after being a stay at home wife and mother for twenty-three (23) years, making it impossible for Respondent to assume the mortgage alone, and when the

---

[2] TRV3 P. 89, lines 11-12 The Court: "It is the income of the business that's community property. That's why the Court said on that it's 50/50."

Court could have ordered the home be paid off like all the other property was. The Court's impartial rulings and unequal division of the marital estate is leading to a once wealthy woman's indigency, which was not necessary, being that the value of the estate was several million dollars and the community business earns close to $ 500,000 per year. Insurance premiums only continue to rise.

107 Nesmith, known as the three beachfront buildable beach lots, valued at $546,000, was ordered to be sold, and wife not be allowed to be the broker. (TRV3 P. 86, LINES 8-16) The split was ordered as 35% net to Petitioner and 65% net to Respondent to offset the whole life policy's ALL being awarded to Petitioner. (TRV3 P. 102, lines 9-21) The Court lowered the recovery of the property because 6% must be paid to a realtor, and Respondent, holding a real estate license, could have saved 3% of the realtor fees and/or gained some income.

Total to Petitioner: $ 75,000 (123 Nesmith) + 191,100 (pre-net of 107 Nesmith) = $ 266,100

$ 75,000 + $ 141,414 (net) = **$ 216,414**

Total to Respondent: $ 75,000 (118 Nesmith) + 354,900 (pre-net of 107 Nesmith) = $ 429,900

$ 75,000 + $ 262,626.00 (net) = **$ 337,626.**

Unfortunately, 107 Nesmith remains for sale. (SRSM P. 9, lines 22-25 & P. 10, lines 1-21) With high interest rates and the real estate market in a sludge, beach properties are not moving. Should the Court allow any receivership, to sell the lots, in the future, this will increase the unequal division of the estate as Petitioner has already received all of the whole life policies without any taxes or penalties.

## CASH AND FINANCIAL ACCOUNTS

Petitioner - **$ 90,579.50**. Petitioner previously received his $ 52,742.00 (TRV3 P. 87, lines 20-22)

Respondent- **$ 66,099.50** (this lasted about 6 months as Respondent's minimum bills are $ 10,000 per month (TRV3 P. 51, lines 13-16, SCR P. 232-236; SCR P. 20-22)

## 2) CLOSELY HELD BUSINESS INTERESTS

Petitioner - **$ 728,058.50; DHIA** valued at $ 728,000.00 based on net income (TRV2 P. 194, Lines 1-5 and 21-25, P. 195, lines 1-19, P. 1129-1140, EX F P. 7) + $ 117/2=$ 58.50

Respondent - **$ 602.50; Restore Entertainment** - $ 544.00 + $ 117/2=$ 58.50. Restore was a community joint venture (TRV3 P. 26, lines 18-23, P. 42, lines 24-25, P. 43, lines 1-14; EX G, TRV3 P. 346) that never generated income. The court's ruling is unclear as to whether she is

deducting, adding or neither Petitioner's claimed $ 89,502 he unfairly wants credited to the wife as an asset she received when it was a community venture and Restore has no worth. (TRV3 P. 43, lines 7-8, P. 88, lines 2-4; EX A & G)

3) **RETIREMENT ACCOUNTS**

Petitioner – $ 604,886.50

Respondent - $ 605,592.50

4) **MOTOR VEHICLES**

Petitioner - $ 22,600.00

Respondent - $ 26,500.00

5) **MISCELLANEOUS ASSETS**

The court did not assign values to these items on spreadsheet as no evidence/appraisals existed and each was awarded what they had in their possession. (TRV3 P. 95, Lines 2-11)

6) **INSURANCE – Whole Life Policies**

Petitioner - **$ 203,538 (TRV3 P. 95, lines 21-24)**

Respondent - **$ 0.00**

B. **DWIGHT HILL INSURANCE AGENCY, INC. (DHIA)**

DHIA opened after marriage. (TRV3 p. 363-364, EX H) Respondent was fifty percent (50%) shareholder on the K-1s (TRV3 P. 44, lines 17-25, P. 45, lines 1-3, P.

375, EX K) and reflected as a co-owner on loans (TRV3 P. 790-792, EX I) as well, though Petitioner controlled all the money. (TRV3 P. 45, lines 6-7) Respondent was on the K-1s as fifty percent (50%) shareholder every year. (TRV3 P. 365 –788) Respondent was not allowed to have a credit card in her name until Restore was opened. (TRV3 P. 45, lines 8-13)

Though the Court correctly characterized (DHIA) and the income it generated as community property with a fifty-fifty (50/50) split (TRV3 P. 89, lines 6-12), she later stated she was talking about termination payments (TRV3 P. 89, lines 18-23) and refused to award Respondent fifty percent (50%) of the actual value of DHIA. This does not make sense since she clearly stated, "The next distribution, under the businesses, would be to....", indicating she had moved on to the next subject, which was DHIA, after completing termination payment rulings. (TRV3 P. 89, lines 22-25 & P.88, lines 11-25) The Court erroneously misapplied the law if she treated the termination payments as one half the value of DHIA. Had the Court issued findings of fact and conclusions of law the reason would be known. In fact, Fuqua did not consider the termination payments when valuing the business at $ 728,000.00. (TRV2 P. 193, lines 19-25) Termination payments are not for the sale of the business[3]

---

[3] *Warren Baker, JR and Dorris J. Baker vs. Commissioner of Internal Revenue,* No. 02-3262 *5 US Court of Appeals (2003)

but are instead deferred compensation to be divided upon divorce.[4] Termination payments are income to be divided upon retirement or termination, if, as and when received, to incentivize an agent to not become State Farm's competitor, but is nevertheless, not the VALUE of the business. Alternatively, the Court abused her discretion and followed Petitioner's cues, like head movements (TRV3 P. 91, lines 5-6), eye contact or just straight words into the record, that occurred throughout the trial, to render that manifestly unjust and clearly wrong lack of award of the value of DHIA that no reasonable person would have done.

Moreover, the Court undoubtedly turned a deaf ear to the $ 728,000 valuation of DHIA by Mr. Fuqua, claiming she didn't hear said valuation. (TRV3 P. 89, lines 24-25 & P. 90, lines 1-18) When asked if she was going to award zero dollars to the wife of the community business earning about half a million a year (TRV3 P. 90, lines 22-25), she said she didn't say that (TRV3 P. 91, line 2), yet in the end that is exactly what she did (Ex C) Petitioner, upon hearing the trial court was not going to award zero dollars to Respondent for the community business, guided the Court on how to repair the award of "50% income" to the wife, alleging she was referring to termination payments. (TRV3 P. 91, lines 1-25)

---

[4] *In the Matter of the Marriage of William C. Wade and Frances Carol Wade*, 923 S.W.2d 735 (Tex. App.-Texarkana, 1996, no writ)

The Court then stated the "expert said the business can't be sold." (TRV3 P. 91, lines 20-23) Notice how the court reiterated for the record, during trial, with Mr. Fuqua, the NON State Farm expert, that, he BELIEVES the agency cannot be sold. (TRV2 P. 199, lines 1-3, The Court: "Sir, one question from the Court. Am I hearing you say that a State Farm Agency cannot be sold?" Fuqua: "Not that I'm aware.") Fuqua does not know for sure whether the agency can be sold or not and has admitted that it could be sold with State Farm permission.

The Court certainly did not clarify his valuation of $ 728,000 for DHIA nor that he admitted the contract that applies in THIS divorce says it can be sold with State Farm permission. (TRV2 P. 186, lines 24-25 & P. 187, lines 1-6) Notice the Court also did not reiterate for the record that Mr. Fuqua admitted he is NOT a State Farm expert, has never worked for State Farm and is deriving all of his information from Petitioner, himself. (TRV2 and TRV3) Though the Court, when necessary, treated Fuqua as a State Farm expert to justify her impartial rulings (TRV3 P. 92, lines 12-15), in a different occasion, she admitted that there was NO State Farm expert testimony. (TRV3 P. 107, lines 6-7) Nonetheless, the Court, though she stated she didn't HEAR Fuqua value the business, she later stated "...and he objected to that..." (TRV3 P. 90, lines 9-10), when Respondent said he testified to the valuation as $ 728,000.00. (TRV3 P. 89, lines 24-25 & P. 90, line 1) Clearly, the Court heard the valuation. In fact, the Court also stated, "Based on what you did preliminarily

13

then what Mr. Orsinger did not do, and then when you did what you did, Mr. Orsinger was given latitude by the Court to give value." (TRV3 P. 90, lines 11-14) What Respondent "did" was object to the report as hearsay, at the time that it was, at the beginning of trial (TRV2 P.184, lines 23-25; P. 185, lines 1 – 25; P. 186, lines 1-23) and questioned Fuqua on the report after the foundation was appropriately laid. (TRV2 P. 188, lines 19-25; P. 189, lines 1-25; P. 190, lines 1-25; P. 194, lines 1-5) What Petitioner "did not do" was purposefully not question Fuqua on the value of the business, so there would not be evidence in the record as to the value, because the Court had struck Respondent's accountant expert, Vantarakis. (TRV2 P.154, lines 23-25) If there is not a value in the record, then the Court doesn't have a hard number to use in awarding Respondent her fifty percent (50%) interest in DHIA.

Petitioner did not anticipate that Respondent had cross designated Fuqua, so after much discussion with the Court, Respondent was finally able to question Mr. Fuqua on the value he had rendered for DHIA but was prevented from fully developing said valuation because the Court made Respondent "yield her time" (TRV3 P. 179, lines 23 – P. 190, line 20) to return Fuqua to Petitioner to "rehabilitate" him in the manner that he needed to (TRV2 P. 180, lines 1 – P. 186, line 9), when Petitioner continued to inappropriately object to Respondent being able to question Fuqua on the value. Petitioner had the opportunity to question Fuqua on the value, after laying the appropriate foundation, and prior to Respondent's

14

questioning of Fuqua, but deliberately chose not to. Please read pages 180 through 186 of TRV2, though other areas of the transcript evidence such as well, to see the level of impartiality exhibited by the Court in favor of Petitioner and the aid Petitioner received from the Court to prevent the value of the business from entering the record. Respondent had the right and responsibility to object to an expert report as hearsay until the expert was on the stand and a foundation laid. The Court used Respondent's objection to the hearsay document, appropriately made at the beginning of trial, to try to censor the record on the value of the business since Petitioner's goal was to exclude said value. It is evident in these pages that the Court was figuring out how Petitioner wanted her to rule so she could comply. Why would any Judge ask one party if it was THEIR intention to admit a produced trial exhibit or not and then exclude it based on THAT party's intention instead of on whether the document was authenticated by the expert and now admissible? This is clear impartiality and cannot be allowed in our Court system, especially family law courts where families' livelihoods are at stake. Real families whose lives are being turned upside down by a divorce are in desperate need of our Courts to be impartial, fair and to divide an estate in a just, right and fair manner and protect the well-being of ALL parties in the process.

As a result of more partiality, Respondent was cut short of her attorney questioning her and developing what she needed to develop in regards to abuse,

health issues and earning capacity, in addition to being censored in questioning Fuqua. When the Court was trying to figure out whole life policies, the Court stated she didn't hear certain evidence and Respondent's attorney stated, "Because I got cut short." (TRV3 P. 97, lines 21-22) The trial court responded "You didn't get cut short. You ran out of time." (TRV3 P. 97, lines 23-25) The record reflects how much time Respondent had for her attorney to develop her side of the case and how much time Petitioner had to develop his case. Please see the Offer of Proof for all the evidence Respondent was purposefully not given time to offer. (TRV3 P. 81, lines 24 – P. 84, line 19) This is impartiality, at best. Nonetheless, following Petitioner's leading questions to Fuqua making him testify as if he is completely incompetent and didn't know what he was doing when he rendered a valuation of the business (TRV3 P. 190, lines 23 – P. 192, line 20), Respondent, on redirect, was able to obtain the value of the business on the record. Fuqua testified the value of DHIA in 2022 was $ 728,000, and testified to the method he employed to derive at such valuation. Notice Fuqua testified that the valuation of $ 728,000, did not have anything to do with the termination payments because he testified that they were not considered in the valuation, as they should not have been. See as follows:

TRV2, P.193, line 3 – 25 (Fuqua Testimony)

> Q. So you're telling me that you did not have the State Farm Agreement when you rendered this opinion because you just testified earlier with me that you did?

A. We did not consider the State Farm Agreement nor the termination payments when we came up with that valuation.

Q. And how many years have you been doing this?

A. Twenty-five or 30.

Q. And how many divorce cases have you testified in?

A. Over a hundred.

Q. And do you normally not read the agreement that they have, though it's been provided to you, and you provided it as one of the things that you reviewed, prior to rendering your analysis of what you felt the business was worth?

A. No, we read it.

Q. So you did read it?

A. Yes.

Q. Okay. And so, all of the documents that were provided that you said you looked at that you reviewed when you rendered the $728,000 that you stated in your report that you reviewed, you did consider when you made your evaluation of $728,000, true?

A. Not as it being freely transferable and not with respect to the termination payments. We did not consider that.

TRV2, P. 194, lines 1 – 25 (Fuqua Testimony)

Q. Okay. Here's where I would like some help if you don't mind. I do not understand if the value is $748,600 based on 2022 or if it's $728,000?

A. 728,000. We used the capitalization of earnings met. We did not use the market data method.

17

Q. Okay. And when you did this analysis, on Report OO2857, okay, it was based on earnings of $331,790 and in 2019, $329,888, 2020, 335,274, '21, 371,474 '22, correct? This is your report.

A. Incorrect.

Q. Incorrect. So what did you use these numbers for –

A. You're confusing the term revenues and the term income.

Q. Okay. So in your total revenues, these numbers were part of your analysis, true?

A. True.

Q. And in 2023, have you seen that tax return?

A. I have.

Q: And how much was that?

A: As I sit here today, I cannot recall.

Q: So let me just show you that it is $438,000 for 2023.

A: The revenues?

Q: 1120, yes.

A: We look at the net income. We don't go into the revenues.

TRV2, P. 195, lines 1 – 10 (Fuqua Testimony)

Q. That would certainly not decrease a 728,000 dollar value, true?

A. Would you mind moving it up so we can see what the net income shows of 154,000?

Q. Yeah

A. That's the number that we would frequently use in trying to come up with our capitalization earnings method.

Q: Okay. Which you did the same thing, right, for these years?

A. Correct.

TRV2, P. 188, lines 4-8 (Fuqua Testimony)

Q. Okay. But you did provide a list of insurance agents that have sold their business, true?

A. I do believe that, in most of our valuation reports, we include some comparable's, if we can find them, similar companies that have been sold, yes.

TRV2, P. 195, lines 14-19 (Fuqua Testimony)

Q. When you do a valuation of a business, do you normally account for when somebody lives through the business?

A. Yeah, we try to consider any kind of personal expenses that were paid out of the business.

Q. And did you do that when you did this report?

A. Probably not to the extent that you would like us to.

Fuqua valued the business for $ 728,000, in 2022, with comparable, after reviewing the specific contract between DHIA and State Farm, looking at the revenue and income after considering personal expenses, and that report was to be used at trial as a number in which to award Respondent her share of the value of the business. All businesses have a value and this business should have been divided fifty-fifty (50/50). Of note, Fuqua did not update the valuation (EX F) as the earnings consistently increased, making the business likely worth more. (TRV2 P. 194, Lines

21-22) In reality, Petitioner would only have been giving Respondent less than one year's income on a business he will continue to earn almost half a million dollars on for years to come, making $ 364,000, not exactly a fair award either. The income that will continue to be made, after marriage, came from the renewal of premiums derived during the marriage. Had Petitioner not filed for divorce, Respondent would have benefited from the continued earnings of the community business and would not be in financial distress.

Though Fuqua was qualified to conduct a business valuation based on the revenue and income earned, he was and is not qualified to make decisions on whether State Farm would allow the servicing of policies by DHIA to be sold or assigned to another agent for a profit. A reasonable person would not believe that he could make such decision when he stated he was not a State Farm expert, not a State Farm representative and that he derived the information from Petitioner (TRV2 P. 172, lines 8-15) and when he admitted the contract says it can be sold with State Farm's permission. Nevertheless, the court would use the terminology, "the expert said", to attempt to justify her predetermined rulings regarding whether DHIA could be sold and how to calculate the value of the percentage for the extended termination pay, the two biggest disputed items in this divorce. Yet, the Court made clear when discussing termination payment values that there was NO State Farm expert. (TRV3 P. 107, lines 6-8, THE COURT: Unless you-all brought an expert in from State

Farm, which you did not, then the Court would have a hard number but we don't.") The Court is incorrect that a hard number does not exist and erred because State Farm gave the hard number on the value already earned as of the date of divorce as $ 6,888 for termination payment and $ 6,816 for extended termination payment. (See Exhibit B)

The ONLY State Farm evidence, before the Court, was the contract between State Farm and DHIA stating State Farm can give permission to sell or assign DHIA and the values earned, as of the date of divorce, for termination and for extended termination payments, all directly from State Farm. While Fuqua could value the business, Fuqua could not change the terms of the contract between State Farm and DHIA. While Fuqua could read the value of the termination and the extended termination payments, *already placed by State Farm themselves*, as of the date of divorce, on State Farm's document (Exhibit B), Fuqua cannot change the terms of the already earned value. In fact, an expert is not needed to know the value of the termination and extended termination payments because all one has to do is read State Farm's document, EX B. This document does not require expert knowledge. Fuqua also cannot change *Berry* which states retirement benefits are to be valued as of the date of divorce *AS IF ELIGIBLE TO RETIRE. Berry v. Berry*, 647 S.W.2d 945, 946 (Tex.1983) Expert testimony is not needed to read or understand: "The following are your estimated monthly termination and Extended Termination

21

Payments by company assuming a 5/31/2024 termination date.....Term Pay $ 6,888 and Ext Term Pay $ 6,816." (EX B)  Without question, the already earned amount as of the date of divorce, was known at the time the divorce decree was signed.  This is clear error, misapplication of the law, unjust, against the great weight of the evidence, and so manifestly unfair that it is just plain wrong.

The Court divesting Respondent/wife of ALL of her community interest in DHIA (TRV2 P. 179, lines 23-25 – P. 186, line 9, P. 188, lines 16 - P. 190, line 20, P. 199, lines 1-3), without any equalization, is an abuse of discretion.[5] The Court, after Petitioner's million inappropriate objections to Respondent questioning Mr. Fuqua of the DHIA valuation, though perfectly appropriate to do so, told Respondent, right as Respondent was starting to question Fuqua on the valuation of the business, *"Ms. Lopez, you're going to yield your time. Sit down"* (TRV2 P. 190, lines 17-18) and passed Fuqua back to Petitioner to undo his testimony.  Respondent was in shock, paralyzed, at the level of abuse of power, the level of impartiality and complete disregard for the rule of law. Respondent's counsel has never seen such blatant bias at a trial before. Though partiality and hostility has been the norm with this Court, this level of impartiality was not fathomable. The Fifth Court of Appeals

---

[5] *Craig v. Craig*, 31 Tex. 203, 204 (1868) (finding abuse of discretion when trial court's property division divested one party of "all his property".

has countless appeals regarding this Court. (See Court of Appeals 5th District) Clear abuse of discretion and of power.

The Court, the morning of trial, excluded Alex Vantarakis, Respondent's accountant expert who agreed with Fuqua's $ 728,000 valuation of DHIA up to year 2022. (TRV2 P. 148, line 24-25 & P. 152, line 23; TRV3 P. 84, line 14-18) Accordingly, Petitioner, with the aid of the Court, changed his trial strategy to exclude the business valuation, altogether, and argue 'the business cannot be sold" (TRV2 P. 180, lines 15-21, P. 181, lines 23-25, P. 182, line 1,P. 190, lines 1-5), arguing that Respondent receives zero of her interest in the business.

Nonetheless, the Court not dividing the $ 728,000 value allowed Petitioner a windfall of $ 364,000.00, that unequivocally belongs to Respondent. This is clear error. *Sharma vs. Routh*, 302 S.W. 3d 355, 360 (Tex. App. -Houston, [14[th] District] 2009, no petition) The estate was large enough to, at a minimum, assess that value elsewhere. For instance, the Court could have awarded all three beach front lots, 107 Nesmith, to Respondent to equalize the value of the business, instead of a 35%/65% net profit split, which was made to equalize Petitioner receiving all of the whole life policies. With that said, Respondent needs income so a buyout would have allowed Respondent income to live on while still allowing Petitioner a large income as well.

Fuqua, was paid a minimum of $ 8,000.00 (TRV2 P. 174, line 24) to value the business and he testified that he took various factors, such as income and revenue into account when assessing the value. (TRV2 P. 194, lines 14-16, 24) Fuqua would not have been hired to conduct a business valuation if DHIA did not have a value to divide upon divorce.

1. **EVIDENCE IGNORED BY THE COURT**

   **a.** DHIA/State Farm contract states under Section VI (B):

   "…..and no right in any sum due or to become due to the agent hereunder can be sold, assigned, or pledged *without the prior written consent of the Companies.*" (TRV2 P. 461 – 472, EX J) Clearly, an agency can be sold to another State Farm agent with State Farm permission.

   **b.** Fuqua admits he read the contract **prior to** rendering his report. (TRV2 P. 193, Line 12-18)

   **c.** Fuqua's valuation of $ 728,000. (EX F and prior paragraphs)

   **d.** Fuqua's admission that the contract states the agency can be sold with State Farm permission. See Fuqua's testimony TRV2 P. 186, lines 24 – 25 and TRV2 P. 187, lines 1-9:

Q. And you testified today that an insurance agency that is contracted with State Farm is unable to be sold or assigned, true, to anyone?

A. Not without State Farm's permission that is correct.

Q. So with State Farm's permission, then it can be assigned?

A. Conceptually, if State Farm were to agree to it, I guess that it could. Like I said, because of the termination payments, being so lucrative, no one would want to jeopardize their termination payments by either trying to sell or compete against State Farm. It's just not logical.

Fuqua's assertion that if the agency is sold or assigned for a profit termination payments are forfeited is unfounded, not grounded in anything and not logical. There is no evidence that says that if an agent sells his book of business, with State Farm permission, to obviously an approved agent he/she loses his termination payments. What is not logical here is for State Farm to give permission for an agent to sell their business to Allstate or another insurance company's agent, thereby competing with State Farm. Termination payments are not affected by selling an agency to another State Farm agent with State Farm permission as the seller/agent is not competing with State Farm. As Fuqua states, "Like I said, because of the termination payments, being so lucrative, no one would want to jeopardize their termination

25

payments by either trying to sell or compete against State Farm. It's just not logical." It is definitely not logical for an agent to not seek State Farm permission to sell the agency to another State Farm agent and it would not be logical to retire before receiving full retirement benefits.

e. Fuqua's admission that insurance agencies are sold and valued by similar comparables and that he did such in this case. (TRV2 P. 188, lines 4-8)

f. No State Farm expert testimony was in evidence, as Court admits,[6] other than documents straight from State Farm.

g. Fuqua admitted he is not a State Farm expert or representative, nor has he ever worked for State Farm (TRV2 p. 172, lines 4-7p. 174, lines 14-16) and only knows about State Farm through Petitioner and the agent's agreement. (TRV2 P. 172, lines 8-15)

h. Petitioner admits his father transferred accounts to him when he got started. (TRV2 P. 91, lines 18-23)

i. Petitioner admits his contract states agency can be sold with State Farm permission. (TRV2 p. 94, lines 15-19)

---

[6] TRV3 P. 107 "The Court: Unless you-all brought an expert in from State Farm, which you did not..... ";

j. Fuqua, thirty-year accountant, clearly valued DHIA. (TRV2 p. 193, line 8-9; EX F)

k. Petitioner's admission that no State Farm expert is there to validate his testimony that contradicts the DHIA/State Farm contract. (TRV2 P. 94, lines 23-25, P. 95, Line 1)

l. Petitioner's admission, that he himself, hired Fuqua to value DHIA. (TRV2 P. 95, lines 4-6)

Without FFCL, it appears the Court used the excuse to completely divest Respondent of her interest in DHIA on insufficient evidence and grounds, relying on contradictory verbiage from a non State Farm expert, that "the business cannot be sold" (TRV2 P. 199, lines 1-3), while also admitting it can be sold with State Farm permission, and all while ignoring the actual State Farm evidence stating in black and white that it can be sold with permission and the admissions thereto. No reasonable, fair minded person would disregard the State Farm/DHIA contract and admissions, and award the wife zero for the value of the business, nor at a minimum equalize Respondent's share elsewhere in the estate. This is legally and factually insufficient evidence, clear error, an abuse of discretion, manifestly unjust and so unfair to just be plain wrong. Even if the business could not be sold, *a divisible value still exists, which is why a value was placed, and a reasonable and objective fair minded person would divide it.* Should DHIA not be able to be sold and/or had no

27

value to divide upon divorce, either way, Petitioner would not have spent $ 8,000 valuing the business and would have hired a State Farm expert to come state that the business cannot be sold or assigned through any manner. Petitioner, himself, received assigned accounts in the past. Of note, the termination payments are not payments made for the sale of the business either.[7] Those benefits are separate and apart from the sale of the business.

In *Hancock*, the spouse owned an insurance agency with no buyers, derived during the marriage, and the Court considered this agency to be a community business that consisted of an insurance agency receiving income from renewal of premiums that arose during the marriage. *Hancock v. Hancock*, No. 2-06-376-CV (Tex. App. 7/31/2007, No. 2-06-376-CV (Tex. App. Jul 31, 2008) "Because the business was the community asset being valued, not the individual renewals, we cannot say that Rice improperly considered the anticipated revenue in valuing the agency or that the trial court abused its discretion by including the amount in its valuation of the agency." *Id* at *7 "Based on the above discussion, we hold that the trial court did not abuse its discretion by valuing the insurance agency at $ 170,520.00." *Id.* Similar to *Hancock,* DHIA had a value placed, $ 728,000, after

---

[7] "While Baker built the insurance agency; the tools he used were on loan from State Farm. State Farm's termination payments were not for the sale of a business where a buyer was able to step into the seller's shoes." *Warren Baker, JR and Dorris J. Baker vs. Commissioner of Internal Revenue*, No. 02-3262 US Court of Appeals (2003) Termination Payments are ordinary income." *Id* at 5.

considering all factors and the Court should have divided the value the same as in *Hancock.* Regardless of whether there was a buyer, whether or not it could be sold, the law requires a fair, just and right division of a marital estate and to arrive at such the Court should have awarded $ 364,000, to be paid to Respondent over time, or have equalized the division of the estate by awarding Respondent her share of DHIA, $ 364,000, in another manner such as all of 107 Nesmith.

## C. UNEQUAL DIVISION OF THE MARTIAL ESTATE CAN EASILY BE REMEDIED

The disparagingly disproportionate and unfair overall division of the community estate can be remedied by this Honorable Court by ordering the trial court to award Respondent her $ 364,000, interest in DHIA, to be paid over a period of time. This is not to include retirement benefits or spousal maintenance. Awarding Respondent her share of the $ 364,000, to be paid over time, would better equalize the estate to a 51/49% division of the marital estate, though Petitioner will continue to make substantial income for years to come based on the renewal of premiums derived during the 23 year marriage. This would also allow Respondent to have an income to qualify to assume the mortgage on Elsby and afford her an opportunity to rehabilitate herself in the workforce while not becoming indigent in the process, as she is fifty-five years of age and ill. (TRV3 P. 50, lines 11- P. 51, line 12) Retirement is built over decades, not over ten years. By the time Respondent is sixty years of age, she would have used all of the retirement fund awarded to her to meet her

minimum reasonable needs since that is how she is supporting herself now while trying to build a real estate and mortgage company, after being denied countless jobs. (SRSM P. 47, lines 12-21, P. 29, lines 7- P. 30, line 8) Being awarded one half of the real property was just but it takes time to sell real property and in the meantime property taxes, mortgage, living and upkeep must be paid. Divesting Respondent of $ 364,000, that rightfully belongs to her, when an estate could support awarding such to the wife, is an abuse of discretion as that lack of division is manifestly unjust and unfair. Our legislatures and Courts created the standard, just, right and fair division of a marital estate to protect both parties in a divorce.

Furthermore, Petitioner rendered the estate cash poor so there was not much liquid money to divide for the wife to live on. (EX A) The money that could be borrowed against, without having to qualify, were the whole life policies which were given to Petitioner completely. This left Respondent without a way to access any money since she does not currently qualify for loans. Now that the community business was given to the Petitioner, without a buyout, Petitioner earns about $ 35,000 to $ 40,000 per month while Respondent earns $ 0.00 per month. This must be equalized. In fact, Respondent is paying for leads, with her retirement money she is pulling out, to try to obtain real estate and mortgage clients but has received zero income to date. (See Spousal Maintenance section of the brief) Petitioner filed for divorce, not Respondent, and had Respondent still been married she would also be

earning $35,000 to $40,000 per month and would not be in financial distress. Given the factors in *Murf*, if an unequal division of the estate were to occur, it would have been reasonable for Respondent to receive a higher percentage of the estate due to her lack of income, age, years of marriage, health and the nature of the property.

Respondent prays this Honorable Court reverse the trial Court and award Respondent $ 364,000, for her share of DHIA, to be paid over time.

**II.    THE TRIAL COURT ERRED, MISAPPLIED THE LAW AND ABUSED HER DISCRETION IN REDUCING THE VALUE OF RESPONDENT'S EXTENDED TERMINTION PAYMENTS (RETIREMENT BENEFITS) WHEN A CLEAR VALUE EXISTED AT THE TIME OF DIVORCE**

The Court erroneously reduced the value of Respondent's extended termination pay from 31.63% of $ 6,816.00 to 31.63% of $ 4,269.00 based on insufficient evidence, not understanding what "actuarial" means, a misapplication of and contrary to law. (TRV3 P. 106, line 24- P. 110, lines 9; EX B & C; CR P. 84-114 & TRV3 P. 816) There is no "actuarial division" at State Farm, as stated by the Court, (TRV3 P. 109, lines 13-14) evidencing that she did not understand what her ruling actually was. The Court refused to view Exhibit B (TRV3 P. 106, lines 11-12), which Respondent was utilizing to seek clarification on whether the 31.63% would apply against the $ 6,701 or the actuarily reduced amount of $ 4,169.00, values assessed as of May 30, 2024. The document, EX B, clearly shows the numbers earned, as of May 30, 2024, and below a different set of numbers if one

retires early. It would not be logical, as stated by Fuqua, to risk losing full retirement benefits. Consequently, Petitioner, if he didn't qualify under the Early Notification Program to retire on June 20, 2024, for full benefits, would not likely retire before the age of sixty-five (65) since he was a few months shy of sixty (60) years of age upon divorce. With that said, Petitioner already qualified for full benefits under the Early Notification Program. The Court would not allow Respondent to place the document so that clarification could be obtained. (TRV3 P. 105, line 23 – P. 106, lines 23) However, the Court allowed Petitioner to argue facts so she could comply with their analysis to award the actuarily reduced value of extended termination payments, instead of the already earned amount, that she herself did not understand. State Farm, themselves, had already determined the value of benefits earned as of June 20, 2024, the date of divorce, in black and white, and the Court ignored that. (EX B) State Farm's evidence weighs much more than an accountant who has never worked for State Farm, nor is a State Farm expert. Clearly, the Court erred by not understanding what actuarially reduced is, by ignoring State Farm's clear numbers/values as of the date of divorce and not applying the correct value to Respondent's 31.63% of the extended termination payments (EX B; TRV3 P. 6-8), regardless of Fuqua's non State Farm expert testimony, and in compliance with *Berry* and *Wade*.

Extended termination payments are characterized as community property and should be divided upon divorce.[8] The court properly characterized the extended termination pay as community property. (TRV3 P. 88, line 22) The Court properly determined the percentage of 31.63% of the retirement benefits, based on the years of marriage. However, the court committed error when she reduced the value of these retirement benefits without following *Berry, Wade and other case law*, and without an understanding of what "actuarily reduced" is as she thought that was a division of State Farm. When the value of such benefits is in issue, however, the benefits are to be apportioned to the spouse based upon the value of the community's interest at the time of divorce. *Matter of Marriage of Wade*, 923 S.W.2d 735 at *739 (1996); *Berry v. Berry*, 647 S.W.2d 945, 947 (Tex.1983) "Specifically, the trial court is to determine the amount of benefits the earning spouse would receive on the date of divorce **IF** he or she **WERE ELIGIBLE** for the benefits on that date. *Id* at 946. Though Petitioner, as of May 30, 2024, qualified for the $ 6,701, and as of June 20, 2024, qualified for the $ 6,816, value of extended termination payments under the Early Termination Program (EX B), Respondent argues, in the alternative, under *Berry* and *Wade*,

---

[8] "Unmatured retirement benefits earned during marriage are community assets subject to division upon divorce; such benefits are not earned on day on which they mature, but are instead a form of deferred compensation earned each month of employment; at time of divorce, they constitute contingent property interest of the marital estate." *In the Matter of the Marriage of William C. Wade and Frances Carol Wade*, 923 S.W.2d 735 (Tex.App.-Texarkana, 1996, no writ);

this deferred compensation is valued as if ELIGIBLE TO RETIRE, regardless. The $ 6,701 value was undisputedly earned as of May 30, 2024, according to State Farm. (EX B) Because Petitioner was not sixty-five (65), at the time of divorce, does not negate the value earned as of the date of divorce, June 20, 2024, which was $ 6,816. (EX B) If Petitioner did not qualify under the Early Notification Program, which he did, then IF he were fully eligible to retire on the date of divorce the value of extended termination payments was $ 6,816.00, as per State Farm, the ONLY State Farm evidence. By the time Petitioner retires, that amount will increase. Respondent is not entitled to the increase over $ 6,816.00, and did not request for any amount above $ 6,816.00.

Our legislatures would never devise a system where retirement benefits are earned during a marriage, but upon divorce, the nonworking spouse doesn't acquire the already earned retirement benefits just because the working spouse is not eligible to RECEIVE them at the time of divorce. That would be unjust leaving a working spouse with all of the retirement and the nonworking spouse, who likely cared for the kids and for the working spouse, for years, without a retirement at all. Many companies do not provide retirement benefits at all if one retires before the designated age of retirement with that company. All of those nonworking spouses, or stay at home spouses, would not have any retirement income under

that scenario. Our legislature protects nonworking spouses and stay at home moms and dads from this very abuse.

In *Berry*, Berry, at the time of divorce, was NOT entitled to ANY retirement benefits at all because he was not yet sixty years of age, which was the prerequisite under the noncontributory retirement plan. *Berry*, 647 S.W.2d 945 (Tex.1983) However, though Berry was making $ 946.34 per month, at actual retirement, Berry would have received $ 221.21 per month had he been fully eligible to retire at the time of divorce. *Id.* at 946. Berry had already earned $ 221.21 per month for retirement at the time of divorce but could not receive it until he was 60 years of age. Similarly, Petitioner had already earned $ 6,816.00, per month, but was not yet eligible to receive it, since he was not yet 65 years of age, that is if he did not qualify already under the Early Notification Program.

Though Ms. Berry was not entitled to any post divorce increases in retirement benefits, she was entitled to $ 110.60 per month, 50% of what the value was at the time of divorce AS IF ELIGIBLE to retire. *Id.* Similarly, Respondent is entitled to receive 31.63% (based on years of marriage) of $ 6,816, as of the date of divorce, as if Petitioner was 65 years of age and fully eligible to retire on the date of divorce. Again, Petitioner was actually already eligible under the Early Notification Program as well. (EX B)

Reducing the value of Respondent's extended termination payments was clear error, unjust, unfair, misapplication of law, misunderstanding of the facts and law, a misunderstanding of what actuarily reduced means and how that does or does not apply, and an abuse of discretion. Logically, Petitioner would have hired a State Farm expert to testify had the value been $ 4,269.00, at the time of divorce. In reality, had a State Farm expert testified, that expert would have reiterated the document produced by State Farm that the earned value is $ 6,816.00, at the time of divorce.

Respondent requests this Honorable Court order the trial Court to award Respondent 31.63% of $ 6,816.00, the value at the time of divorce, to be paid for Extended Termination payments if, as and when received by Petitioner.

## III.    THE TRIAL COURT ERRED AND ABUSED HER DISCRETION IN DENYING SPOUSAL MAINTENANCE

Under Tex. Fam. Code Sec. 8.051, 8.052, 8.053, and 8.054, the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs if the spouse has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs and has exercised reasonable diligence in earning sufficient income to provide for her

minimum reasonable needs or developing skills necessary to provide for her minimum reasonable needs.

Here, though there is much real property, the nonworking spouse, wife and mother, does not have any income, nor liquid assets, nor does she have any access to borrowing money. In fact, Respondent was left without sufficient money to pay for her own counsel. As such, Respondent's first attorneys were not fully defending Respondent and minimizing the required discovery disclosures. (SCR P. 7, 11) Said counsel withdrew from representing Respondent. (SCR P. 13) Respondent's sister filed a notice of appearance and represented Respondent free of charge (SCR P. 17) because Respondent had been left without money. Moreover, Respondent had to file a Motion for Temporary Orders because Petitioner had closed bank accounts and credit cards preventing Respondent from accessing any money to live and pay bills while one child was still under 18 years of age. (SCR P. 20 – 22) Petitioner spent roughly $ 109,000, in one attorneys' fees (TRV3 P. 76, line 3), and unnecessarily brought in another attorney from San Antonio, Orsinger, as well, and spent more money on attorneys' fees. Petitioner benefited greatly from Respondent's sister not having charged the estate to defend Respondent the same $ 109,000 + Orsinger's fees, Petitioner's attorneys gained. The time Respondent and her attorney spent to attempt to figure out the finances was enormous since Petitioner controlled all of the finances. With that said, attorneys were not necessary at all for Petitioner since

Respondent's sister offered to draft the decree for free provided all would be split 50/50. (TRV3 P. 146, lines 4 – 12)

Furthermore, had the Court awarded Respondent some of the whole life policies, she could have at least borrowed against them, without having to qualify for a loan, to help pay for her share of the real property taxes and upkeep and to otherwise survive. See as follows:

SRSM P. 39, lines 16-23 (Maribel Hill Testimony)

Q. (By Ms. Lopez) Do you currently have financial stability?

A. No.

Q. The whole life policies, would they have provided you a way to have income?

A. Yes.

Q. Do you qualify for a loan currently?

A. No.

The marital estate paid on the while life policies for 23 years and the policies were in debt at the time of marriage. (TRV3 P. 49, lines 6 – P. 50, line 10 )

Respondent qualifies for spousal maintenance. (SRSM; SCR P. 225-244 & P. 448-523) She was a stay-at-home wife and mother for twenty-three years (TRV3 P. 70, lines 24-25, P. 71, lines 1-7, P. 72, lines 14-15) and now lacks the ability and health to earn sufficient income to provide for her minimum reasonable needs.

(TRV3, P. 31- P. 32, line 14, P. 10, lines 12-16, P. 51, lines 11-16, P. 52, line 25, P. 53 – P. 54, line 17; SME entire transcript, SME P. 9 line, 16 – P. 11, P. 14, lines 6-25, P. 15 lines 1-25, P. 16, lines 1-21, P. 23, lines 23-25, P. 23, lines 1-3, P. 37, lines 4-20, 24, P. 38 line 1-24; SRSM entire transcript) Respondent, though credentialed, lost earning capacity by being at home tending to her husband and kids instead of building her career. While separated and thereafter, Respondent took classes to learn the new market in real estate, study and retake her exams for her mortgage license and applied for countless jobs of which she was repeatedly denied employment. (SCR p. 225-244, 448-523; SRSM transcript) Respondent, age 55, could only obtain 100% commission jobs in the real estate and mortgage market and sadly has not had one closing. (SCR p 225-244, 448-523; SRSM transcript) Respondent had to file for temporary spousal maintenance pending appeal, and after three settings (SCR P. 1-4), of which Respondent was turned away from at the Courtroom, on the third try the motion was finally heard but never ruled on. (CR P. 12) The evidence at trial showed Respondent did not earn money in any business venture during the marriage. (TRV3 P. 30 - P. 31, line 15) The estate was kept cash poor (EX A) All whole life policies that could be borrowed against were given to the husband. (TRV3 P. 95, lines 21-24) Real property exists that has not sold and costs money to maintain and a wife/mother, like all human beings, have financial needs to survive. Currently, Respondent is paying penalties and taxes on the money she is having to pull out to

survive from her retirement account. Respondent has applied for countless jobs but no one will employ her. See as follows:

SRSM P. 37, lines 4-21 (Maribel Hill Testimony)

Q. Why are you asking the Court of Appeals to find you indigent for purposes of appeal?

A. Because I do not have an income, and I have been looking for a job, and I was not awarded any spousal maintenance nor was I awarded half of the business that was created after marriage.

Q. Do you have an income?

A. No.

Q. Do you have access to cash money?

A. I have investments that when I pull out, I have to pay penalty and taxes on.

Q. Is that how you're living today?

A. Yes.

Q. How did you pay property taxes?

A. Pulling out money from my retirement.

Q. And, at this point, when will that retirement be exhausted?

A. Within three years.

SRSM P. 38, lines 11- 24 (Maribel Hill Testimony)

Q. Have you done everything that you can to find a job?

A. Yes.

Q. Are you trying to rehabilitate yourself in the workforce?

A. Yes.

Q. Did you take classes to rehabilitate yourself in the workforce?

A. Yes, real estate and mortgage classes.

Q. And who was the primary caregiver of the kids?

A. Me.

Q. And do these kids still come home to stay with you?

A. They live with me.

Respondent deserves the opportunity to transition into independent living without becoming indigent in the process. Justice is severely compromised when one spouse is allowed to remain with the entire community property business and earn $ 35,000 to $ 40,000 per month, while the stay at home mom and wife of 23 years becomes indigent and can't support her reasonable needs because she is no longer marketable in the workforce. The nature of the property divided was mainly real property that requires an income to maintain and not lose in a foreclosure. As already stated, the only liquid money was in the whole life policies and in the income generated by DHIA. A reasonable and fair minded person would never leave a nonworking spouse without access to liquid money or award an entire community business to one spouse. This is an injustice, unreasonable and just plain wrong. Our legislatures devised Tex. Fam. Code Sec. 8.051, 8.052, 8.053, and 8.054, to help the

41

class of people just like Respondent from becoming indigent as a result of staying at home to care for the family, instead of building their careers, and then finding themselves divorced and indigent. Respondent is the very person our legislatures created these statutes to protect. Respondent qualifies and has complied with all of the necessary requirements and deserves the protections afforded her under Tex. Fam. Code Sec. 8.051, 8.052, 8.053, and 8.054. Spousal maintenance should have been awarded for at least five years.

Respondent prays that this Honorable Court will order the trial Court to award Respondent $ 5,000.00, per month, as spousal maintenance for five years, which is only half of what Respondent needs to meet her minimum reasonable needs to survive and to maintain her real property while she rehabilitates herself in the workforce.

## IV. FOLLOWING A BENCH TRIAL, RESPONDENT TIMELY FILED HER FINDINGS OF FACT AND CONCLUSIONS OF LAW AND HER NOTICE OF PAST DUE FINDINGS OF FACT AND CONCLUSIONS OF LAW. DESPITE AN OBLIGATION TO DO SO, THE TRIAL COURT NEVER MADE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

What was the basis for why the Court awarded the entire community property business to the husband without an equalization of the value of the business to wife? What was the basis for why the Court reduced the already earned value of the extended termination payments to the wife, especially since she thought State Farm

had an "actuarial division"? What was the basis for not awarding ANY spousal maintenance and ignoring that our legislatures allow up to seven years of spousal maintenance, Sec. 8.054 (1)(B), to a stay at home wife and mom of twenty-three (23) years to give her an opportunity to rehabilitate herself in the workforce and not become homeless at the age of sixty (60)? What was the basis, after hearing that the wife had not been able to gain employment and had zero income or way to access money, because the Court depleted her of that, other than to drain her retirement account, for not awarding any spousal maintenance, even pending appeal?

Findings of fact and conclusions of law would certainly help answer these questions. Respondent timely filed her request for findings of fact and conclusions of law. (CR P. 113-118) Respondent timely filed her past due notice for findings of fact and conclusions of law. (CR P. 164-166) The Court requested Petitioner's attorney draft her findings of fact and conclusions of law (TRV3 P. 110, lines 1-9) to which Respondent objected to. (CR P. 186-189) That practice only gives opposing counsel an opportunity to state what he/she wants a court to determine and defeats the purpose of receiving FFCL from the Court. Such a practice should never be allowed in our court system. Nevertheless, the court failed to make her findings of fact and conclusions of law.

When a trial court has served as the fact finder, the trial court is required to make findings of fact and conclusions of law following a timely request. *Cherne*

*Indus., Inc. V. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989) ("the trial court's duty to file findings and conclusions is mandatory"); *Landerman v. State Bar of Texas*, 247 S.W.3d 426, 430 (Tex. App. – Dallas 2008, pet denied) ("When properly requested, the trial court has a mandatory duty to file findings of fact."); see also Tex. R. Civ. P. 297 ("The court shall file its findings of fact and conclusions of law.") Moreover, a trial court's failure to make findings of fact and conclusions of law is generally presumed harmful. *Tenery v. Tenery*, 932 S.W. 2d 29, 30 (Tex. 1996); *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989). The court should have made findings of fact and conclusions of law and given Respondent the opportunity to understand how the awards, and lack thereof, raised in this appeal complied with the laws that Texas has to ensure that a just, right and fair division of a marital estate ensues while protecting the rights and well-being of BOTH parties, not just one. This also would have afforded Respondent the opportunity to request additional findings of fact to clarify any remaining questions. Tex. R. Civ. P. 298.

## V. PRAYER

Respondent prays this Honorable Court will reverse the trial court's judgment and equalize the division of the community estate by rendering judgment that Respondent is entitled to $ 364,000, her share of the value of DHIA, to be paid monthly over the course of three years, render judgment that the value of the

extended termination pay be that of $ 6,816.00 to be paid at 31.63% to the wife, as, if and when received by Petitioner and render judgment that Petitioner is to pay Respondent $ 5,000 per month for five years in spousal maintenance. Respondent further prays that this Honorable Court will reverse the trial's court's order requiring Respondent to sign a Deed of Trust to Secure Assumption, on behalf of Petitioner, for Respondent's separate property. Alternatively, Respondent prays that this Court reverse and remand with instructions that the trial court make findings of fact and conclusions of law, herself, and not allow Petitioner's attorneys to draft such for her. Respondent also prays for her costs and for all other relief to which she may be entitled.

Respectfully submitted,

_____*/s/ Marisol Lopez*_____
MARISOL LOPEZ LAW FIRM
Marisol Lopez
State Bar No 24050952
301 W Avenue D
Garland, TX 75040
972-205-1110 office
1-866-232-2077 facsimile
marisol@lawyerforu.com

## CERTIFICATE OF COMPLIANCE

I certify that, according to my word processor's word-count function, in the sections of this brief covered by TRAP 9.4(i)(1), there are 10,892 words.

*/s/ Marisol Lopez*
Marisol Lopez

## CERTIFICATE OF SERVICE

Counsel for Movant/Appellant certifies that a true copy of this Notice has been forwarded in accordance with TRAP 9.5 this _21st_ day of August, 2025 to


Petitioner Dwight Hill's lead attorney:

EPSTEIN FAMILY LAW, P.C.
Robert D. Epstein
State Bar No. 24065206
robert@epsteinpc.com
5949 Sherry Lane, Suite 1070
Dallas, TX 75225
Tel: (972) 232-7673

And

ORSINGER, NELSON, DOWNING & ANDERSON, LLP
Richard R. Orsinger
State Bar NO. 15322500
425 Soledad, Suite 550
San Antonio, Texas 78205
210-225-5567
richard@ondafamilylaw.com

Attorneys for Petitioner/Appellee


_____*/s/ Marisol Lopez*
Marisol Lopez

*Attorney for Maribel Hill,*
*Respondent/Appellant*

46

# APPENDIX



# EXHIBIT A

# WIFE'S AMENDED PROPERTY DIVISION

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| | **COMMUNITY ASSETS** | | | | | | | |
| | **REAL PROPERTY (including Mineral Interests)** | | | | | | | |
| 1 | **1211 Ft Velasco**, Surfside Beach, TX 77541 | $265,000 | $350,000 | | | $265,000 | 0% | 100% |
| 2 | **123 Nesmith Pl**, Surfside Beach, TX 77541 (agreed) | $75,000 | $75,000 | | $75,000 | | 100% | 0% |
| 3 | **107 Nesmith Pl**, Sufside Beach, TX 77541 (Lots 1, 2 & 3) Lot 3 is currently for sale but price needs to be lowered (Propose Lot 1 for W, Lot 2 for H and Lot 3 sold) | $546,000 | $546,000 | | $273,000 | $273,000 | 50% | 50% |
| 4 | **118 Nesmith Pl**, Surfside Beach, TX 77541 (Agreed) | $75,000 | $75,000 | | | $75,000 | 0% | 100% |
| | **CASH AND ACCOUNTS WITH FINANCIAL INSTITUTIONS (including Brokerage and Mutual Funds)** | | | | | | | |
| 5 | Cash on Hand (H) | | $10,000 | | $10,000 | | 100% | 0% |
| 6 | PNC Bank Checking account ending **6118** (H&W) a/o 6/10/24 (agreed) | | $126 | | $126 | | 100% | 0% |
| 7 | PNC Bank DLH Separate Savings accountending **2065** (H) a/o 5/15/24 (agreed) | | $27 | | $27 | | 100% | 0% |
| 8 | State Farm FCU Reglar Share Account / Dwight Hill ending 8951/member ID Savings account ending **2289 S1** (H&W) a/o 5/15/24 (agreed) | | $204 | | $102 | $102 | 50% | 50% |
| 9 | PNC Bank Personal Checking account ending **4643** (H&W) a/o 6/10/24 (agreed) | | $8,533 | | $4,267 | $4,267 | 50% | 50% |
| 10 | PNC Bank Ava Education Account Checking account ending **2033** (Ava, H&W) a/o 6/10/24 used as a way to transfer money to Ava (agreed) | $2,097 | for Ava | | for Ava | for Ava | | |
| 11 | PNC Bank Checking account ending **2183** (H) a/o 5/15/24 (agreed) | | $14,327 | | $14,327 | | 100% | 0% |
| 12 | State Farm Funds Brokerage Joint Tenants account ending **5608** (H&W) a/o 6/10/24 (agreed) | | $17,978 | | $8,989 | $8,989 | 50% | 50% |
| 13 | JP Morgan Chase Bank Chase Checking ending **2507** (H&W) a/o 4/10/23 (account closed) | | Closed | | Closed | Closed | | |
| 14 | JP Morgan Chase Bank Chase Total Checking account ending **2380** (W) a/o 5/8/24; W transferred from Chase ending in 2507 (Agreed separate acct); H had an acct also receiving same amount. | $52,742 | $52,742 | | | $52,742 | 0% | 100% |



PLAINTIFFS EXHIBIT
Amended
W 2

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| CLOSELY HELD BUSINESS INTERESTS | | | | | | | | |
| 15 | Restore Entertainment, LLC DBA Mousika Publishing | | X | | | X | 0% | 100% |
| a | Chase Bank Complete Business Checking account ending in 6763 (W) a/o 5/8/24 (agreed) | | $544 | | | $544 | 0% | 100% |
| b | Investment into Restore Entertainment from community (both were investors & both lost money) | $0 | $80,000 | | | $0 | 0% | 100% |
| 16 | Dwight Hill Insurance Agency, Inc. (appraisal not updated with higher numbers though income higher) | > $728,000 | $0 | | $400,000 | $400,000 | 50% | 50% |
| a | PNC Bank Business Checking account ending in 3338 (H&W) a/o 05/15/24 (Agreed leave $ 3k and split remainder) | $2,441 | | | X | | 50% | 50% |
| b | 2022 Toyota 4Runner (in possession of Ava) a/o 05/31/24; (Agreed title to Ava Hill) | $43,000 | | | | | 0% | 0%% |
| 17 | Grateful Hippies LLC (Agreed assign to wife) | $0 | | | | X | 0% | 100% |
| a | PNC Bank Business Checking account ending in 4123 (H&W) a/o 5/15/24 (Agreed) | | $117 | | | $117 | 0% | 100% |
| RETIREMENT ACCOUNTS AND OTHER DEFERRED COMPENSATION (Including Union Benefits) 50/50 as of | | | | | | | | |
| 18 | State Farm Fund Maribel Hill Roth IRA ending in 9212 (W) a/o 6/10/24 | $34,521 | $30,500 | | $17,261 | $17,261 | 50% | 50% |
| 19 | State Farm Fund Dwight Hill Roth IRA ending in 9211 (H) a/o 5/15/24 | | $33,815 | | $16,908 | $16,908 | 50% | 50% |
| 20 | State Farm Pershing 4620 ROTH IRA formerly State Farm BlackRock A6KTA (current account balance as of 5/8/24); Dwight's account; account is of mixed character | | $615,382 | | $307,691 | $307,691 | 50% | 50% |
| 21 | State Farm Pershing 9931 ROTH IRA formery State Farm BlackRock A6KTA (current account balance as of 5/15/24); Dwight's account; account is of mixed character | | $155,547 | | $77,774 | $77,774 | 50% | 50% |
| 22 | Ascensus Trust IRA Services account ending in 2370 (also known as State Farm Brokerage Investment 6955 - subaccount) (H) a/o 5/8/24 | | $63,078 | | $31,539 | $31,539 | 50% | 50% |
| 23 | Ascensus Trust IRA Services account ending in 2370 (also known as State Farm Brokerage Investment 6956 - subaccount) (W) a/o 6/7/24 | $50,650 | $49,752 | | $25,325 | $25,325 | 50% | 50% |
| 24 | State Farm Blackrock Maribel L Hill ending in C17dn (W) same as 4612 a/o 6/10/24 | $111,051 | $109,964 | | $55,526 | $55,526 | 50% | 50% |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| 25 | State Farm Blackrock Maribel L Hill ROTH IRA ending in C9ASY same as 9964 a/o 6/10/24 | $146,435 | $143,926 | | $73,218 | $73,218 | 50% | 50% |
| | **OTHER DEFERRED COMPENSATION BENEFITS** | | | | | | | |
| 26 | Termination Payments for H employment through SF paid out monthly after H retires; 66% to Husband and 34 % to wife = $ 2,710.40 first 5 years an d then $ 2,680.40 after 5 years forward); H gets $ 4,472.16 first 5 years and $ 2,680.40 after first 5 years; H will actually get more by teh time he retires | | | | | | 66% | 34% |
| | **MOTOR VEHICLES, BOATS, AIRPLANES, CYCLES, ETC.** | | | | | | | |
| 27 | Honda Scooter Elite (Name on title: H); at 4647 Elsby; W claims her name is on title | $600 | $600 | | $600 | | 100% | 0% |
| 28 | 2014 Club Car Gas xtr 850 (Name on title: H); at 1211 Surfside Beach (goes w whoever has Velasco) | $2,500 | $5,000 | | | | | |
| 29 | 2010 Lexus LX570 (Name on title: H&W); in possession of H (No lien) ( Agreed) | $22,000 | $20,000 | | $20,000 | | 100% | 0% |
| 30 | 2021 Mazda CX-5 (Name on title: W); in possession of Wife ( Agreed) | $24,000 | $25,000 | | | $25,000 | 0% | 100% |
| 31 | 2022 Ford F-150 (Name on title: H&W); in possession of Jacob ($45,000 FMV less $2,157 owed a/o 10/25/23; paid off a/o 3/12/24) **Vehicle to be titled to Jacob Hill. Agreed** | $48,000 | | | | | | |
| | **MISCELLANEOUS ASSETS** | | | | | | | |
| 32 | Clothes, bicycle, books, guitar, tools (poss: H) | | $5,000 | | $5,000 | | 100% | 0% |
| 33 | Household furnishings, musical instruments & tools (Agreed) | $5,000 | $8,000 | | | $5,000 | 0% | 100% |
| 34 | Computer monitors (x2) (poss: H) (Agreed) | | $100 | | $100 | | 100% | 0% |
| 35 | Glock 26 (poss: H) (Agreed) | | $500 | | $500 | | 100% | 0% |
| 36 | Sig P238 (poss: W) (Agreed) | $450 | $600 | | | $450 | 0% | 100% |
| 37 | 4.53 ct Diamond/Platinum Ring (poss: W) (can nsure jewlrey w no appraisal but not even insured for that amount); gift to W | no appraisal/gift | $75,000 | | | | 0% | 100% |
| 38 | Diamond necklace (poss: W); (can insure for whatever but not even insured for that); Gift to W | no appraisal/gift | $15,000 | | | | 0% | 100% |
| 39 | Maribel Hill Music (Agreed) | $0 | unknown | | | $0 | 0% | 100% |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| 40 | Unknown jewelry and papers in PNC Bank Safe-Deposit Box (Agreed) | | TBD | | | | 0% | 100% |
| INSURANCE | | | | | | | | |
| 41 | State Farm ending in 2752 Whole (H); $250K face value (W is beneficiary); date of issue is 09/25/1989; acct in debt of 16,819.20 as of 10/15/2001; a/o 6.4.24 | $94,997 | | | $ - | $94,997 | 0% | 100% |
| 42 | State Farm ending in 5601 Whole (H); $10K face value (W is beneficiary); date of issue is 08/23/1988; therefore, it is not H's SP a/o 6/4/24 bc paid the premiums throughout marriage | $4,020 | | | $4,020.39 | | 100% | 0% |
| 43 | State Farm ending in 2655 Whole (H); $25K face value (W is beneficiary); date of issue is 09/25/1989; therefore, it is not H's SP a/o 6/4/24 bc paid premiums for 23 years | $9,709 | | | $ - | $9,709 | 0% | 100% |
| 44 | State Farm ending In 8176 Whole (H); $10K face value (W is beneficiary); date of issue is 09/28/1990; therefore, it is not H's SP a/o 6/4/24 bc paid premiums for 23 years | $4,684 | | | $4,683.51 | | 100% | 0% |
| 45 | State Farm ending in 0889 Whole (Garrett insured; owner TBD); $50k face value; W is beneficiary; however, date of issue is 05/24/1990; therefore, it is not H's SP a/o 6/4/24 bc paid premiums for 23 years (Agreed title to Garrett) | $8,369 | | | $ - | | 0% | 0% |
| 46 | State Farm ending in 2774 Whole (H); $250K face value (W is beneficiary); date of issue is 09/25/1989; acct was in debt of $20,304.47 as of 10/15/01 a/o 6/4/24 | $90,128 | | | $90,128.00 | | 100% | 0% |
| 47 | State Farm ending in 2821 Term (H); $500K face value | | no CSV | | X | | 100% | 0% |
| 48 | State Farm ending in 3643 Term (W); $400K face value | | no CSV | | | X | 0% | 100% |
| 49 | State Farm ending in 0051 Whole (H owner, Ava Hill insured); $50K face value (W is beneficiary) a/o 6/4/24 (Agreed title ownership to Ava Hill) | $2,841 | $2,841 | | | | 0% | 0% |
| 50 | State Farm ending in 1479 Whole (H owner; Jacob Hill insured); $50K face value (W is beneficiary) a/o 6/4/24 (Agreed Title ownership to Jacob Hill) | $3,151 | $3,318 | | | | 0% | 0% |

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| **REIMBURSEMENT CLAIMS** | | | | | | | | |
| 51 | H claims reduction of princpal amount of debts secured by liens on W's SP residence at 4647 Elsby Avenue, Dallas, Texas 75209. But no reimbursement claim exists as the mortgage is 3 times higher than before marriage; and H received benefit & was already compensated by acquiring paid off assets with the equity money out of separate property & never paid back the equity $ he withdrew on the separate property) H owes $ 126,000 to Elsby or wife needs Ft. Velasco free and clear as equity of Elsby is in that home while the mortgage remains on Elsby. | H owes $ 126,000.00 to Elsby (half mortgage) | $378,000 | | | | 0% | 0% |
| 52 | H's Separate Property Funds DID NOT invest in capital improvements to W's SP residence at 4647 Elsby Avenue, Dallas, TX 75209 from Clubway House. Mortgage was placed on it and W had $ 83,000 from insurance. | $0 | $79,000 | | | $0 | 0% | 0% |
| 53 | There are no community property funds invested in capital improvements to W's SP residence at 4647 Elsby Ave, Dallas, Texas 75209 ($83,000 came from insurance claim premarital & $ 100,000 was a loan afer marriage that was never paid back & is part of existing mortgage debt; loan is 3 times higher than before marriage and H benefited as he is receiving property w no mortgage bc derived from Elsby and Elsby has the debt | $0 | $100,000 | | $0 | $0 | 0%% | 0%% |
| | Totals | | | | $1,516,109 | $1,820,158 | | |
| **COMMUNITY LIABILITIES** | | | | | | | | |
| **CREDIT CARDS AND CHARGE ACCOUNTS** | | | | | | | | |
| 1 | Chase Bank, Acct ending 9682 (W) a/o 5/8/24 (Agreed) | | ($95) | | | ($95) | 0% | 100% |
| 2 | Chase Bank, Acct ending 7039 (W) a/o 5/8/24 (Agreed) | | ($870) | | | ($870) | 0% | 100% |
| 3 | CapitalOne, Acct ending 0864 (H) a/o 3/12/24 (Agreed) | | $0 | | $0 | | 100% | 0% |
| **ATTORNEY'S FEES IN THIS CASE** | | | | | | | | |

# In the Matter of the Marriage of Hill

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| 4 | Epstein Family Law, P.C. (Agreed) | | accruing | | X | | 100% | 0% |
| 5 | Armstrong Divorce and Family Law, PLLC (Agreed) | | unknown | | | X | 0% | 0% |
| 6 | Marisol Lopez (Agreed) | | unknown | | | X | 0% | 100% |
| OTHER PROFESSIONAL FEES IN THIS CASE | | | | | | | | |
| 7 | Stephen Fuqua (Agreed) | | $0 | | $0 | | 100% | 0% |
| OTHER LIABILITIES NOT OTHERWISE LISTED | | | | | | | | |
| 8 | State Farm FCU Line of Credit ending 2289 (a/o 3/12/24) (Agreed) | | $0 | | $0 | | 100% | 0% |
| 9 | Real Property taxes (50/50 paid on taxes up to date of divorce) and split any tax refunds or rebates on tax returns filed during marriage | | | | | | | |
| | | | | | | | | |
| | Totals | | ($965) | | $0 | ($965) | 0% | 100% |
| | | | | | | | | |
| SUMMARY OF PROPOSED DIVISION OF COMMUNITY PROPERTY | | | | | | | | |
| | | | | | Husband | Wife | | |
| | Grand Total of Assets | | $0 | | $1,516,109 | $1,820,158 | | |
| | Less Community Unsecured Liabilities | | ($965) | | $0 | ($965) | | |
| | Net Value of Estate | | ($965) | | $1,516,109 | $1,819,193 | | |
| | Percentage Division | | | | -157183% | -188605% | | |
| | 50 Percent of Net Estate | | | | ($482) | ($482) | | |
| | Over : (Short) | | | | $1,516,591 | $1,819,675 | | |
| | | | | | $ 265k Ft. Velasco for portion of Elsby mortgage+ $ 52k H already got) | | | |

| Note | Description | Wife's Proposed Value | Husband's Proposed Value | Value Used for Division | To Husband | To Wife | Percent to Husband | Percent to Wife |
|---|---|---|---|---|---|---|---|---|
| **HUSBAND'S SEPARATE PROPERTY** | | | | | | | | |
| No. | Description | | | | Value of Property | | | |
| 1 | PNC Checking Account **1641** (check issued for 1/4 land sale from Bill Hill) a/o 5/15/24 (not separate property) | $167,195 | $9,031.54 | | $83,598.00 | $83,598 | 50% | 50% |
| 2 | Levovo Laptop (bought with separate property monies) | | | | $600.00 | | 100% | 0% |
| 3 | Gun Cabinet with Gun Collection (gift and purchases) | | | | $5,000.00 | | 100% | 0% |
| 4 | Gibson J45 Guitar to be given to Jacob Hill (purchased 1997) | | | | $2,000.00 | | 0% | 0% |
| 5 | Life insurance policies (see above) | | | | | | | |
| 6 | Reimbursement claim against Elsby (see above) | $0 | | | | | | |
| | | | | | | | | |
| Total | | | | | $91,198 | | | |
| | | | | | | | | |
| **WIFE'S SEPARATE PROPERTY** | | | | | | | | |
| No. | Description | | | | Value of Property | | | |
| 1 | Elsby SP | | | | | | | |
| Total | 4647 Elsby Ave 75209 (FMV=$1,065,000 - Mort $258,325.320) a/o 10/25/2023 (W FMV = $758,000) W to continue to pay loan and sign hold harmless for H. Separate property that is now 3 times more in debt than prior to marriage. H owes half the mortgage or W gets Ft Velasco in exchange for his portion of debt in Elsby. | | | | | not relevant | | 100% |
| | | | | | | | | |
| **CHILDREN'S PROPERTY** | | | | | | | | |
| No. | Description | | Value of Property | | | | | |
| 1 | Blackrock Coverdell, Acct ending 2281 (Ava) (Maribel Custodian) a/o 5/7/24 (Agreed to title to Ava Hill) | | $38,038.00 | | | | 0% | 0% |
| 2 | Blackrock Coverdell, Acct ending 4121 (Jacob) (Maribel Custodian) a/o 5/7/24 (Agreed to titile to Jacob Hill) | | $78,965.32 | | | | 0% | 0% |
| 3 | State Farm Funds Coverdell, Acct ending 9274 (Jacob) (Maribel Custodian) a/o 6/7/24 (Agreed to title to Jacob Hill) | | $9,829.99 | | | | 0% | 0% |
| | | | | | | | | |
| | **OTHER REQUESTS:** | | | | | | | |



# EXHIBIT B

# STATE FARM TERMINATION AND EXTENDED TERMINATION PAYMENTS VALUED AS OF JUNE 20, 2024, ATTACHED TO EXHIBIT C (DIVORCE DECREE)

May 30, 2024

Hill, Dwight L
4647 Elsby Ave
Dallas, TX 75209-3203

Dear Dwight,

Following is a review of your estimated Termination and Extended Termination Payments you requested. Section IV, Paragraph B of the Agent's Agreement reviews the qualifications that must be met in order for Termination Payments to be made. In order for Termination Payments to be made, the Agent's Agreement must be terminated. The agent will return, or make available for return, Company property within 10 days of the termination of the agreement. In addition, the agent agrees to not induce, advise, or solicit any State Farm policyholders in his account at the time of his termination. The agent also agrees to not act or represent himself in any way as an agent or representative of the Companies. Please see Section III, Termination of Agreement, of the Agent's Agreement for a more thorough review of Termination provisions.

The following are your estimated monthly Termination and Extended Termination Payments by company assuming a 4/30/2024 termination date. Term payments will be made for 60 months following your termination.

|  | Term Pay | Ext Term Pay |
| --- | --- | --- |
| Auto Voluntary | $2,645 | $2,645 |
| Auto TCM | $19 | $0 |
| Fire | $198 | $193 |
| Lloyds | $3,665 | $3,636 |
| Fire TCM | $125 | $125 |
| Health | $22 | $0 |
| Life | $102 | $102 |
| **Total** | **$6,776** | **$6,701** |

**NOTE:** Extended Termination pay is available to agents who are 60 years or older with 20 years of service (last 10 continuous). Please remember that if you terminate prior to age 65, your Extended Termination Payments will be actuarially reduced. Extended termination payments are also available for those agents who meet the terms of the Early Notification Program. Under the Early Notification Program, you can qualify for Extended Termination payments at age 55 if (1) you are at least 55 years old, with 20 years of service (last 10 continuous) OR (2) age plus years of service equals 80.

**Extended Termination amounts will be actuarially reduced for retirement before age 65.** For retirement at age 59 years 6 months, the actuarial factor of 0.6222 reduces your Extended Termination payments to $4,169 a month. If you elect the joint and 2/3 survivor option, the extended term amount would be further adjusted to $3,543 a month. The survivor amount would be $2,362 a month.

**NOTE: Life Writing Compensation** Payments are based on writing compensation that would have been paid to you if your Agreement had not been terminated. **Life Writing Compensation** Payments will fluctuate each month depending on premium paid each month following termination and payments are reduced by a decreasing commission scale as business ages and any lapsed/cancelled policies.

**NOTE:** All figures are estimates. Contract provisions will govern actual amounts.

Attached is the estimate you requested. If you have any additional questions or concerns, please contact an ASR Representative at 1-833-335-0077 and follow the prompts to contracts and compensation.

Our hours of operation are 7am to 7 pm central time, Monday through Friday.

Sincerely,
Agency/Sales Resources



PLAINTIFF'S
EXHIBIT
W 24

 

June 20, 2024

Hill, Dwight L
4647 Elsby Ave
Dallas, TX 75209-3203

Dear Dwight,

Following is a review of your estimated Termination and Extended Termination Payments you requested. Section IV, Paragraph B of the Agent's Agreement reviews the qualifications that must be met in order for Termination Payments to be made. In order for Termination Payments to be made, the Agent's Agreement must be terminated. The agent will return, or make available for return, Company property within 10 days of the termination of the agreement. In addition, the agent agrees to not induce, advise, or solicit any State Farm policyholders in his account at the time of his termination. The agent also agrees to not act or represent himself in any way as an agent or representative of the Companies. Please see Section III, Termination of Agreement, of the Agent's Agreement for a more thorough review of Termination provisions.

The following are your estimated monthly Termination and Extended Termination Payments by company assuming a 5/31/2024 termination date. Term payments will be made for 60 months following your termination.

|  | Term Pay | Ext Term Pay |
| --- | --- | --- |
| Auto Voluntary | $2,640 | $2,640 |
| Auto TCM | $19 | $0 |
| Fire | $206 | $201 |
| Lloyds | $3,763 | $3,737 |
| Fire TCM | $131 | $131 |
| Health | $22 | $0 |
| Life | $107 | $107 |
| **Total** | **$6,888** | **$6,816** |

**NOTE:** Extended Termination pay is available to agents who are 60 years or older with 20 years of service (last 10 continuous). Please remember that if you terminate prior to age 65, your Extended Termination Payments will be actuarially reduced. Extended termination payments are also available for those agents who meet the terms of the Early Notification Program. Under the Early Notification Program, you can qualify for Extended Termination payments at age 55 if (1) you are at least 55 years old, with 20 years of service (last 10 continuous) OR (2) age plus years of service equals 80.

**Extended Termination amounts will be actuarially reduced for retirement before age 65.** For retirement at age 59 years 7 months, the actuarial factor of 0.6263 reduces your Extended Termination payments to $4,269 a month. If you elect the joint and 2/3 survivor option, the extended term amount would be further adjusted to $3,625 a month. The survivor amount would be $2,417 a month.

**NOTE: Life Writing Compensation** Payments are based on writing compensation that would have been paid to you if your Agreement had not been terminated. **Life Writing Compensation** Payments will fluctuate each month depending on premium paid each month following termination and payments are reduced by a decreasing commission scale as business ages and any lapsed/cancelled policies.

**NOTE:** All figures are estimates. Contract provisions will govern actual amounts.

Attached is the estimate you requested. If you have any additional questions or concerns, please contact an ASR Representative at 1-833-335-0077 and follow the prompts to contracts and compensation.

Our hours of operation are 7am to 7 pm central time, Monday through Friday.

Sincerely,
Agency/Sales Resources



# EXHIBIT C

# DIVORCE DECREE

FILED
6/10/2024 3:31 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
John Feltch DEPUTY

## NO. <u>DF-22-14398</u>

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| DWIGHT L. HILL | § | |
| AND | § | 302ND JUDICIAL DISTRICT |
| MARIBEL L. HILL | § | |
| | § | |
| AND IN THE INTEREST OF | § | |
| J.L.H., A CHILD | § | DALLAS COUNTY, TEXAS |

## <u>COUNTERRESPONDENT'S ANSWER TO FOURTH AMENDED ANSWER AND COUNTERPETITION FOR DIVORCE</u>

Dwight L. Hill, Counterrespondent, files this Answer to Maribel L. Hill (Counterpetitioner)'s Fourth Amended Answer and Counterpetition for Divorce.

### 1. *General Denial*

Dwight L. Hill enters a general denial.

### 2. *Information about Child*

The child the subject of this suit has attained the age of majority and graduated from high school since the filing of this suit.

### 3. *No Double Recovery*

To the extent that Maribel L. Hill seeks to double recover for tort claims alleged in her Fourth Amended Answer and Counterpetition and her requests for disproportionate division of the community estate, Dwight L. Hill objects to such double recovery and asserts that Maribel L. Hill is estopped from such double recovery under the principles set forth in *Schlueter v. Schlueter*, 975 S.W.2d 548 (Tex. 1998). An allegedly wronged spouse has an adequate remedy for alleged fraud on the community through the means of a just and right division. Therefore, no independent tort cause of action may be recovered for regarding any alleged damages to the community estate. *Id* at 585.

---

Counterrespondent's Answer to Fourth Amended Answer and Counterpetition for Divorce     Page 1 of 3

## 4. *Attorney's Fees, Expenses, Costs, and Interest*

It was necessary for Dwight L. Hill to secure the services of Robert D. Epstein and Jordan C. Watson of Epstein Family Law, P.C., along with Richard R. Orsinger and the law firm of Orsinger, Nelson, Downing & Anderson, licensed attorneys, to prepare and prosecute this suit. To effect an equitable division of the estate of the parties and as a part of the division, and for services rendered in connection with conservatorship and support of the child, judgment for attorney's fees, expenses, and costs through trial and appeal should be granted against Petitioner and in favor of Dwight L. Hill for the use and benefit of Dwight L. Hill's attorneys and be ordered paid directly to Dwight L. Hill's attorneys, who may enforce the judgment in the attorneys' own names. Dwight L. Hill requests postjudgment interest as allowed by law.

## 5. *Prayer*

Dwight L. Hill prays that Maribel L. Hill take nothing and that Dwight L. Hill be granted all relief requested in this Answer.

Dwight L. Hill also prays for attorney's fees, expenses, costs, and interest as requested above.

Dwight L. Hill prays for general relief.

Respectfully submitted,

**EPSTEIN FAMILY LAW, P.C.**
5949 Sherry Lane, Suite 1070
Dallas, TX 75225
Tel: (972) 232-7673

By:_____
**Robert D. Epstein**
State Bar No. 24065206
robert@epsteinpc.com
**Jordan C. Watson**
State Bar No. 24110895
jordan@epsteinpc.com
*Attorneys for Dwight L. Hill*

## Certificate of Service

I certify that a true copy of this Counterrespondent's First Amended Answer was served in accordance with rule 21a of the Texas Rules of Civil Procedure on the following on June 10, 2024:

Marisol Lopez by electronic filing manager.

_____
**Robert D. Epstein**
*Attorney for Dwight L. Hill*

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jenn Huey on behalf of Robert Epstein
Bar No. 24065206
jenn@epsteinpc.com
Envelope ID: 88633060
Filing Code Description: RESPONSE
Filing Description: COUNTERRESPONDENT'S ANSWER TO FOURTH AMENDED ANSWER AND COUNTERPETITION FOR DIVORCE
Status as of 6/12/2024 11:16 AM CST

Associated Case Party: DWIGHTL.HILL

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robert Epstein | | robert@epsteinpc.com | 6/10/2024 3:31:50 PM | SENT |

Associated Case Party: MARIBELLEANNHILL

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Marisol Lopez | | Marisol@Lawyerforu.com | 6/10/2024 3:31:50 PM | SENT |



NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA

## NO. <u>DF-22-14398</u>

| | | |
|---|---|---|
| **IN THE MATTER OF** | § | **IN THE DISTRICT COURT** |
| **THE MARRIAGE OF** | § | |
| | § | |
| **DWIGHT L. HILL** | § | **302ND JUDICIAL DISTRICT** |
| **AND** | § | |
| **MARIBEL L. HILL** | § | **DALLAS COUNTY, TEXAS** |

## <u>FINAL DECREE OF DIVORCE</u>

On June 17, 2024, and June 20, 2024, the Court heard this case.

### 1. *Appearances*

Petitioner, Dwight L. Hill, appeared physically in the courtroom. Dwight L. Hill's attorney of record, Robert D. Epstein, appeared physically in the courtroom and announced ready.

Respondent, Maribel L. Hill, appeared physically in the courtroom. Maribel L. Hill's attorney of record, Marisol Lopez, appeared physically in the courtroom and announced ready.

### 2. *Record*

The record of testimony was duly reported by the court reporter for the 302nd Judicial District Court.

### 3. *Jurisdiction and Domicile*

The Court finds that the pleadings of Dwight L. Hill are in due form and contain all the allegations, information, and prerequisites required by law. The Court, after receiving evidence, finds that it has jurisdiction of this case and of all the parties and that at least sixty days have elapsed since the date the suit was filed.

The Court further finds that, at the time this suit was filed, Dwight L. Hill had been a domiciliary of Texas for the preceding six-month period and a resident of the county in which this suit was filed for the preceding ninety-day period. All persons entitled to citation were properly cited.

### 4. *Jury*

A jury was waived, and questions of fact and of law were submitted to the Court.

### 5. *Divorce*

---

Final Decree of Divorce                                                      Page 1 of 17

The Court finds that Dwight L. Hill and Maribel L. Hill were married on October 19, 2001.

IT IS ORDERED AND DECREED that Dwight L. Hill, Petitioner, and Maribel L. Hill, Respondent, are divorced and that the marriage between them is dissolved on the ground of insupportability.

## 6. *Child of the Marriage*

The Court finds that there is no child of the marriage of Dwight L. Hill and Maribel L. Hill now under eighteen years of age or otherwise entitled to support and that none is expected.

## 7. *Division of Marital Estate*

The Court finds that the following is a just and right division of the parties' marital estate, having due regard for the rights of each party.

### a. **Property to Dwight L. Hill**

IT IS ORDERED AND DECREED that Petitioner, Dwight L. Hill, is awarded the following as his sole and separate property, and Respondent, Maribel L. Hill, is divested of all right, title, interest, and claim in and to that property:

P-1. The following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

> LOT TWELVE (12), BLOCK TWO (2), SURFSIDE, CONSISTING OF 0.080 ACRES OF LAND, MORE OR LESS, HEREBY SUBDIVIDED OUT OF TRACT 212, OUT OF BRAZOS COAST INVESTMENT COMPANY SUBDIVISION NO. 1, BRANCH T. ARCHER LEAGUE, ABSTRACT 9, BRAZORIA COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS IN VOLUME 1772, PAGE 276 OF THE DEED RECORDS OF BRAZORIA COUNTY, TEXAS. (ACCOUNT NUMBER 6751-002-110)

> More commonly known as 123 Nesmith Place, Surfside Beach, Texas 77541.

P-2. 35% of the net sales proceeds from the sale of the following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents and more particularly described in the "Sale of Real Property" provisions below:

> Being Lots 1, 2 and 3 in Block 3 hereby subdivided out of NESMITH Tract 212 in Brazos Coast Investment Company Subdivision No. 1, Branch T.

Archer League, Abstract No. 9, Brazoria County, Texas, and being more particularly described by metes and bounds in Document Number 2004053260 of the Deed Records of Brazoria County, Texas.

More commonly known as 107 Nesmith Place, Lots 1, 2 and 3, Surfside Beach, Texas 77541. GEOGRAPHIC ID: 6751-0006-000 AND PROPERTY ID: 232468

P-3.    All household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment in the possession of Dwight L. Hill or subject to his sole control.

P-4.    All clothing, jewelry, and other personal effects in the possession of Dwight L. Hill or subject to his sole control, including but not limited to the following:

      a.    Bicycle

      b.    Books

      c.    Guitar

      d.    Tools

      e.    Computer monitors x2

      f.    Glock 26 gun

P-5.    The cash on hand and funds on deposit, together with accrued but unpaid interest, in the following banks, savings institutions, or other financial institutions:

      a.    PNC Bank, Checking, Account number Account ending 6618

      b.    PNC Bank, DLH Separate Savings, Account number Account ending 2065

      c.    50% of the State Farm Federal Credit Union, Account number Account ending 2289

      d.    50% of the PNC Bank, Personal Checking, Account number Account ending 4643

      e.    PNC Bank, Checking, Account number Account ending 2183

P-6.    The following individual retirement accounts or portions thereof:

      a.    State Farm Fund Roth IRA, Account number Account ending 9211

      b.    The State Farm Pershing Roth IRA, Account number Account ending 4620 after transferring a 50% interest to Maribel L. Hill

c.     The State Farm Pershing Roth IRA, Account number Account ending 9931 after transferring a 50% interest to Maribel L. Hill

d.     The Ascensus Trust IRA, Dwight Hill's Account, Account number Account ending 2370, known as 6955, after transferring a 50% interest to Maribel L. Hill

e.     A 50% interest in Ascensus Trust IRA, Maribel Hill's Account, Account number Account ending 2370, known as 6956

f.     A 50% interest in State Farm Blackrock, Account number Account ending C17DN, known as 4612, currently

g.     A 50% interest in State Farm Blackrock, Account number Account ending C9ASY, known as 9964, currently

P-7.   Except for those portions of Dwight L. Hill's employee and retirement benefits in State Farm Termination Payments and State Farm Extended Termination Payments expressly awarded to Maribel L. Hill in this Final Decree of Divorce, all sums, whether matured or unmatured, accrued or unaccrued, vested or otherwise, together with all increases thereof, the proceeds therefrom, and any other rights related to any profit-sharing plan, retirement plan, Keogh plan, pension plan, employee stock option plan, 401(k) plan, employee savings plan, accrued unpaid bonuses, disability plan, or other benefits existing by reason of Dwight L. Hill's employment.

P-8.   The following policies of insurance insuring Dwight L. Hill's life:

a.     State Farm Term Life Insurance Policy, Policy number Ending 2821

P-9.   The following stocks, bonds, and securities, together with all dividends, splits, and other rights and privileges in connection with them:

a.     A 50% interest in the State Farm Funds Brokerage Joint Tenants, Account number Account ending 5608

P-10.  The Honda Scooter Elite motor vehicle, together with all prepaid insurance, keys, and title documents.

P-11.  The 2010 Lexus LX570 motor vehicle, vehicle identification number JTJHY7AX5A4049377, together with all prepaid insurance, keys, and title documents.

P-12.  100% of Dwight L. Hill's interest in the closely held business corporation known as Dwight Hill Insurance Agency, Inc., including but not limited to its name, goodwill, receivables and claims, including but not limited to the funds on deposit, together with accrued but unpaid interest, in the following bank account:

a.     PNC Bank Business Checking account ending 3338.

*IT IS ORDERED that the retirement and investment accounts being divided 50/50 herein shall be divided as of the date of the transfer.*

Final Decree of Divorce                                                    Page 4 of 17

**b.    Property to Maribel L. Hill**

IT IS ORDERED AND DECREED that Respondent, Maribel L. Hill, is awarded the following as her sole and separate property, and Petitioner, Dwight L. Hill, is divested of all right, title, interest, and claim in and to that property:

R-1.    The following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

> Lot(s) Eleven (11) and Thirteen (13) in Block Five Hundred Fifty-Six (556) of SURFSIDE TOWNSITE, a subdivision in Brazoria County, Texas, according to the map or plat thereof, recorded in Volume 32, Page 28 of the Deed Records of Brazoria County, Texas.
>
> More commonly known as 1211 Ft. Velasco, Surfside Beach, Texas 77541. GEOGRAPHIC ID: 7875-0531-001 AND PROPERTY ID: 575513

R-2.    65% of the net sales proceeds from the sale of the following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents and more particularly described in the "Sale of Real Property" provisions below:

> Being Lots 1, 2 and 3 in Block 3 hereby subdivided out of NESMITH Tract 212 in Brazos Coast Investment Company Subdivision No. 1, Branch T. Archer League, Abstract No. 9, Brazoria County, Texas, and being more particularly described by metes and bounds in Document Number 2004053260 of the Deed Records of Brazoria County, Texas.
>
> More commonly known as 107 Nesmith Place, Lots 1, 2 and 3, Surfside Beach, Texas 77541. GEOGRAPHIC ID: 6751-006-000 AND PROPERTY ID: 232468

R-3.    The following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

> Being a 0.08 acre tract (southeast 15.00 feet of Lot 1 and the northwest 35 foot of Lot 2) of the Loch Nesmith Shores (unrecorded subdivision) situated in Tract 212 of the Brazos Coast Investment Company Subdivision No. 1, Brazoria County, Texas, being the same called 0.08 acre tract conveyed to Ronald Frankel as described in File No. 10-014652 of the Official Records of BRAZORIA County, Texas, said 0.08 acre tract being more particularly described by metes and bounds in Document Number 2010031228 of the Deed Records of Brazoria County, Texas.
>
> More commonly known as 118 Nesmith Place, Surfside Beach, Texas

77541. GEOGRAPHIC ID: 6751-0003-000 AND PROPERT ID: 232465; NESMITH TR 212 (A0009 B T ARCHER DIV (B C I C)) (SURFSIDE) BLK 2 LOT 1A-2A

R-4. All household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment in the possession of Maribel L. Hill or subject to her sole control.

R-5. All clothing, jewelry, and other personal effects in the possession of Maribel L. Hill or subject to her sole control, including but not limited to the following:

    a.    Musical instruments

    b.    Tools

    c.    Sig P238 gun

    d.    4.53 ct Diamond/Platinum Ring

    e.    Diamond necklace

    f.    Maribel Hill Music

    g.    Miscellaneous jewelry and papers in PNC Bank Safe Deposit Box

R-6. The cash on hand and funds on deposit, together with accrued but unpaid interest, in the following banks, savings institutions, or other financial institutions:

    a.    50% of the State Farm Federal Credit Union, Account number Account ending 2289

    b.    50% of the PNC Bank, Personal Checking, Account number Account ending 4643

    c.    JP Morgan Chase Bank, Chase Total Checking, Account number Account ending 2380

    d.    50% of cash on hand in PNC Bank, DHIA Business Checking 3338, which has already been distributed

R-7. The following individual retirement accounts or portions thereof:

    a.    State Farm Fund Roth IRA, Account number Account ending 9212

    b.    A 50% interest in State Farm Pershing Roth IRA, Account number Account ending 4620

    c.    A 50% interest in State Farm Pershing Roth IRA, Account number Account ending 9931

d. A 50% interest in Ascensus Trust IRA, Dwight Hill's Account, Account number Account ending 2370, known as 6955, currently

e. The Ascensus Trust IRA, Maribel Hill's Account, Account number Account ending 2370 known as 6956 currently, after transferring a 50% interest to Dwight L. Hill

f. The State Farm Blackrock, Account number Account ending C17DN known as 4612, after transferring a 50% interest to Dwight L. Hill

g. The State Farm Blackrock, Account number Account ending C9ASY known as 9964 currently, after transferring a 50% interest to Dwight L. Hill

R-8. The following portion of Dwight L. Hill's State Farm Termination Payments benefits arising out of Dwight L. Hill's employment during the marriage: 31.63% to be paid when Dwight L. Hill retires and/or terminates and begins to receive benefits. The following steps are to be completed prior to the signing of this divorce decree or within 3 days of the signing of this divorce decree:

A. Dwight L. Hill must call Agency Sales Resource (ASR) at 833-335-0077 and inform them he is divorced and that the Court awarded the ex-wife 31.63% of the term and extended term pay to be paid once Dwight retires and/or terminates;

B. Dwight L. Hill will request for them to begin the process immediately to have a QDRO or similar document of similar nature set up in order to divide the retirement account into 2 accounts;

C. ASR will begin the process and forms will be exchanged and Dwight Hill shall comply with all requests for information from ASR and/or the Retirement Analyst Group and/or Legal Team of State Farm.

The benefits are to be paid directly to Maribel L. Hill from State Farm and/or their agencies without any involvement from Dwight L. Hill other than continued cooperation regarding the process involved with the QDRO or similar document of similar nature. The contingent benefits to be received by Maribel Hill shall be 31.63% of the value of the term pay as of June 20, 2024, if, as, and when received, and as further illustrated by correspondence from State Farm dated June 20, 2024, attached hereto as Exhibit A and incorporated by reference as if fully set forth herein, which shows the value of the term pay as of June 20, 2024 if Dwight L. Hill were to actually have retired on May 31, 2024, as indicated by said letter.

R-9. The following portion of Dwight L. Hill's State Farm Extended Termination Payments benefits arising out of Dwight L. Hill's employment during the marriage: 31.63% to be paid when Dwight L. Hill retires and/or terminates and begins to receive benefits. The following steps are to be completed prior to the signing of this divorce decree or within 3 days of the signing of this divorce decree:

A. Dwight L. Hill must call Agency Sales Resource (ASR) at 833-335-0077 and inform them he is divorced and that the Court awarded the ex-wife 31.63% of the term and extended term pay to be paid once Dwight retires and/or terminates;

B. Dwight L. Hill will request for them to begin the process immediately to have a QDRO or similar document of similar nature set up in order to divide the retirement account into 2 accounts;

C. ASR will begin the process and forms will be exchanged and Dwight Hill shall comply with all requests for information from ASR and/or the Retirement Analyst Group and/or Legal Team of State Farm.

The benefits are to be paid directly to Maribel L. Hill from State Farm and/or their agencies without any involvement from Dwight L. Hill. The current benefits, actuarially reduced, to be received by Maribel Hill are $1,350.28, based on 31.63% of the estimated extended term pay of $4,269 per month which is the actuarially reduced earned amount by Dwight Hill if terminated on May 31, 2024. The contingent benefits to be received by Maribel Hill shall be 31.63% of the value of the extended term pay as of June 20, 2024, if, as, and when received, and as further illustrated by correspondence from State Farm dated June 20, 2024, attached hereto as Exhibit A and incorporated by reference as if fully set forth herein, which shows the value of the extended term pay as of June 20, 2024 if Dwight L. Hill were to actually have retired on May 31, 2024, as indicated by said letter.

R-10. The following policies of insurance insuring Maribel L. Hill's life:

    a.     State Farm Term Life Insurance Policy, Policy number Ending 3643

R-11. The following stocks, bonds, and securities, together with all dividends, splits, and other rights and privileges in connection with them:

    a.     A 50% interest in the State Farm Funds Brokerage Joint Tenants, Account number Account ending 5608

R-12. The 2014 Club Car Gas xtr 850 motor vehicle, vehicle identification number SW1523 560386, together with all prepaid insurance, keys, and title documents.

R-13. The 2021 Mazda CX-5 motor vehicle, vehicle identification number JM3KFBCM1M1398215, together with all prepaid insurance, keys, and title documents.

R-14. 100% of parties' interest in the closely held business limited liability company known as Restore Entertainment, LLC DBA Mousika Publishing, including but not limited to its intellectual property, artistry, name, goodwill, receivables, claims and money invested, including but not limited to the funds on deposit, together with accrued but unpaid interest, in the following bank account:

    a.     Chase Bank Complete Business Checking account ending 6763

R-15. 100% of parties' interest in the closely held business limited liability company known as Grateful Hippies LLC, including but not limited to its name, goodwill, receivables and claims, including but not limited to the funds on deposit, together with accrued but unpaid interest, in the following bank account:

    a.    PNC Bank Business Checking account ending 4123

R-16. The PNC Safe Deposit Box, Box located at PNC bank and all contents contained therein. *It is ordered that the retirement and investment accounts being divided also herein shall be divided as of the date of the transfer.*

## 8. Division of Debt

### a. Debts to Dwight L. Hill

IT IS ORDERED AND DECREED that Petitioner, Dwight L. Hill, shall timely pay, as a part of the division of the estate of the parties, and shall indemnify and hold Respondent, Maribel L. Hill, and her property harmless from any failure to so discharge, these items:

P-1. The following debts, charges, liabilities, and obligations:

    a.    Debt, if any, owed to CapitalOne, Account number Account ending 0864

    b.    Debt, if any, owed to Stephen Fuqua

    c.    Debt, if any, owed to State Farm Federal Credit Union Line of Credit, Account number ending 2289

P-2. All encumbrances, ad valorem taxes, liens, assessments, premiums, debts, charges, liabilities, and other obligations incurred by Dwight L. Hill from and after June 20, 2024

P-3. All encumbrances, ad valorem taxes, liens, assessments, premiums, property taxes, or other charges due or to become due on the real and personal property awarded to Dwight L. Hill in this Final Decree of Divorce unless express provision is made in this Final Decree of Divorce to the contrary.

P-4. All outstanding attorney's fees, if any, owed to Epstein Family Law, P.C.

P-5. All outstanding attorney's fees, if any, owed to Armstrong Divorce and Family Law, PLLC, up to June 20, 2024.

P-6. All outstanding attorney's fees, if any, owed to Orsinger, Nelson, Downing and Anderson, LLP, up to June 20, 2024.

P-7 ~~35%~~ *100%* of all property taxes owed on 107 Nesmith, Property ID: 232468 *for 2024.*

*P-8. $6,000 of property taxes on 1211 Ft. Velasco, Surfside Beach, Texas 77541.*

**b.**    **Debts to Maribel L. Hill**

IT IS ORDERED AND DECREED that Respondent, Maribel L. Hill, shall timely pay, as a part of the division of the estate of the parties, and shall indemnify and hold Petitioner, Dwight L. Hill, and his property harmless from any failure to so discharge, these items:

R-1.    The following debts, charges, liabilities, and obligations:

    a.    Debt owed to Chas Bank, Account number Account ending 9682

    b.    Debt owed to Chase Bank, Account number Account ending 7039

R-2.    All debts, charges, liabilities, and other obligations incurred by Maribel L. Hill from and after June 20, 2024.

R-3.    All encumbrances, ad valorem taxes, liens, assessments, premiums, or other charges due or to become due on the real and personal property awarded to Maribel L. Hill in this Final Decree of Divorce unless express provision is made in this Final Decree of Divorce to the contrary.

R-4.    The balance due, including principal, interest, tax, and insurance escrow, on the promissory note executed by Dwight L. Hill and Maribel L. Hill, payable to PNC Bank, and secured by deed of trust on the real property awarded in this decree to Maribel L. Hill, which is recorded in the Official Public Records of Dallas County, Texas.

IT IS ORDERED that Maribel L. Hill shall sign a Deed of Trust to Secure Assumption for the real property associated with the promissory note payable to PNC Bank *on or before September 15, 2025 if Maribel L. Hill has not refinanced the property or obtained an assignee to assume | Dwight L.*

R-5.    All outstanding attorney's fees, if any, owed to Marisol Lopez *up to June 18, 11 by Note for* 20, 2024.

*September 11, 2025.*

~~R-6    65% of all property taxes owed on 107 Nesmith, Property ID: 232468.~~

**9.**    *Notice*

IT IS ORDERED AND DECREED that each party shall send to the other party by mail to the other party's last known mailing address, by email to the other party's last known email address, or by text message to the other party's last known mobile telephone number, within three days of its receipt, a copy of any correspondence from a creditor or taxing authority concerning any potential liability of the other party.

**10.**    *Sale of Real Property*

IT IS FURTHER ORDERED AND DECREED that the property and all improvements located thereon Being Lots 1, 2 and 3 in Block 3 hereby subdivided out of Tract 212 in Brazos Coast Investment Company Subdivision No. 1, Branch T. Archer

---

League, Abstract No. 9, Brazoria County, Texas, and being more particularly described by metes and bounds in Document Number 2004053260 of the Deed Records of Brazoria County, Texas, and more commonly known as 107 Nesmith Place, Lots 1, 2 and 3, Surfside Beach, Texas 77541; GEOGRAPHIC ID: 6751-006-000 AND PROPERTY ID: 232468 ("the property"), shall be sold under the following terms and conditions:

1. The parties shall list the property with a duly licensed real estate broker having sales experience in the area where the property is located, provided further that the real estate broker shall be an active member in the Multiple Listing Service with the Texas Board of Realtors, on or before July 1, 2024. The real estate broker should be an independent real estate broker who is familiar with the properties in Surfside Beach, Texas.

2. The property shall be sold for a price that is mutually agreeable to Petitioner and Respondent. If Petitioner and Respondent are unable to agree on a sales price, on the application of either party, the property shall be sold under terms and conditions determined by a court-appointed receiver.

3. The net sales proceeds (defined as the gross sales price less cost of sale and full payment of any mortgage indebtedness or liens on the property) shall be distributed as follows: 35% to Dwight L. Hill and 65% to Maribel L. Hill.

## 11. _Liability for Federal Income Taxes for Prior Years_

IT IS ORDERED AND DECREED that Dwight L. Hill and Maribel L. Hill shall be equally responsible for all federal income tax liabilities of the parties allocable to the period from the date of marriage through December 31, 2023, and each party shall timely pay 50 percent of any taxes, penalties, and interest due thereon and shall indemnify and hold the other party and the other party's property harmless from the portion of such tax, penalty, and interest required to be paid by the indemnifying party unless that additional tax, penalty, or interest resulted from a party's omission of income or claim of erroneous deduction, in which case that party shall pay, and hold the other party and the other party's property harmless from, the additional tax, penalty, and interest allocable to the omitted income or erroneous deduction.

IT IS ORDERED AND DECREED that if a refund of tax or other amounts is made for any year during the parties' marriage through December 31, 2023, each party shall be entitled to one-half of the refund amount, and the party receiving the refund check is designated a constructive trustee for the benefit of the other party to the extent of one-half of the refund amount, and the party receiving the refund check shall pay to the other party one-half of the refund amount within five days of receipt of the refund check. Each party is ORDERED to endorse the refund check on presentation by the other party.

## 12. _Treatment/Allocation of Community Income for Year of Divorce_

The term "I.R.C." means the Internal Revenue Code of 1986, as amended.

IT IS ORDERED AND DECREED that, for the calendar year 2024, Maribel L. Hill

will file an individual tax return 1040, after receiving the W2 from Dwight Hill Insurance Agency, Inc. Maribel L. Hill will pay her income taxes based on her W2 in accordance with the IRS. Maribel L. Hill will not receive a K-1 from Dwight Hill Insurance Agency, Inc. for tax year 2024. Dwight L. Hill will file an individual federal income tax return 1040 for the calendar year 2024, and pay any income taxes due under his personal tax return. *Dwight Hill to pay any taxes due on Dwight Hill Insurance Agency Inc for 2024 tax year.*

IT IS ORDERED AND DECREED that for calendar year 2024, each party shall indemnify and hold the other party and the other party's property harmless from any tax liability associated with the reporting party's federal tax return for that year.

IT IS ORDERED AND DECREED that each party shall provide such information to the other party as is requested to prepare federal income tax returns for 2024 within thirty days of receipt of a written request for the information, and in no event shall the available information be exchanged later than March 1, 2025. As requested information becomes available after that date, IT IS ORDERED that it shall be provided within ten days of receipt. IT IS FURTHER ORDERED AND DECREED that all information shall be sent by mail to the other party's last known mailing address, by email to the other party's last known email address, or by text message to the other party's last known mobile telephone number.

IT IS ORDERED AND DECREED that all payments made to the other party in accordance with the allocation provisions for payment of federal income taxes contained in this Final Decree of Divorce are not deemed income to the party receiving those payments but are part of the property division and necessary for a just and right division of the parties' estate.

IT IS ORDERED AND DECREED that the parties shall cooperate with each other and exchange all relevant information, notices, and documents in the event of an audit or examination (or notice thereof) of their income tax returns for any period during their marriage through the date of divorce by the Internal Revenue Service or other governmental agency, and each party shall have the right to participate, at that participant party's cost and expense, in that audit or examination individually or by that party's designated representative.

## 13. _Confirmation of Separate Property_

IT IS ORDERED AND DECREED that the following described property is confirmed as the separate property of Dwight L. Hill:

P-1. The funds on deposit, together with accrued but unpaid interest, in the following banks, savings institutions, or other financial institutions:

a. PNC Bank Checking Account, Account number Ending 1641

P-2. The following policies of insurance insuring Dwight L. Hill's life, including cash values, if any:

a. State Farm Whole Life Insurance Policy, Policy number Ending 2752

b.    State Farm Whole Life Insurance Policy, Policy number Ending 5601

c.    State Farm Whole Life Insurance Policy, Policy number Ending 2655

d.    State Farm Whole Life Insurance Policy, Policy number Ending 8176

e.    State Farm Whole Life Insurance Policy, Policy number Ending 2774

P-3.    The State Farm Termination Payments other than that portion awarded to Maribel L. Hill awarded herein.

P-4.    The State Farm Extended Termination Payments other than that portion awarded to Maribel L. Hill herein.

P-5.    Levovo Laptop.

P-6.    Gun Cabinet with gun collection.

P-7.    Gibson J45 Guitar.

IT IS ORDERED AND DECREED that the following described property is confirmed as the separate property of Maribel L. Hill:

R-1.    The following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

> LOT TWELVE (12), BLOCK B/5680 OF LINWOOD PLACE ADDITION, AN ADDITION TO THE CITY OF DALLAS, DALLAS COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 3, PAGE 429, MAP RECORDS, DALLAS COUNTY, TEXAS. LINWOOD PLACE BLK B – 5680 LT 12, ACCT #: 425713000000. SUBJECT TO ALL EASEMENTS, COVENANTS, CONDITIONS, RESERVATIONS, LEASES AND RESTRICTIONS OF RECORD, ALL LEGAL HIGHWAYS, ALL RIGHTS OF WAY, ALL ZONING, BUILDING AND OTHER LAWS, ORDINANCES AND REGULATIONS, ALL RIGHTS OF TENANTS IN POSSESSION, AND ALL REAL ESTATE TAXES AND ASSESSMENTS NOT YET DUE AND PAYABLE. BEING THE SAME PROPERTY CONVEYED BY DEED RECORDED IN VOLUME 98034, PAGE 757, OF THE DALLAS COUNTY, TEXAS RECORDS.
>
> More commonly known as 4647 Elsby Avenue, Dallas, Texas 75209. MARIBEL HILL IS TO ASSUME DEBT AND PAYMENT OF PNC LOAN ACCT #: 1210015809, MORTGAGE FOR SAID PROPERTY.

## 14.   *Confirmation of Property Gifted to Children of the Parties*

IT IS ORDERED AND DECREED that the following properties shall be gifted from

the marital or separate property estate of the parties as follows:

a.   Dwight L. Hill and Maribel L. Hill shall remove their names from the PNC Bank Education Checking Account ending 2033 and put the account solely in Ava Hill's name (ACCOUNT CLOSED);

b.   The 2022 Toyota 4Runner shall be gifted to Ava Hill and the title transferred to her name. Dwight L. Hill and Maribel L. Hill shall take any necessary steps to transfer the title from Dwight Hill Ins Agency and Maribel Hill to Ava Hill no later than November 1, 2024;

c.   The Ford F-150 shall be gifted to Jacob Hill and the title transferred to his name. Dwight L. Hill and Maribel L. Hill shall take any necessary steps to transfer the title from Dwight L. Hill and Maribel Hill to Jacob Hill;

d.   The State Farm Whole Life Policy, Policy number Ending 0889 shall be transferred to Garrett Hill as the owner on the policy;

e.   The State Farm Whole Life Policy, Policy number Ending 0051 shall be transferred to Ava Hill as the owner on the policy;

f.   The State Farm Whole Life Policy, Policy number Ending 1479 shall be transferred to Jacob Hill as the owner on the policy;

g.   Dwight L. Hill and/or Maribel L. Hill shall remove their names from the Blackrock Coverdell Account ending 2281 and put the account solely in Ava Hill's name;

h.   Dwight L. Hill and/or Maribel L. Hill shall remove their names from the Blackrock Coverdell Account ending 4121 and put the account solely in Jacob Hill's name;

i.   Dwight L. Hill and/or Maribel L. Hill shall remove their names from the State Farm Funds Coverdell Account ending 9274 and put the account solely in Jacob Hill's name. (ACCOUNT CLOSED)

## 15. *Credit Cards*

IT IS ORDERED AND DECREED that Dwight L. Hill is granted exclusive use of the following credit card and Maribel L. Hill is enjoined and prohibited from using or incurring any indebtedness on that card:

a.   Capital One Credit Card, Account number Ending 0864

IT IS ORDERED AND DECREED that Maribel L. Hill is granted exclusive use of the following credit cards and Dwight L. Hill is enjoined and prohibited from using or incurring any indebtedness on these cards:

a. Chase Bank Credit Card, Account number Ending 9682

b. Chase Bank Credit Card, Account number Ending 7039

## 16. *Transfer and Delivery of Property*

Dwight L. Hill is ORDERED to execute, have acknowledged, and deliver to Maribel L. Hill, by and through her attorney of record, these instruments on or before ~~November~~ December 31, 2024:

a. Special Warranty Deed for the 1211 Ft Velasco property; and

b. Special Warranty Deed for the 118 Nesmith Pl property.

Maribel L. Hill is ORDERED to execute, have acknowledged, and deliver to Dwight L. Hill, by and through his attorney of record, these instruments on or before ~~November~~ December 31, 2024:

a. Special Warranty Deed for the 123 Nesmith Pl property, attached hereto as Exhibit 1; and

b. Deed of Trust to Secure Assumption for the 4647 Elsby Avenue property, attached hereto as Exhibit 2, to be executed, acknowledged, and delivered to Dwight L. Hill, on or before September 15, 2025 if Maribel L. Hill has not refinanced

This Final Decree of Divorce shall serve as a muniment of title to transfer the property or obtained an assignee to assume the Note for Dwight L. Hill by September 1, 2025. ownership of all property awarded to any party in this Final Decree of Divorce.

## 17. *Court Costs*

IT IS ORDERED AND DECREED that costs of court are to be borne by the party who incurred them.

## 18. *Discharge from Discovery Retention Requirement*

IT IS ORDERED AND DECREED that the parties and their respective attorneys are discharged from the requirement of keeping and storing the documents produced in this case in accordance with rule 191.4(d) of the Texas Rules of Civil Procedure.

## 19. *Clarifying Orders*

Without affecting the finality of this Final Decree of Divorce, this Court expressly reserves the right to make orders necessary to clarify and enforce this Final Decree of Divorce.

## 20. *Relief Not Granted*

IT IS ORDERED AND DECREED that all relief requested in this case and not expressly granted is denied. This is a final judgment, for which let execution and all writs and processes necessary to enforce this judgment issue. This judgment finally disposes

---

Final Decree of Divorce

of all claims and all parties and is appealable.

## 21. *Date of Judgment*

This divorce judicially PRONOUNCED AND RENDERED in court at 600 Commerce Street, Dallas County, Texas, on June 20, 2024, and further noted on the court's docket sheet on the same date, but signed on _DECEMBER 10, 2024_

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

**EPSTEIN FAMILY LAW, P.C.**
5949 Sherry Lane, Suite 1070
Dallas, TX 75225
Tel: (972) 232-7673

By: _____

**Robert D. Epstein**
State Bar No. 24065206
robert@epsteinpc.com
*Attorney for Dwight L. Hill*



_____

Lopez Law Firm
Marisol Lopez
SBN: 24050952
301 W. Avenue D
Garland, Texas 75040
972-205-1110 office phone
1-866-232-2077 facsimile
Marisol@lawyerforu.com
Attorney for Maribel L. Hill



June 20, 2024

Hill, Dwight L
4647 Elsby Ave
Dallas, TX 75209-3203

Dear Dwight,

Following is a review of your estimated Termination and Extended Termination Payments you requested. Section IV, Paragraph B of the Agent's Agreement reviews the qualifications that must be met in order for Termination Payments to be made. In order for Termination Payments to be made, the Agent's Agreement must be terminated. The agent will return, or make available for return, Company property within 10 days of the termination of the agreement. In addition, the agent agrees to not induce, advise, or solicit any State Farm policyholders in his account at the time of his termination. The agent also agrees to not act or represent himself in any way as an agent or representative of the Companies. Please see Section III, Termination of Agreement, of the Agent's Agreement for a more thorough review of Termination provisions.

The following are your estimated monthly Termination and Extended Termination Payments by company assuming a 5/31/2024 termination date. Term payments will be made for 60 months following your termination.

|                 | Term Pay | Ext Term Pay |
|-----------------|----------|--------------|
| Auto Voluntary  | $2,640   | $2,640       |
| Auto TCM        | $19      | $0           |
| Fire            | $206     | $201         |
| Lloyds          | $3,763   | $3,737       |
| Fire TCM        | $131     | $131         |
| Health          | $22      | $0           |
| Life            | $107     | $107         |
| **Total**       | **$6,888** | **$6,816** |

**NOTE:** Extended Termination pay is available to agents who are 60 years or older with 20 years of service (last 10 continuous). Please remember that if you terminate prior to age 65, your Extended Termination Payments will be actuarially reduced. Extended termination payments are also available for those agents who meet the terms of the Early Notification Program. Under the Early Notification Program, you can qualify for Extended Termination payments at age 55 if (1) you are at least 55 years old, with 20 years of service (last 10 continuous) OR (2) age plus years of service equals 80.

**Extended Termination amounts will be actuarially reduced for retirement before age 65.** For retirement at age 59 years 7 months, the actuarial factor of 0.6263 reduces your Extended Termination payments to $4,269 a month. If you elect the joint and 2/3 survivor option, the extended term amount would be further adjusted to $3,625 a month. The survivor amount would be $2,417 a month.

**NOTE: Life Writing Compensation** Payments are based on writing compensation that would have been paid to you if your Agreement had not been terminated. **Life Writing Compensation** Payments will fluctuate each month depending on premium paid each month following termination and payments are reduced by a decreasing commission scale as business ages and any lapsed/cancelled policies.

**NOTE:** All figures are estimates. Contract provisions will govern actual amounts.

Attached is the estimate you requested. If you have any additional questions or concerns, please contact an ASR Representative at 1-833-335-0077 and follow the prompts to contracts and compensation.

Our hours of operation are 7am to 7 pm central time, Monday through Friday.

Sincerely,
Agency/Sales Resources

**EXHIBIT**

1

## Special Warranty Deed

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

**Date:** _____, 2024

**Grantor:** Maribel L. Hill

**Grantor's Mailing Address:**

    4647 Elsby Avenue
    Dallas, Texas 75209
    Dallas County

**Grantee:** Dwight L. Hill

**Grantee's Mailing Address:**

    10300 N. Central Expressway, #296
    Dallas, Texas 75231
    Dallas County

**Consideration:**

The division of property ordered by the 302nd Judicial District Court of Dallas County, Texas, in Cause No. DF-22-14398, styled "In the Matter of the Marriage of Dwight L. Hill and Maribel L. Hill and in the Interest of J.L.H., A Child," and ten dollars and other valuable consideration paid by Grantee.

**Property (including any improvements):**

    LOT TWELVE (12), BLOCK TWO (2), SURFSIDE, CONSISTING OF 0.080 ACRES OF LAND, MORE OR LESS, HEREBY SUBDIVIDED OUT OF TRACT 212, OUT OF BRAZOS COAST INVESTMENT COMPANY SUBDIVISION NO. 1, BRANCH T. ARCHER LEAGUE, ABSTRACT 9, BRAZORIA COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS IN VOLUME 1772, PAGE 276 OF THE DEED RECORDS OF BRAZORIA COUNTY, TEXAS. (ACCOUNT NUMBER 6751-002-110)

    More commonly known as 123 Nesmith Place, Surfside Beach, Texas 77541.

---

Special Warranty Deed – 123 Nesmith Place          Page 1 of 3

**Reservations from Conveyance and Exceptions to Conveyance and Warranty:**

This deed is subject to all easements, restrictions, conditions, covenants, and other instruments of record.

**Conveyance:**

Grantor, for the consideration and subject to the reservations from conveyance and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee all of Grantor's interest in the property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise, except as to the reservations from conveyance and exceptions to conveyance and warranty.

Grantor assigns to Grantee the casualty insurance policy on the property, all utility deposits for utility services at the property, and all funds held in escrow for payment of taxes and insurance premiums.

When the context requires, singular nouns and pronouns include the plural.

Grantee assumes all ad valorem taxes due on the property for the current year.

Maribel L. Hill

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

STATE OF TEXAS                              §

COUNTY OF DALLAS                            §


    This      instrument      was      acknowledged      before      me      on
by Maribel L. Hill.


_____
Notary Public, State of Texas

**EXHIBIT**

**2**

## Deed of Trust to Secure Assumption

## Basic Information

**Date:** _____, 2024

**Grantor:** Maribel L. Hill

**Grantor's Mailing Address:**

> 4647 Elsby Avenue
> Dallas, Texas 75209
> Dallas County

**Trustee:** Robert D. Epstein

**Trustee's Mailing Address:**

> 5949 Sherry Lane, Suite 1070
> Dallas, Texas 75225
> Dallas County

**Beneficiary:** Dwight L. Hill

**Beneficiary's Mailing Address:**

> 10300 N. Central Expressway, #296
> Dallas, Texas 75231
> Dallas County

**Note and Deed of Trust Assumed:**

> Date: May 17, 2013
>
> Original principal amount: $336,000.00
>
> Maker and Grantor: Dwight L. Hill and Maribel L. Hill
>
> Payee and Beneficiary: Compass Bank, now known as PNC Bank
>     Loan number 1210015809
>
> Recording information: Instrument Number 201300161422;
>     Dallas County Deed Records

**Property (including any improvements):**

---

LOT TWELVE (12), BLOCK B/5680 OF LINWOOD PLACE ADDITION, AN ADDITION TO THE CITY OF DALLAS, DALLAS COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 3, PAGE 429, MAP RECORDS, DALLAS COUNTY, TEXAS. LINWOOD PLACE BLK B – 5680 LT 12, ACCT #: 425713000000. SUBJECT TO ALL EASEMENTS, COVENANTS, CONDITIONS, RESERVATIONS, LEASES AND RESTRICTIONS OF RECORD, ALL LEGAL HIGHWAYS, ALL RIGHTS OF WAY, ALL ZONING, BUILDING AND OTHER LAWS, ORDINANCES AND REGULATIONS, ALL RIGHTS OF TENANTS IN POSSESSION, AND ALL REAL ESTATE TAXES AND ASSESSMENTS NOT YET DUE AND PAYABLE. BEING THE SAME PROPERTY CONVEYED BY DEED RECORDED IN VOLUME 98034, PAGE 757, OF THE DALLAS COUNTY, TEXAS RECORDS.

More commonly known as 4647 Elsby Avenue, Dallas, Texas 75209.

**Prior Lien:** None

**Other Exceptions to Conveyance and Warranty:** None

**Consideration:** Beneficiary has conveyed the property to Grantor, who as part of the consideration promised to pay the note assumed and to be bound by the deed of trust assumed.

**A.    Granting Clause**

For value received and to secure Grantor's assumption, Grantor conveys the property to Trustee in trust. Grantor warrants and agrees to defend the title to the property, subject to the other exceptions to conveyance and warranty. If Grantor performs all the covenants of the note and deed of trust assumed and if Beneficiary has not filed a notice of advancement, a release of the deed of trust assumed will release this deed of trust to secure assumption and Beneficiary's vendor's lien.

**B.    Grantor's Obligations**

Grantor agrees to –

B.1.    perform all the covenants of the Note and Deed of Trust assumed; and

B.2.    notify Beneficiary and Lender of any change of address.

## C.    Beneficiary's Rights

C.1.    Beneficiary may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

C.2.    If Grantor fails to perform any of Grantor's obligations under the note assumed or deed of trust assumed, Beneficiary may perform those obligations, advance funds required, and then be reimbursed by Grantor on demand for any amounts so advanced, including attorney's fees, plus interest on those amounts from the dates of payment at the highest legal rate.    The amount to be reimbursed will be secured by this deed of trust to secure assumption.

C.3.    Beneficiary may file a sworn notice of such advancement in the office of the county clerk in the county in which the property is located.    The notice will detail the dates, amounts, and purposes of the amounts advanced and the legal description of the property.

C.4.    If Grantor fails on demand to reimburse Beneficiary for the amounts advanced and such failure continues after Beneficiary gives Grantor notice of the failure and the time within which it must be cured, to the extent required by law or by written agreement, Beneficiary may –

- a.    exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect;

- b.    direct Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

---

c.    purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the amount owed to Beneficiary.

## D.    Trustee's Rights and Duties

If directed by Beneficiary to foreclose this lien, Trustee will –

D.1.    either personally or by agent give notice of the foreclosure sale as required by this deed of trust to secure assumption and the Texas Property Code as then in effect;

D.2.    sell and convey all or part of the property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the prior lien and to the other exceptions to conveyance and warranty and without representation or warranty, express or implied, by Trustee;

D.3.    from the proceeds of the sale, pay, in this order –

a.    expenses of foreclosure, including a reasonable commission to Trustee;

b.    to Beneficiary, the full amount advanced, attorney's fees, and other charges due and unpaid;

c.    any amounts required by law to be paid before payment to Grantor; and

d.    to Grantor, any balance; and

D.4.    be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust to secure assumption, which

includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E.    General Provisions**

E.1.    If any of the property is sold under this deed of trust to secure assumption, Grantor must immediately surrender possession to the purchaser.  If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

E.2.    Recitals in any trustee's deed conveying the property will be presumed to be true.

E.3.    Proceeding under this deed of trust to secure assumption, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

E.4.    This lien will be superior to liens later created even if Beneficiary has made no advancements when later liens are created.

E.5.    If any portion of the advancements cannot be lawfully secured by this deed of trust to secure assumption, payments will be applied first to discharge that portion.

E.6.    A sale of the property under this deed of trust to secure assumption-

a.    is subject to Grantor's continuing obligation to make all payments owing on the note assumed and to perform all obligations under the deed of trust assumed; and

b.    does not extinguish Trustee's right to conduct subsequent sales of the property for future Grantor defaults under this deed of trust to secure assumption.

E.7.    Grantor collaterally assigns to Beneficiary all present and future rent from the property and its proceeds.  Grantor warrants the validity and enforceability of the assignment.   Grantor will apply all rent to payment of the note assumed and performance of the deed of trust assumed, but if the rent exceeds the amount due with respect to the note and deed of trust assumed, Grantor may retain the excess.  If a default exists in payment of the note assumed or performance of this deed of trust to secure assumption or of the deed of trust assumed, Beneficiary may exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the property.  Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the property.  Beneficiary will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect.  Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies.

E.8.    Interest on the debt secured by this deed of trust to secure assumption will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law.   Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded.  On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded.   This provision overrides any conflicting provisions in this and all other

instruments concerning the debt.

E.9. Any action taken under this deed of trust to secure assumption will not extinguish the rights of Beneficiary to proceed against Grantor under the indemnity contained in the deed by which Grantor assumed the note and deed of trust assumed.

E.10. When the context requires, singular nouns and pronouns include the plural.

E.11. This deed of trust to secure assumption binds, benefits, and may be enforced by the successors in interest of all parties.

E.12 Grantor waives and surrenders to Beneficiary (a) Grantor's power to authorize anyone (other than Beneficiary or Grantor) to pay ad valorem taxes on the property and (b) Grantor's power to authorize a taxing entity to transfer its tax lien on the property to anyone other than Beneficiary. Grantor agrees and declares that any authorization from Grantor to another (other than Beneficiary) to pay the taxes and transfer a tax lien on the property is void.

E.13. If all or any part of the property is sold, conveyed, leased for a period longer than three years, leased with an option to purchase, or otherwise sold (including any contract for deed) without Beneficiary's prior written consent, which consent may be withheld in Beneficiary's sole discretion, Beneficiary may declare a default of this agreement and seek to foreclose on the property. The creation of a subordinate lien, any conveyance under threat or order of condemnation, or the passage of title by reason of the death of Grantor or by operation of law will not entitle Beneficiary to exercise the remedies provided in this paragraph.

E.14. Grantor agrees to provide proof of payment (including escrows) of all

obligations paid under the assumed note to Beneficiary on request. Grantor and Beneficiary agree to provide each other with ongoing access to all passwords and ongoing online access related to the assumed note. Grantor and Beneficiary agree to forward a copy of any and all correspondence from the underlying Lender to the other party within five business days of receipt.

_____
Maribel L. Hill

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

STATE OF TEXAS                    )

COUNTY OF DALLAS                  )

This instrument was acknowledged before me on _____ by Maribel L. Hill.

_____
Notary Public, State of Texas


 **State Farm**

June 20, 2024

Hill, Dwight L
4647 Elsby Ave
Dallas, TX 75209-3203

Dear Dwight,

Following is a review of your estimated Termination and Extended Termination Payments you requested. Section IV, Paragraph B of the Agent's Agreement reviews the qualifications that must be met in order for Termination Payments to be made. In order for Termination Payments to be made, the Agent's Agreement must be terminated. The agent will return, or make available for return, Company property within 10 days of the termination of the agreement. In addition, the agent agrees to not induce, advise, or solicit any State Farm policyholders in his account at the time of his termination. The agent also agrees to not act or represent himself in any way as an agent or representative of the Companies. Please see Section III, Termination of Agreement, of the Agent's Agreement for a more thorough review of Termination provisions.

The following are your estimated monthly Termination and Extended Termination Payments by company assuming a 5/31/2024 termination date. Term payments will be made for 60 months following your termination.

|  | Term Pay | Ext Term Pay |
|---|---|---|
| Auto Voluntary | $2,640 | $2,640 |
| Auto TCM | $19 | $0 |
| Fire | $206 | $201 |
| Lloyds | $3,763 | $3,737 |
| Fire TCM | $131 | $131 |
| Health | $22 | $0 |
| Life | $107 | $107 |
| **Total** | **$6,888** | **$6,816** |

**NOTE:** Extended Termination pay is available to agents who are 60 years or older with 20 years of service (last 10 continuous). Please remember that if you terminate prior to age 65, your Extended Termination Payments will be actuarially reduced. Extended termination payments are also available for those agents who meet the terms of the Early Notification Program. Under the Early Notification Program, you can qualify for Extended Termination payments at age 55 if (1) you are at least 55 years old, with 20 years of service (last 10 continuous) OR (2) age plus years of service equals 80.

**Extended Termination amounts will be actuarially reduced for retirement before age 65.** For retirement at age 59 years 7 months, the actuarial factor of 0.6263 reduces your Extended Termination payments to $4,269 a month. If you elect the joint and 2/3 survivor option, the extended term amount would be further adjusted to $3,625 a month. The survivor amount would be $2,417 a month.

**NOTE: Life Writing Compensation** Payments are based on writing compensation that would have been paid to you if your Agreement had not been terminated. **Life Writing Compensation** Payments will fluctuate each month depending on premium paid each month following termination and payments are reduced by a decreasing commission scale as business ages and any lapsed/cancelled policies.

**NOTE:** All figures are estimates. Contract provisions will govern actual amounts.

Attached is the estimate you requested. If you have any additional questions or concerns, please contact an ASR Representative at 1-833-335-0077 and follow the prompts to contracts and compensation.

Our hours of operation are 7am to 7 pm central time, Monday through Friday.

Sincerely,
Agency/Sales Resources

**EXHIBIT**

___1___

## Special Warranty Deed

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

**Date:** _____, 2024

**Grantor:** Maribel L. Hill

**Grantor's Mailing Address:**

    4647 Elsby Avenue
    Dallas, Texas 75209
    Dallas County

**Grantee:** Dwight L. Hill

**Grantee's Mailing Address:**

    10300 N. Central Expressway, #296
    Dallas, Texas 75231
    Dallas County

**Consideration:**

The division of property ordered by the 302nd Judicial District Court of Dallas County, Texas, in Cause No. DF-22-14398, styled "In the Matter of the Marriage of Dwight L. Hill and Maribel L. Hill and in the Interest of J.L.H., A Child," and ten dollars and other valuable consideration paid by Grantee.

**Property (including any improvements):**

    LOT TWELVE (12), BLOCK TWO (2), SURFSIDE, CONSISTING OF 0.080 ACRES OF LAND, MORE OR LESS, HEREBY SUBDIVIDED OUT OF TRACT 212, OUT OF BRAZOS COAST INVESTMENT COMPANY SUBDIVISION NO. 1, BRANCH T. ARCHER LEAGUE, ABSTRACT 9, BRAZORIA COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS IN VOLUME 1772, PAGE 276 OF THE DEED RECORDS OF BRAZORIA COUNTY, TEXAS. (ACCOUNT NUMBER 6751-002-110)

    More commonly known as 123 Nesmith Place, Surfside Beach, Texas 77541.

**Reservations from Conveyance and Exceptions to Conveyance and Warranty:**

This deed is subject to all easements, restrictions, conditions, covenants, and other instruments of record.

**Conveyance:**

Grantor, for the consideration and subject to the reservations from conveyance and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee all of Grantor's interest in the property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise, except as to the reservations from conveyance and exceptions to conveyance and warranty.

Grantor assigns to Grantee the casualty insurance policy on the property, all utility deposits for utility services at the property, and all funds held in escrow for payment of taxes and insurance premiums.

When the context requires, singular nouns and pronouns include the plural.

Grantee assumes all ad valorem taxes due on the property for the current year.

Maribel L. Hill

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

STATE OF TEXAS                          §

COUNTY OF DALLAS                        §

      This      instrument      was      acknowledged      before      me      on
by Maribel L. Hill.

---

Notary Public, State of Texas

EXHIBIT

2

## <u>Deed of Trust to Secure Assumption</u>

### Basic Information

**Date:** _____, 2024

**Grantor:** Maribel L. Hill

**Grantor's Mailing Address:**

    4647 Elsby Avenue
    Dallas, Texas 75209
    Dallas County

**Trustee:** Robert D. Epstein

**Trustee's Mailing Address:**

    5949 Sherry Lane, Suite 1070
    Dallas, Texas 75225
    Dallas County

**Beneficiary:** Dwight L. Hill

**Beneficiary's Mailing Address:**

    10300 N. Central Expressway, #296
    Dallas, Texas 75231
    Dallas County

**Note and Deed of Trust Assumed:**

    Date: May 17, 2013

    Original principal amount: $336,000.00

    Maker and Grantor: Dwight L. Hill and Maribel L. Hill

    Payee and Beneficiary: Compass Bank, now known as PNC Bank
                       Loan number 1210015809

    Recording information: Instrument Number 201300161422;
                            Dallas County Deed Records

**Property (including any improvements):**

---

Deed of Trust to Secure Assumption - Elsby                          Page 1 of 8

LOT TWELVE (12), BLOCK B/5680 OF LINWOOD PLACE ADDITION, AN ADDITION TO THE CITY OF DALLAS, DALLAS COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 3, PAGE 429, MAP RECORDS, DALLAS COUNTY, TEXAS. LINWOOD PLACE BLK B – 5680 LT 12, ACCT #: 425713000000. SUBJECT TO ALL EASEMENTS, COVENANTS, CONDITIONS, RESERVATIONS, LEASES AND RESTRICTIONS OF RECORD, ALL LEGAL HIGHWAYS, ALL RIGHTS OF WAY, ALL ZONING, BUILDING AND OTHER LAWS, ORDINANCES AND REGULATIONS, ALL RIGHTS OF TENANTS IN POSSESSION, AND ALL REAL ESTATE TAXES AND ASSESSMENTS NOT YET DUE AND PAYABLE. BEING THE SAME PROPERTY CONVEYED BY DEED RECORDED IN VOLUME 98034, PAGE 757, OF THE DALLAS COUNTY, TEXAS RECORDS.

More commonly known as 4647 Elsby Avenue, Dallas, Texas 75209.

**Prior Lien:** None

**Other Exceptions to Conveyance and Warranty:** None

**Consideration:** Beneficiary has conveyed the property to Grantor, who as part of the consideration promised to pay the note assumed and to be bound by the deed of trust assumed.

**A.    Granting Clause**

For value received and to secure Grantor's assumption, Grantor conveys the property to Trustee in trust. Grantor warrants and agrees to defend the title to the property, subject to the other exceptions to conveyance and warranty. If Grantor performs all the covenants of the note and deed of trust assumed and if Beneficiary has not filed a notice of advancement, a release of the deed of trust assumed will release this deed of trust to secure assumption and Beneficiary's vendor's lien.

**B.    Grantor's Obligations**

Grantor agrees to –

B.1.    perform all the covenants of the Note and Deed of Trust assumed; and

B.2.    notify Beneficiary and Lender of any change of address.

---

## C.   Beneficiary's Rights

C.1.   Beneficiary may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

C.2.   If Grantor fails to perform any of Grantor's obligations under the note assumed or deed of trust assumed, Beneficiary may perform those obligations, advance funds required, and then be reimbursed by Grantor on demand for any amounts so advanced, including attorney's fees, plus interest on those amounts from the dates of payment at the highest legal rate. The amount to be reimbursed will be secured by this deed of trust to secure assumption.

C.3.   Beneficiary may file a sworn notice of such advancement in the office of the county clerk in the county in which the property is located. The notice will detail the dates, amounts, and purposes of the amounts advanced and the legal description of the property.

C.4.   If Grantor fails on demand to reimburse Beneficiary for the amounts advanced and such failure continues after Beneficiary gives Grantor notice of the failure and the time within which it must be cured, to the extent required by law or by written agreement, Beneficiary may –

> a.   exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect;
>
> b.   direct Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

c.   purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the amount owed to Beneficiary.

## D.   Trustee's Rights and Duties

If directed by Beneficiary to foreclose this lien, Trustee will –

D.1.   either personally or by agent give notice of the foreclosure sale as required by this deed of trust to secure assumption and the Texas Property Code as then in effect;

D.2.   sell and convey all or part of the property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the prior lien and to the other exceptions to conveyance and warranty and without representation or warranty, express or implied, by Trustee;

D.3.   from the proceeds of the sale, pay, in this order –

a.   expenses of foreclosure, including a reasonable commission to Trustee;

b.   to Beneficiary, the full amount advanced, attorney's fees, and other charges due and unpaid;

c.   any amounts required by law to be paid before payment to Grantor; and

d.   to Grantor, any balance; and

D.4.   be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust to secure assumption, which

includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E.    General Provisions**

E.1.    If any of the property is sold under this deed of trust to secure assumption, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

E.2.    Recitals in any trustee's deed conveying the property will be presumed to be true.

E.3.    Proceeding under this deed of trust to secure assumption, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

E.4.    This lien will be superior to liens later created even if Beneficiary has made no advancements when later liens are created.

E.5.    If any portion of the advancements cannot be lawfully secured by this deed of trust to secure assumption, payments will be applied first to discharge that portion.

E.6.    A sale of the property under this deed of trust to secure assumption-

a.    is subject to Grantor's continuing obligation to make all payments owing on the note assumed and to perform all obligations under the deed of trust assumed; and

b.    does not extinguish Trustee's right to conduct subsequent sales of the property for future Grantor defaults under this deed of trust to secure assumption.

---

Deed of Trust to Secure Assumption - Elsby                                    Page 5 of 8

E.7. Grantor collaterally assigns to Beneficiary all present and future rent from the property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the note assumed and performance of the deed of trust assumed, but if the rent exceeds the amount due with respect to the note and deed of trust assumed, Grantor may retain the excess. If a default exists in payment of the note assumed or performance of this deed of trust to secure assumption or of the deed of trust assumed, Beneficiary may exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the property. Beneficiary will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies.

E.8. Interest on the debt secured by this deed of trust to secure assumption will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other

instruments concerning the debt.

E.9. Any action taken under this deed of trust to secure assumption will not extinguish the rights of Beneficiary to proceed against Grantor under the indemnity contained in the deed by which Grantor assumed the note and deed of trust assumed.

E.10. When the context requires, singular nouns and pronouns include the plural.

E.11. This deed of trust to secure assumption binds, benefits, and may be enforced by the successors in interest of all parties.

E.12 Grantor waives and surrenders to Beneficiary (a) Grantor's power to authorize anyone (other than Beneficiary or Grantor) to pay ad valorem taxes on the property and (b) Grantor's power to authorize a taxing entity to transfer its tax lien on the property to anyone other than Beneficiary. Grantor agrees and declares that any authorization from Grantor to another (other than Beneficiary) to pay the taxes and transfer a tax lien on the property is void.

E.13. If all or any part of the property is sold, conveyed, leased for a period longer than three years, leased with an option to purchase, or otherwise sold (including any contract for deed) without Beneficiary's prior written consent, which consent may be withheld in Beneficiary's sole discretion, Beneficiary may declare a default of this agreement and seek to foreclose on the property. The creation of a subordinate lien, any conveyance under threat or order of condemnation, or the passage of title by reason of the death of Grantor or by operation of law will not entitle Beneficiary to exercise the remedies provided in this paragraph.

E.14. Grantor agrees to provide proof of payment (including escrows) of all

obligations paid under the assumed note to Beneficiary on request. Grantor and Beneficiary agree to provide each other with ongoing access to all passwords and ongoing online access related to the assumed note. Grantor and Beneficiary agree to forward a copy of any and all correspondence from the underlying Lender to the other party within five business days of receipt.

_____
Maribel L. Hill

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

STATE OF TEXAS              )

COUNTY OF DALLAS        )

      This instrument was acknowledged before me on _____ by Maribel L. Hill.

_____
Notary Public, State of Texas



# EXHIBIT D

# CURRENT MORTGAGE ON ELSY (RESPONDENT SEPARATE PROPERTY WHICH IS PAYING MORTGAGE ON 1211 VELASCO)



# A. Settlement Statement (HUD-1)

OMB No. 2502-0265

### B. Type of Loan

| | | | |
|---|---|---|---|
| 1. ☐ FHA  2. ☐ RHS  3. ☒ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
| 4. ☐ VA  5. ☐ Conv Ins.  6. ☐ Seller Fin | 1332220-ALND | 6710099292 | |
| 7. ☐ Cash Sale. | | | |

C. Note:  This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Dwight L. Hill and Maribel L. Hill<br>4647 Elsby Avenue<br>Dallas, TX 75209 | | Compass Bank<br>701 S. 32nd Street<br>Birmingham, AL 35233 |

| G. Property Location | H. Settlement Agent Name | I. Settlement Date |
|---|---|---|
| Linwood Place, Block B/5680, Lot 12, Collin County<br>4647 Elsby Avenue<br>Dallas, TX 75209 | Allegiance Title Company<br>8111 Preston Road, Suite 300<br>Dallas, TX 75225<br>2146353700<br>Underwritten By: Title Resources<br>Place of Settlement<br>Allegiance Title Company - North Dallas<br>15770 N. Dallas Parkway, #1200<br>Dallas, TX 75248 | 5/17/2013<br>Fund: 5/22/2013 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower | $6,903.51 | 403. | |
| 104. Payoff to Bank of America | $49,582.44 | 404. | |
| 105. Payoff to BBVA Compass | $91,094.92 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City property taxes | | 406. City property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Assessment Taxes | | 408. Assessment Taxes | |
| 109. School property taxes | | 409. School property taxes | |
| 110. Other taxes | | 410. Other taxes | |
| 111. Other taxes | | 411. Other taxes | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | $147,580.87 | **420. Gross Amount Due to Seller** | |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $336,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City property taxes | | 510. City property taxes | |
| 211. County property taxes | | 511. County property taxes | |
| 212. Assessment Taxes | | 512. Assessment Taxes | |
| 213. School property taxes | | 513. School property taxes | |
| 214. Other taxes | | 514. Other taxes | |
| 215. Other taxes | | 515. Other taxes | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $336,000.00 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $147,580.87 | 601. Gross Amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $336,000.00 | 602. Less reductions in amt. due seller (line 520) | |
| 303. Cash To Borrower | $188,419.13 | 603. Cash  Seller | |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting ... may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. N... nessured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the se...

POC (B) – Paid Outside of Closing by Borrower.   POC (S) – Paid Outside of Closing by Seller.   POC (L) – Paid Outside of Closing ...

PLAINTIFF'S EXHIBIT
W  8



## L. Settlement Charges

| | | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|---|
| 700. Total Real Estate Broker Fees | | | | | | |
| Division of Commission (line 700) as follows: | | | | | | |
| 701. | | to | | | | |
| 702. | | to | | | | |
| 703. | | | | | | |
| 704. The following parties, persons, firms or | | to | | | | |
| 705. corporations have received a portion of | | to | | | | |
| 706. the real estate commission shown above. | | to | | | | |

| 800. Items Payable in Connection with Loan | | | | | | |
|---|---|---|---|---|---|---|
| 801. Our origination charge | | | | $3,196.75 | (from GFE #1) | |
| 802. Your credit or charge (points) for the specific rate chosen | | | | $1.69 | (from GFE #2) | |
| 803. Your adjusted origination charges | to | Compass Bank | | | (from GFE A) | $3,196.75 |
| 804. Appraisal Fee | to | Southwest Financial Services, Ltd. | | POC (B) $425.00 | (from GFE #3) | |
| 805. Credit report | to | Equifax Mortgage Solutions | | POC (B) $16.69 | (from GFE #3) | |
| 806. Tax service | to | CoreLogic | | | (from GFE #3) | $105.00 |
| 807. Flood certification | to | CoreLogic Flood Services | | | (from GFE #3) | $12.50 |
| 808. Document Preparation Fee to Polunsky & Beitel, P.C. $225 (in 801) | to | | | | | |

| 900. Items Required by Lender To Be Paid in Advance | | | | | | |
|---|---|---|---|---|---|---|
| 901. Daily interest charges from 5/12/2013 to 6/1/2013 @ $33.37/day | | | | | (from GFE #10) | $333.70 |
| 902. Mortgage Insurance Premium for months | to | | | | (from GFE #3) | |
| 903. Homeowner's insurance for years | to | | | | (from GFE #11) | |

| 1000. Reserves Deposited With Lender | | | | | | |
|---|---|---|---|---|---|---|
| 1001. Initial Deposit for your escrow account | | | | | (from GFE #9) | |
| 1002. Homeowner's insurance | | months @ | per month | | | |
| 1003. Mortgage insurance | | months @ | per month | | | |
| 1004. City property taxes | | months @ | per month | | | |
| 1005. County property taxes | | months @ | per month | | | |
| 1006. Assessment Taxes | | months @ | per month | | | |
| 1007. School property taxes | | months @ | per month | | | |
| 1008. Other taxes | | months @ | per month | | | |
| 1009. Other taxes | | months @ | | | | |
| 1010. Other taxes | | months @ | | | | |
| 1011. Aggregate Adjustment | | | | | | |

| 1100. Title Charges | | | | | | |
|---|---|---|---|---|---|---|
| 1101. Title services and lender's title insurance | to | Allegiance Title Company | | | (from GFE #4) | $3,127.56 |
| 1102. Settlement or closing fee | to | Allegiance Title Company | | | $175.00 | |
| 1103. Owner's title insurance | to | Allegiance Title Company | | | (from GFE #5) | |
| 1104. Lender's title insurance | to | Allegiance Title Company | | | $2,182.00 | |
| 1105. Lender's title policy limit $ | | $336,000.00/$2,886.60 | | | | |
| 1106. Owner's title policy limit $ | | | | | | |
| 1107. Agent's portion of the total title insurance premium | to | Allegiance Title Company | | $2,453.61 | | |
| 1108. Underwriter's portion of the total title insurance premium | to | Title Resources Guaranty | | $432.99 | | |
| 1109. State of Texas Policy Guaranty Fee | to | Allegiance Title Company - Guaranty Fee | | $2.00 (from GFE #4) | | |
| 1110. State of Texas Policy Guaranty Fee | to | Allegiance Title Company - Guaranty Fee | | (from GFE #5) | | |
| 1111. e-Recording Fee | to | Allegiance Title Company | | $6.00 (from GFE #4) | | |
| 1112. Not yet due/payable (MTP & BIN | to | Allegiance Title Company | | $5.00 | | |
| 1113. Tax deletion (MTP & BINDER ONL | to | Allegiance Title Company | | $20.00 | | |
| 1114. Environmental Protection Lien | to | Allegiance Title Company | | $25.00 | | |
| 1115. T19 Res. Endorsement | to | Allegiance Title Company | | $109.10 | | |
| 1116. T42 Endorsement | to | Allegiance Title Company | | $218.20 | | |
| 1117. T42.1 Endorsement | to | Allegiance Title Company | | $327.30 | | |
| 1118. Tax Certificate | to | Allegiance Title Company | | $57.96 (from GFE #4) | | |

| 1200. Government Recording and Transfer Charges | | | | | | |
|---|---|---|---|---|---|---|
| 1201. Government recording charges | | | | | (from GFE #7) | $128.00 |
| 1202. Mortgage $92.00 | | to Allegiance Title Company | | | | |
| 1203. Transfer taxes | | | | | (from GFE #8) | |
| 1204. City/County tax/stamps | | | | | | |
| 1205. State tax/stamps | | | | | | |
| 1206. Home Equity Affidavit | to | Allegiance Title Company | | | $36.00 (from GFE #7) | |

| 1300. Additional Settlement Charges | | | | | | |
|---|---|---|---|---|---|---|
| 1301. Required services you can shop for | | | | | (from GFE #6) | |

| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | | | | $6,903.51 | |
|---|---|---|---|---|---|---|

POC (B) – Paid Outside of Closing by Borrower.  POC (S) – Paid Outside of Closing by Seller.  POC (L) – Paid Outside of Closing by Lender.

## Comparison of Good Faith Estimate (GFE) and HUD-1 Charges

| Charges That Cannot Increase | HUD-1 Line Number | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Our origination charge | # 801 | $3,196.75 | $3,196.75 |
| Your credit or charge (points) for the specific rate chosen | # 802 | $0.00 | $0.00 |
| Your adjusted origination charges | # 803 | $3,196.75 | $3,196.75 |
| Transfer taxes | # 1203 | $0.00 | $0.00 |

| Charges That in Total Cannot Increase More Than 10% | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Government recording charges | # 1201 | $112.00 | $128.00 |
| Appraisal Fee | # 804 | $425.00 | $425.00 |
| Credit report | # 805 | $16.00 | $16.00 |
| Tax service | # 806 | $105.00 | $105.00 |
| Flood certification | # 807 | $12.50 | $12.50 |
| | Total | $670.50 | $686.50 |
| Increase between GFE and HUD-1 Charges | | $16.00 or | 2.39% |

| Charges That Can Change | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Initial deposit for your escrow account | # 1001 | $0.00 | $0.00 |
| Daily interest charges | # 901 $33.37/day | $333.70 | $333.70 |
| Homeowner's insurance | # 903 | $0.00 | $0.00 |
| Title services and lender's title insurance | # 1101 | $3,704.00 | $3,127.56 |

## Loan Terms

| | |
|---|---|
| Your initial loan amount is | $336,000.00 |
| Your loan term is | 30 years |
| Your initial interest rate is | 3.625% |
| Your initial monthly amount owed for principal, interest, and any mortgage insurance is | $1,532.33 includes<br>☒ Principal<br>☒ Interest<br>☐ Mortgage Insurance |
| Can your interest rate rise? | ☒ No. ☐ Yes, it can rise to a maximum of 0%. The first change will be on and can change again every after . Every change date, your interest rate can increase or decrease by 0%. Over the life of the loan, your interest rate is guaranteed to never be lower than 0% or higher than 0%. |
| Even if you make payments on time, can your loan balance rise? | ☒ No. ☐ Yes, it can rise to a maximum of $0.00 |
| Even if you make payments on time, can your monthly amount owed for principal, interest, and mortgage insurance rise? | ☒ No. ☐ Yes, the first increase can be on and the monthly amount owed can rise to $0.00 The maximum it can ever rise to is $0.00 |
| Does your loan have a prepayment penalty? | ☒ No. ☐ Yes, your maximum prepayment penalty is $0.00 |
| Does your loan have a balloon payment? | ☒ No. ☐ Yes, you have a balloon payment of $0.00 due in 0 years on |
| Total monthly amount owed including escrow account payments | ☒ You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance. You must pay these items directly yourself.<br>☐ You have an additional monthly escrow payment of that results in a total initial monthly amount owed of $1,532.33. This includes principal, interest, any mortgage insurance and any items checked below:<br><br>☐ Property taxes ☐ Homeowner's Insurance<br>☐ Flood insurance ☐<br>☐ |

Note: If you have any questions about the Settlement Charges and Loan Terms listed on this form, please contact your lender.

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

_Dwight L. Hill_
DWIGHT L. HILL

_Maribel L. Hill_
MARIBEL L. HILL

### SETTLEMENT AGENT CERTIFICATION

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_____   _____
Settlement Agent                              Date

Warning: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TYLER FARRIS (PK49966) COMPANY:

CUSTOMER ACCOUNT ACTIVITY STATEMENT          DATE 06/06/24
                                             PAGE    1

DWIGHT L HILL
MARIBEL L HILL                    LOAN NUMBER: 1210015809
4647 ELSBY AVE                    REQ BY GUO
DALLAS TX 75209


IF YOU HAVE QUESTIONS ABOUT THIS STATEMENT,
PLEASE CALL PNC'S CUSTOMER SERVICE AT
1-800-822-5626. VISIT PNC.COM TO ACCESS
ACCOUNT INFORMATION.
*************************************************************************
---------------------- CURRENT ACCOUNT INFORMATION ----------------------

| DATE PAYMENT DUE | TOTAL PAYMENT AMOUNT | PRINCIPAL & INTEREST PAYMENT | LOAN INTEREST RATE | CURRENT PRINCIPAL BALANCE | ESCROW BALANCE |
|---|---|---|---|---|---|
| 07-01-24 | 1,532.33 | 1,532.33 | 3.62500 | 252,245.55 | 0.00 |
| 2ND MORTGAGE: | | | 0.00  0.00000 | 0.00 | |

*************************************************************************

ACTIVITY FOR PERIOD 05/17/13 - 06/05/24

| PROCESS DATE | DUE DATE | TRANSACTION CODE | TRANSACTION DESCRIPTION | EFFECTIVE DATE OF TRANSACTION |
|---|---|---|---|---|
| TRANSACTION AMOUNT | PRIN. PAID/ BALANCE | INTEREST | ESCROW PAID/ BALANCE | ---------OTHER--------- AMOUNT  CODE/DESCRIPTION |

| | | | | |
|---|---|---|---|---|
| 06-03-24  06-24  171  PAYMENT | | | | 06-01-24 |
| 1,532.33 | 768.02 | 764.31 | 0.00 | |
| | 252,245.55 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 05-01-24  05-24  171  PAYMENT | | | | |
| 1,532.33 | 765.71 | 766.62 | 0.00 | |
| | 253,013.57 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 04-01-24  04-24  171  PAYMENT | | | | |
| 1,532.33 | 763.40 | 768.93 | 0.00 | |
| | 253,779.28 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 03-01-24  03-24  171  PAYMENT | | | | |
| 1,532.33 | 761.10 | 771.23 | 0.00 | |
| | 254,542.68 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 02-01-24  02-24  171  PAYMENT | | | | |
| 1,532.33 | 758.81 | 773.52 | 0.00 | |
| | 255,303.78 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 01-02-24  01-24  171  PAYMENT | | | | 01-01-24 |
| 1,532.33 | 756.52 | 775.81 | 0.00 | |
| | 256,062.59 | | | NEW PRINCIPAL/ESCROW BALANCES |

DLH-009256

CUSTOMER ACCOUNT ACTIVITY STATEMENT           DATE 06/06/24
REQ BY GUO                                              PAGE   2


DWIGHT L HILL
LOAN NUMBER: 1210015809

ACTIVITY FOR PERIOD 05/17/13 - 06/05/24

| PROCESS DATE | DUE DATE | TRANSACTION CODE | TRANSACTION DESCRIPTION | | EFFECTIVE DATE OF TRANSACTION |
|---|---|---|---|---|---|
| TRANSACTION AMOUNT | PRIN. PAID/ BALANCE | INTEREST | ESCROW PAID/ BALANCE | OTHER AMOUNT | CODE/DESCRIPTION |
| 12-01-23 12-23 | 171 | PAYMENT | | | |
| 1,532.33 | 754.24 | 778.09 | 0.00 | | |
| | 256,819.11 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 11-01-23 11-23 | 171 | PAYMENT | | | |
| 1,532.33 | 751.97 | 780.36 | 0.00 | | |
| | 257,573.35 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 10-02-23 10-23 | 171 | PAYMENT | | | 10-01-23 |
| 1,532.33 | 749.71 | 782.62 | 0.00 | | |
| | 258,325.32 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 09-01-23 09-23 | 171 | PAYMENT | | | |
| 1,532.33 | 747.45 | 784.88 | 0.00 | | |
| | 259,075.03 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 08-01-23 08-23 | 171 | PAYMENT | | | |
| 1,532.33 | 745.20 | 787.13 | 0.00 | | |
| | 259,822.48 | | | | NEW PRINCIPAL/ESCROW BALANCES 07-01-23 |
| 07-03-23 07-23 | 171 | PAYMENT | | | |
| 1,532.33 | 742.95 | 789.38 | 0.00 | | |
| | 260,567.68 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 06-01-23 06-23 | 171 | PAYMENT | | | |
| 1,532.33 | 740.72 | 791.61 | 0.00 | | |
| | 261,310.63 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 05-01-23 05-23 | 171 | PAYMENT | | | |
| 1,532.33 | 738.49 | 793.84 | 0.00 | | |
| | 262,051.35 | | | | NEW PRINCIPAL/ESCROW BALANCES 04-01-23 |
| 04-03-23 04-23 | 171 | PAYMENT | | | |
| 1,532.33 | 736.26 | 796.07 | 0.00 | | |
| | 262,789.84 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 03-01-23 03-23 | 171 | PAYMENT | | | |
| 1,532.33 | 734.04 | 798.29 | 0.00 | | |
| | 263,526.10 | | | | NEW PRINCIPAL/ESCROW BALANCES |
| 02-01-23 02-23 | 171 | PAYMENT | | | |
| 1,532.33 | 731.83 | 800.50 | 0.00 | | |
| | 264,260.14 | | | | NEW PRINCIPAL/ESCROW BALANCES 01-01-23 |
| 01-03-23 01-23 | 171 | PAYMENT | | | |
| 1,532.33 | 729.63 | 802.70 | 0.00 | | |
| | 264,991.97 | | | | NEW PRINCIPAL/ESCROW BALANCES |

DLH-009257

CUSTOMER ACCOUNT ACTIVITY STATEMENT        DATE 06/06/24

REQ BY GUO                                            PAGE    3


DWIGHT L HILL
LOAN NUMBER: 1210015809

ACTIVITY FOR PERIOD 05/17/13 - 06/05/24

| PROCESS DATE | DUE DATE | TRANSACTION CODE | TRANSACTION DESCRIPTION | EFFECTIVE DATE OF TRANSACTION |
|---|---|---|---|---|
| TRANSACTION AMOUNT | PRIN. PAID/ BALANCE | INTEREST | ESCROW PAID/ BALANCE | OTHER AMOUNT  CODE/DESCRIPTION |

| 12-01-22 | 12-22 | 171 | PAYMENT | |
| 1,532.33 | 727.43 | 804.90 | 0.00 | |
| | 265,721.60 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 11-01-22 | 11-22 | 171 | PAYMENT | |
| 1,532.33 | 725.24 | 807.09 | 0.00 | |
| | 266,449.03 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 10-03-22 | 10-22 | 171 | PAYMENT | 10-01-22 |
| 1,532.33 | 723.06 | 809.27 | 0.00 | |
| | 267,174.27 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 09-01-22 | 09-22 | 171 | PAYMENT | |
| 1,532.33 | 720.88 | 811.45 | 0.00 | |
| | 267,897.33 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 08-01-22 | 08-22 | 171 | PAYMENT | |
| 1,532.33 | 718.71 | 813.62 | 0.00 | |
| | 268,618.21 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 07-01-22 | 07-22 | 171 | PAYMENT | |
| 1,532.33 | 716.54 | 815.79 | 0.00 | |
| | 269,336.92 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 06-01-22 | 06-22 | 171 | PAYMENT | |
| 1,532.33 | 714.39 | 817.94 | 0.00 | |
| | 270,053.46 | | | NEW PRINCIPAL/ESCROW BALANCES 05-01-22 |
| 05-02-22 | 05-22 | 171 | PAYMENT | |
| 1,532.33 | 712.23 | 820.10 | 0.00 | |
| | 270,767.85 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 04-01-22 | 04-22 | 171 | PAYMENT | |
| 1,532.33 | 710.09 | 822.24 | 0.00 | |
| | 271,480.08 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 03-01-22 | 03-22 | 171 | PAYMENT | |
| 1,532.33 | 707.95 | 824.38 | 0.00 | |
| | 272,190.17 | | | NEW PRINCIPAL/ESCROW BALANCES |
| 02-01-22 | 02-22 | 171 | PAYMENT | |
| 1,532.33 | 705.82 | 826.51 | 0.00 | |
| | 272,898.12 | | | NEW PRINCIPAL/ESCROW BALANCES 01-01-22 |
| 01-03-22 | 01-22 | 171 | PAYMENT | |
| 1,532.33 | 703.69 | 828.64 | 0.00 | |
| | 273,603.94 | | | NEW PRINCIPAL/ESCROW BALANCES |

DLH-009258

CUSTOMER ACCOUNT ACTIVITY STATEMENT                    DATE 06/06/24

REQ BY GUO                                                      PAGE    4


DWIGHT L HILL
LOAN NUMBER: 1210015809

                      ACTIVITY FOR PERIOD 05/17/13 - 06/05/24
PROCESS    DUE     TRANSACTION         TRANSACTION            EFFECTIVE DATE
DATE       DATE    CODE                DESCRIPTION            OF TRANSACTION
-----------------------------------------------------------------------------
TRANSACTION    PRIN. PAID/        ESCROW PAID/ ------------OTHER-----------
  AMOUNT        BALANCE    INTEREST  BALANCE   AMOUNT  CODE/DESCRIPTION
-----------------------------------------------------------------------------
12-01-21  12-21   171   PAYMENT
   1,532.33      701.57    830.76     0.00
              274,307.63                     NEW PRINCIPAL/ESCROW BALANCES
11-01-21  11-21   171   PAYMENT
   1,532.33      699.46    832.87     0.00
              275,009.20                     NEW PRINCIPAL/ESCROW BALANCES
10-08-21  10-21   171   PAYMENT
   1,532.33      697.35    834.98     0.00
              275,708.66                     NEW PRINCIPAL/ESCROW BALANCES
10-01-21  10-21   170   BEGINNING BALANCES (ESCROW, INTEREST, ETC.)
  13,790.97    6,182.43  7,608.54     0.00
              276,406.01                     NEW PRINCIPAL/ESCROW BALANCES

DLH-009259

# Uniform Residential Loan Application

130491101

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked when [ ] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [X] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below).

Borrower _Dwight L Hill_    Co-Borrower _(signature)_

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | [ ] VA   [X] Conventional   [ ] Other (explain):  [ ] FHA  [ ] USDA/Rural Housing Service | Agency Case Number | Lender Case Number 9434322 |
|---|---|---|---|

| Amount | Interest Rate | No. of Months | Amortization Type: |
|---|---|---|---|
| $336,000.00 | 3.625000 % | 360 | [X] Fixed Rate  [ ] GPM   [ ] Other (explain):  [ ] ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state & ZIP)
4647 ELSBY AVE, DALLAS, TX 75209

No. of Units: 1

Legal Description of Subject Property (attach description if necessary)
Lot 12, Block B/5660, Linwood Place

Year Built: 1936

Purpose of Loan: [ ] Purchase  [ ] Construction  [ ] Other (explain):  [X] Refinance  [ ] Construction-Permanent

Property will be: [X] Primary Residence  [ ] Secondary Residence  [ ] Investment

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
|  | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [ ] made  [ ] to be made |
|---|---|---|---|---|
| 1995 | $80,000.00 | $135,000.00 | Cash-out/other | Cost $ |

Title will be held in what Name(s)
DWIGHT L HILL & MARIBEL L. HILL

Manner in which Title will be held
SEE TITLE REPORT

Estate will be held in:
[X] Fee Simple
[ ] Leasehold (show expiration date)

Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain)
Checking/Savings

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name (include Jr. or Sr. if applicable) | DWIGHT L HILL | MARIBEL L. HILL |

| | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|
| Borrower | 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 | (214) 478-3150 | 10/03/1964 | 16 |
| Co-Borrower | 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 | (214) 478-3150 | 11/08/1969 | 16 |

Borrower: [X] Married (include registered domestic partners)  [ ] Separated  [ ] Unmarried (include single, divorced, widowed)
Dependents (not listed by Co-Borrower) no. 2  ages 10yrs;7yrs

Co-Borrower: [X] Married (include registered domestic partners)  [ ] Separated  [ ] Unmarried (include single, divorced, widowed)
Dependents (not listed by Borrower) no. 0

Present Address (street, city, state, ZIP)  [X] Own  [ ] Rent  12 No. Yrs.
4647 ELSBY AVE
DALLAS, TX 75209

Present Address (street, city, state, ZIP)  [X] Own  [ ] Rent  18 No. Yrs.
4647 ELSBY AVE
DALLAS, TX 75209

Mailing Address, if different from Present Address

Mailing Address, if different from Present Address

If residing at present address for less than two years, complete the following:

Former Address (street, city, state, ZIP)  [ ] Own  [ ] Rent  ___ No. Yrs.

Former Address (street, city, state, ZIP)  [ ] Own  [ ] Rent  ___ No. Yrs.

## IV. EMPLOYMENT INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | DWIGHT HILL INSURANCE AGENCY INC [X] Self Employed  4246 W LOVERS LN  DALLAS, TX 75209 | DWIGHT HILL INSURANCE AGENCY INC. [X] Self Employed  4246 W LOVERS LN  DALLAS, TX 75209 |
| Yrs. on this job | 25yrs 0mos | 12yrs 0mos |
| Yrs. employed in this line of work/profession | 25yrs 0mos | 12yrs 0mos |
| Position/Title/Type of Business | PRESIDENT  INSURANCE | VICE PRESIDENT  INSURANCE |
| Business Phone (incl. area code) | (214) 727-5754 | (214) 352-7404 |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | [ ] Self Employed | [ ] Self Employed |
| Dates (from-to) | | |
| Monthly Income | $ | $ |
| Position/Title/Type of Business | | |
| Business Phone (incl. area code) | | |

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | [ ] Self Employed | [ ] Self Employed |
| Dates (from-to) | | |
| Monthly Income | $ | $ |
| Position/Title/Type of Business | | |
| Business Phone (incl. area code) | | |

Uniform Residential Loan Application
Freddie Mac Form 65 7/05 (rev. 6/09)

Fannie Mae Form 1003 7/05 (rev. 6/09)

Page 1 of 8

DLH-009272

Uniform Residential Loan Application - MPS Standard Version © 2011 Harland Financial Solutions, Inc.

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 7,992.37 | $ 7,992.37 | $ 15,984.74 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 1,600.00 | $ 1,532.33 |
| Bonuses | | | | Other Financing (P&I) | 400.00 | |
| Commissions | | | | Hazard Insurance | | 176.08 |
| Dividends/Interest | | | | Real Estate Taxes | 750.00 | 716.91 |
| Net Rental Income | | | | Mortgage Insurance | | |
| OTHER (before completing, see the notice in "describe other income," below) | | | | Homeowner Association Dues | | |
| | | | | Other | | |
| Total | $ 7,992.37 | $ 7,992.37 | $ 15,984.74 | Total | $ 2,750.00 | $ 2,425.32 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income     Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed [X] Jointly [ ] Not Jointly

| ASSETS Description | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property | $ Payment/Months | $ |
| List checking and savings accounts below | | Name and address of Company | | |
| Name and address of Bank, S&L, or Credit Union COMPASS | | See Continuation Sheet for Schedule of Liabilities | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. 0010364752 | $ 5,795.64 | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | | | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | | | |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value Face amount: $ 0.00 | $ 0.00 | | | |
| Subtotal Liquid Assets | $ 5,795.64 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 1,435,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. No. Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 6,052.70 | |
| Total Assets a. | $ 1,440,795.64 | Net Worth (a minus b) ▶ $ 1,212,973.83 | Total Liabilities b. | 227,821.81 |

Uniform Residential Loan Application
Freddie Mac Form 65 7/05 (rev. 6/09)     Page 2 of 5      Fannie Mae Form 1003 7/05 (rev. 6/09)
* Harland Financial Solutions, Inc.

## VI. ASSETS AND LIABILITIES (cont.)

Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if Sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| See Continuation Sheet for Schedule of Real Estate Owned — Totals | | $ 1,435,000.00 | $ 199,874.81 | $ 0.00 | $ 3,393.00 | $ 1,122.14 | $ 0.00 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

### VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 140,677.36 |
| e. Estimated prepaid items | 333.70 |
| f. Estimated closing costs | 7,010.81 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 148,021.87 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) Other equity | 441.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 336,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 336,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | - 188,419.13 |

### VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | | X | | X |
| b. Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. Are you a party to a lawsuit? | | X | | X |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | X |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | | X | | X |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| h. Is any part of the down payment borrowed? | | X | | X |
| i. Are you a co-maker or endorser on a note? | | X | | X |
| j. Are you a U.S. citizen? | X | | X | |
| k. Are you a permanent resident alien? | | X | | X |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | X | |
| m. Have you had an ownership interest in a property in the last three years? | X | | X | |
| (1) What type of property did you own – principal residence (PR), second home (SH), or investment property (IP)? | SH | | SH | |
| (2) How did you hold title to the home – by yourself (S), jointly with your spouse (SP) or jointly with another person (O)? | SP | | SP | |

### IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

Acknowledgement. Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Dwight Z. Khit* | | X | |

### X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER ☐ I do not wish to furnish this information. | CO-BORROWER ☐ I do not wish to furnish this information. |
|---|---|
| Ethnicity: ☐ Hispanic or Latino ☒ Not Hispanic or Latino | Ethnicity: ☒ Hispanic or Latino ☐ Not Hispanic or Latino |
| Race: ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☒ White | Race: ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☒ White |
| Sex: ☐ Female ☒ Male | Sex: ☒ Female ☐ Male |

To be Completed by Loan Originator:
This information was provided:
☐ In a face-to-face interview
☐ In a telephone interview
☐ By the applicant and submitted by fax or mail
☒ By the applicant and submitted via e-mail or the Internet

| Loan Originator's Signature X | Date 4/17/2013 |
|---|---|
| Loan Originator's Name (print or type) Aaron Clark | Loan Originator Identifier 222693 | Loan Originator's Phone Number (including area code) (760) 613-4548 |
| Loan Origination Company's Name Compass Bank | Loan Origination Company Identifier 402936 | Loan Origination Company's Address 3920 Glade Road, Colleyville TX 76034 |

Uniform Residential Loan Application
Freddie Mac Form 65 7/05 (rev. 6/09)
Harland Financial Solutions, Inc.
Page 3 of 5
Fannie Mae Form 1003 7/05 (rev. 6/09)

DLH-009274

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: DWIGHT L HILL | | Agency Case Number: |
|---|---|---|---|
| | Co-Borrower: MARIBEL L. HILL | | Lender Case Number: 9434322 |

05/16/2013

SCHEDULE OF LIABILITIES AND PLEDGED ASSETS

| CREDITOR'S NAME, ADDRESS AND ACCOUNT NUMBER | ACCT. NUMBER. NAME IF NOT BORROWER'S | NO. PMT/ MOS LEFT | UNPAID BALANCE |
|---|---|---|---|
| **INSTALLMENT DEBTS** | | $ PMT/MOS. $ | |
| CO. STATEFARMCU<br>ADDR. ONE STATE FARM PLAZA<br>CITY BLOOMINGTON, IL 61710 | ACCT # 25522890300<br>ACCT NAME | 320.00<br>/24 | 7471.00 |
| CO. STATEFARMCU<br>ADDR. ONE STATE FARM PLAZA<br>CITY BLOOMINGTON, IL 61710 | ACCT # 25522895100<br>ACCT NAME | 191.00<br>/54 | 10164.00 |
| **REVOLVING DEBTS** | | $ PMT/MOS. $ | |
| CO. CAP ONE<br>ADDR. PO BOX 85015<br>CITY RICHMOND, VA 23285 | ACCT # 5528518853493206<br>ACCT NAME | 119.00<br>/35 | 4113.00 |
| CO. CITI<br>ADDR. 701 E 60TH ST B IBS CDV DISPUT<br>CITY SIOUX FALLS, SD 57104 | ACCT # 5466150014846263<br>ACCT NAME | 163.00<br>/37 | 6027.00 |
| CO. DISCOVER FIN<br>ADDR. PO BOX15316 ATT CMS PROD DEVEL<br>CITY WILMINGTON, DE 19850 | ACCT # 6011003551175460<br>ACCT NAME | 35.00<br>/5 | 172.00 |
| **REAL ESTATE LOANS** | | $ PMT/MOS. $ | |
| CO. WFHM<br>ADDR. 8400 STAGECOACH CIR<br>CITY FREDERICK, MD 21701 | LOAN # 7080042157073<br>ACCT NAME | 1198.00<br>/37 | 44427.00 |
| CO. BK OF AMER<br>ADDR. 4161 PIEDMONT PKWY<br>CITY GREENSBORO, NC 27410 | LOAN # 20899170<br>ACCT NAME | 1463.00<br>/0* | *<br>49554.16 |
| CO. COMPASS BK<br>ADDR. 701 S 32ND ST<br>CITY BIRMINGHAM, AL 35233 | LOAN # 4355764000098636<br>ACCT NAME | 347.00<br>/0* | *<br>90967.65 |
| CO. STATEFARMCU<br>ADDR. 1 STATE FARM PLAZA<br>CITY BLOOMINGTON, IL 61710 | LOAN # 25522891900<br>ACCT NAME | 385.00<br>/39 | 14926.00 |
| CO. N/A-Other expenses for property at:<br>ADDR. 103 YUCCA<br>CITY SURFSIDE BEACH, TX 77541 | LOAN #<br>ACCT NAME | 90.43 | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Dwight L. Hill_ | 5/17/13 | X _[signature]_ | |

# Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>DWIGHT L HILL | | Agency Case Number: |
|---|---|---|---|
| | Co-Borrower:<br>MARIBEL L. HILL | | Lender Case Number:<br>9434322 |

05/16/2013       SCHEDULE OF LIABILITIES AND PLEDGED ASSETS

| CREDITOR'S NAME, ADDRESS AND ACCOUNT NUMBER | ACCT. NUMBER, NAME IF NOT BORROWER'S | | MO. PMT/ MOS LEFT | UNPAID BALANCE |
|---|---|---|---|---|
| REAL ESTATE LOANS | | $ | PMT/MOS. | $ |
| CO.   N/A-Other expenses for property at:<br>ADDR. 118 NESMITH PLACE LOT1A-2A<br>CITY   SURFSIDE BEACH, TX 77541 | LOAN #<br>ACCT NAME | | 37.50 | |
| CO.   N/A-Other expenses for property at:<br>ADDR. NESMITH PLACE LOT1T03<br>CITY   SURFSIDE BEACH, TX 77541 | LOAN #<br>ACCT NAME | | 206.91 | |
| CO.   N/A-Other expenses for property at:<br>ADDR. 111 NESMITH PLACE/LOT9/10<br>CITY   SURFSIDE BEACH, TX 77541 | LOAN #<br>ACCT NAME | | 337.23 | |
| CO.   N/A-Other expenses for property at:<br>ADDR. NESMITH PLACE, LOTS 12<br>CITY   SURFSIDE BEACH, TX 77541 | LOAN #<br>ACCT NAME | | 450.07 | |
| ALIMONY/CHILD SUPPORT/SEPARATE MAINTENANCE | | $ | PMT/MOS. | |
| taxes for additional propertie | | | 709.56 | |
| TOTAL MONTHLY PAYMENTS | | | 6052.70 | |
| TOTAL LIABILITIES | | | | 227821.81 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Dwight L. Hill* | 5/17/13 | X *[signature]* | |

Freddie Mac Form 65   07/05
Uniform Residential Loan Application - MFS Standard Version   © 2013 Harland Financial Solutions, Inc.

DLH-009478   Fannie Mae Form 1003   07/05
5/16/2010

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>DWIGHT L HILL | | Agency Case Number: |
|---|---|---|---|
| | Co-Borrower:<br>MARIBEL L. HILL | | Lender Case Number:<br>9434322 |

05/16/2013

SCHEDULE OF REAL ESTATE OWNED

| ADDRESS OF PROPERTY | TYPE OF PROPERTY/ STATUS* | PRESENT MARKET VALUE | MONTHS LEFT | AMOUNT OF MORTGAGES & LIENS | GROSS RENTAL INCOME | MORTGAGE PAYMENTS | TAXES/INS MAINT & MISC. | NET RENTAL INCOME |
|---|---|---|---|---|---|---|---|---|
| 4647 ELSBY AVE DALLAS, TX 75209 | SFD/ N | 420000.00 | 0 | 140521.81 | 0.00 | 1810.00 | 0.00 | 0.00 |
| 103 YUCCA SURFSIDE BEACH, TX 77541 | Other/ | 165000.00 | 39 | 14926.00 | 0.00 | 385.00 | 90.43 | 0.00 |
| 118 NESMITH PLACE LOT1A-2A SURFSIDE BEACH, TX 77541 | Other/ | 45000.00 | 0 | 0.00 | 0.00 | 0.00 | 37.50 | 0.00 |
| NESMITH PLACE LOT1T03 SURFSIDE BEACH, TX 77541 | Other/ | 45000.00 | 0 | 0.00 | 0.00 | 0.00 | 206.91 | 0.00 |
| 111 NESMITH PLACE/LOTS9/10 SURFSIDE BEACH, TX 77541 | Other/ | 165000.00 | 37 | 44427.00 | 0.00 | 1198.00 | 337.23 | 0.00 |
| NESMITH PLACE, LOTS 12 SURFSIDE BEACH, TX 77541 | Other/ | 595000.00 | 0 | 0.00 | 0.00 | 0.00 | 450.07 | 0.00 |
| TOTALS | | 1435000.00 | | 199874.81 | 0.00 | 3393.00 | 1122.14 | 0.00 |

* Indicates: H if Borrower's Primary Residence, S if Sold, PS if Pending Sale, R if Rental being held for income, N if Subject Property not included in debt ratios (i.e. Refinance)

** vacancy factor applied

I/We fully understand that it is a Federal crime punishable by fine or imprisonment or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| x Dwight L. Hill | 5/17/13 | x | |

Freddie Mac Form 65  07/05   Page 6 of 6   DLH-009227

Uniform Residential Loan Application • MFS Standard Version   © 2013 Harland Financial Solutions, Inc.

Mortgage Forms 1003  07/05

5/14/2010



# EXHIBIT E

# ELSBY MORTGAGE PRIOR TO MARRIAGE ($ 78,527) WITH A WATER CLAIM BEING PAID OF $ 83,583.52, MADE PRIOR TO MARRIAGE)

 **Washington Mutual**

Date: 01/09/2002
Loan Number: 0038743209

Borrower's Name(s)
DWIGHT L HILL

Borrower's Current Address
4647 ELSBY AVE

DALLAS, TX 75209
Security Property
Description: 4647 ELSBY AVE

DALLAS, TX 75209

Serial #
Located (or to be located) at 4647 ELSBY AVE

DALLAS, TX 75209

We are pleased to inform you that your application for a loan (the "Loan") to be secured by the Security Property identified above, has been approved by Washington Mutual Bank, FA (the "Bank") in the amount and on the terms stated below, subject to the following conditions.

Purpose: This Loan is being made to finance the ☐ purchase ☒ refinance of the Security Property, if a manufactured home and address is noted above, such is installed or to be installed at the Security Property address above.

Repayment Terms:

Loan Amount: 396,000.00
Term: 240
Interest Rate: ☒ Fixed ☐ Initial Variable Rate 6.840 % per annum
Index: 0.000 %
Margin: 0.000 %
Interest Rate ☒ is ☐ is not conditioned upon participation in Autopay
Payments: 6734.86 ☒ Monthly ☐ Initial Monthly
Loan Fee payable at Closing _____

Interest rate is locked for 30 days from the date of your application. If the loan does not close and fund by that date, your interest rate will be the Bank's rate for Loans of this type as of the date documents are drawn.

Conditions: All documents to be provided, information to be verified or other conditions to be satisfied, including without limit, work, repairs, and appraisals, whether set forth above or below, must be acceptable and satisfactory to the Bank, in its sole discretion. This Commitment is subject to the following terms and conditions which must be satisfied prior to preparation of documents except as otherwise indicated. Any matter requiring Bank's approval is subject to the Bank's sole discretion.

If you are going to apply to have a manufactured home considered real property under applicable law, you must provide Bank satisfactory evidence at least 10 days notice prior to closing that the manufactured home has been or will be permanently attached to the real property pursuant to Texas Property Code Section 2.001, with the certificate of title surrendered to the Texas Department of Housing and Community Affairs and a certificate of permanent attachment filed in the real property records of the county where the property is located.

Other Conditions:

1. AN ACCEPTABLE COLLATERAL APPROVAL, THAT MEETS BANK GUIDELINES, BY THE LENDER MUST BE SUBMITTED PRIOR TO CLOSING AND ANY CONDITIONS FOR REPAIRS MUST BE SATISFACTORILY MET AND COMPLETED WITH A MINIMUM PROPERTY VALUE OF $240,000.00

2. RECEIPT OF FLOOD HAZARD DETERMINATION TO INCLUDE LIFE OF LOAN TRACKING.

3. RECEIPT OF A MORTGAGEE'S TITLE INSURANCE POLICY, WITH ANY SPECIAL ENDORSEMENTS WHICH THE BANK MAY REQUIRE, INSURING THE BANK'S SECURITY INSTRUMENT AS A VALID LIEN AGAINST THE SECURITY.

4. YOUR INTEREST RATE WILL REFLECT A .125% REDUCTION IF YOU HAVE CHOSEN TO PARTICIPATE IN THE BANK'S AUTOPAY PROGRAM. AUTOPAY IS A SERVICE THAT AUTOMATICALLY WITHDRAWS FUNDS FROM YOUR DEPOSIT ACCOUNT TO MAKE YOUR LOAN PAYMENT.

5. IF THE EXISTING SURVEY IS OLDER THAN 7 YEARS, A NEW SURVEY WILL BE ORDERED FOR $295 FEES TO THE BORROWER.

6. BORROWER TO FAX A COPY OF THE NOTE ON EXISTING FIRST LIEN MORTGAGE TO 214-358-2518.

7. 12 DAY COOLING OFF PERIOD, AND 3 DAY RIGHT OF RESCISSION APPLIES.

8. A COPY OF HAZ INSURANCE TO BE FAXED TO: 214-358-2518


EXHIBIT
W 6

4003 (01/24/01) W2.1

BORROWER COPY

Hazard Insurance: All insurance must be in form and issued by companies acceptable to the Bank naming Bank as loss payee, in a position acceptable to the Bank. If we advise you that the Security Property is located in a federally designated Flood Hazard area, Flood Hazard Insurance is required. You will be required to provide the Bank with a policy or policies of insurance against fire and "extended coverage" perils in an amount which is at least equal to the replacement cost of the Security Property or the Loan Amount, whichever is less.

If the Security Property includes a manufactured home, the above fire and extended coverage policy must be under a manufactured home policy. You may provide the required property insurance through existing policies or you may purchase the required insurance through any insurance company authorized to transact business in Texas that is reasonably acceptable to Bank.

Adverse Change in Financial Condition: Lender reserves the right to verify and reverify information submitted during the loan process. Lender shall have the right to rescind this Commitment with no further obligation to make the loan: (1) in the event of a material change in your credit or financial condition prior to the expiration of the Commitment; (2) in the event of a material change in the value, lien position, or condition of the Security Property prior to the expiration of this commitment; (3) in the event Lender discovers evidence of misrepresentation or omission of material fact in connection with your loan application or any aspect of the contemplated transaction; or, (4) to the extent permitted by law, in the event of ministerial, clerical, or calculation error in the processing or underwriting of your loan request or issuing any commitment or in the event of a misquote in your pricing package. Notwithstanding anything to the contrary in any commitment, conditional approval, or otherwise which may be issued by Lender, should your financial institution return your check for any fee related hereto, including without limit, insufficient funds, payment stopped, or account closed, Lender shall have the right, at its discretion, to deny the Loan, remove the interest rate lock and to pursue any other remedy available at law, equity, or otherwise.

Assignment: This Commitment is made solely to the above named Borrower(s) and may not be assigned and shall terminate in the event of an attempt by you to assign it to a third party. No third parties are entitled to rely on this Commitment.

Documents and Closing: All documents and terms not specified herein shall be the Bank's standard terms and conditions for a loan of this type and must be satisfactory to Bank. The Loan will be closed by the Bank or other settlement agent acceptable to the Bank.

Expiration: The Bank shall have no obligation under this Commitment and all fees previously collected will be earned unless all the above mentioned conditions have been satisfied, in full, all required documents signed and where appropriate, filed or recorded prior to 30 days from the date of this letter ("Expiration Date"). If this Loan is subject to the three day right to rescind under the Federal Truth In Lending Act, the three days must expire before the Expiration Date in order to allow time for funding and recording.

Additional Cost: You must pay as applicable all lawfully permitted costs and other charges incurred in connection with the Loan including, but not limited to, title insurance premiums, appraisal, inspection flood search and tracking, attorney fees, recording, filing, other governmental and lender fees, based on Lender's fee policy applicable at the time of this commitment, subject to legal limits.

| By | | Date |
|----|----|------|
| FRED ROOMIANI | *Fred Roomiani*, V.P. | 01/09/2002 |

NOTICE: THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND, TO THE EXTENT PERMITTED BY LAW, MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

I ACCEPT THIS COMMITMENT ON THE TERMS AND CONDITIONS STATED ABOVE.

DWIGHT L HILL

*Mailed to Borrower in 1/9/02.*

BORROWER COPY

Washington Mutual

BORROWER NAMES: ...IGHT L HILL

0038743209

| PROPERTY ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4647 ELSBY AVE | DALLAS, TX 75209 | | |

| PURPOSE | OCCUPANCY | INTEREST RATE | TERM (MONTHS) |
|---|---|---|---|
| ☐ PURCHASE ☐ REFINANCE ☐ CONSTRUCTION/HOME IMPROVEMENT | ☒ OWNER ☐ NON-OWNER | 6.840 % ® ☒ FIXED ☐ ARM | 240 |

| TYPE OF LOAN | PAYMENT METHOD |
|---|---|
| ☐ MH REAL ESTATE ☐ MH ONLY ☐ EQUITY 1ST LIEN ☒ EQUITY 2ND LIEN ☐ MH SECOND EQUITY | ☒ AUTO-PAY ☐ NOT AUTO-PAY |

This is an estimate of most of the charges you will have to pay at the closing ("settlement") of your loan. The figures shown are estimates and therefore are subject to change. The estimates are computed on a sales price/estimated value of **$240,000.00** and a proposed loan of **$96,000.00**.

GOOD FAITH ESTIMATE OF SETTLEMENT COSTS as required by Federal Law. The numbers in each column correspond to the line numbers on the HUD-1 Settlement Statement which will be used in conjunction with the closing of your loan. For further explanation of these charges consult your booklet entitled "Settlement Costs and You, a HUD Guide for Homebuyers."

| LOAN CHARGES | | | PREPAID ESCROW CHARGES | | |
|---|---|---|---|---|---|
| 801 Loan Origination Fee ( 0.000 %) | | | 901 Interest (1 day = $0.00 ) 15 days = | | ** |
| 803 Appraisal Fee * | POC $275.00 | | 903 Hazard Ins. 1st Yr Prem. | | |
| 805 Inspection Fee | | | 904 Flood Insurance | | |
| 1101 Settlement or Closing Fee | | | 905 Wind Insurance | | |
| 1105 Subordination Fee | | | | | |
| 1108 Title Insurance (Lender's Coverage) | POC $1,125.00 | | RESERVES DEPOSITED WITH LENDER Reserves To Be Collected: ☐ Haz. Ins. ☐ Taxes ☒ None | | |
| 1112 Sub-Escrow Fee | | | | | |
| 1201 Recording Fees | POC $56.00 | | | | |
| 1301 Survey Fee | | $295.00 | | | |
| 1305 Flood Hazard Determination | POC $13.00 | | | | |
| | | | | | |
| | | | TOTAL PREPAID ITEMS | | |
| TOTAL ESTIMATED CLOSING COSTS | | $295.00 | | | |

** The actual amount will be determined by which day of the month your loan actually closes.

Adjustments for real estate taxes which include prorated taxes and/or any seller reimbursement are not included.

**POC** - Paid Outside of Closing. Some fees may be marked POC. These could represent (a) loan costs paid by Bank in connection with a "No Cost" promotion; (b) fees paid by the lender; (c) hazard insurance or other costs paid by the borrower outside or before closing/settlement. Any such costs will not be calculated into your Total Estimated Closing Costs.

NOTICE: THIS FORM DOES NOT COVER ALL ITEMS YOU MAY BE REQUIRED TO PAY AT SETTLEMENT. YOU MAY WISH TO INQUIRE AS TO THE AMOUNTS OF SUCH OTHER ITEMS. THIS FORM IS NEITHER A TRUTH IN LENDING DISCLOSURE STATEMENT NOR A COMMITMENT TO EXTEND FINANCING.

| ESTIMATED MONTHLY LOAN & RESERVE PAYMENT | | ESTIMATED FUNDS TO CLOSE/PROCEEDS | |
|---|---|---|---|
| Principal & Interest | $735.00 ® | Purchase Price or Existing Liens (to be paid off) | $78,232.00 |
| Real Estate Taxes | $ | Plus: Total Closing Costs | $295.00 |
| Hazard Insurance | $ | Plus: Prepaid Items | |
| Other | $ | TOTAL | $78,527.00 |
| Other | $ | Less: Loan Amount | $96,000.00 |
| Other | $ | Less: Deposits | |
| Other | $ | Less: Other Financing | $ |
| | | ☐ Cash Required to Close | |
| TOTAL | $735.00 | ☒ Proceeds at Closing | $17,473.00 |

**PARTICULAR PROVIDERS OF SERVICE REQUIRED** The charges indicated in the Good Faith Estimate above are based upon the corresponding charge of the designated providers described below.

ITEM NO. 803* The appraisal/property evaluation service will be completed by an appraiser from Lender's controlled list. The range is $50.00 to $1,300.00, however, we currently estimate your fee to be the amount reflected on line 803.

ITEM NO. 1305 NAME/ADDRESS
LERETA CORPORATION 1123 S PARK VIEW DR COVINA, CA 91724
RELATIONSHIP? ☒ YES ☐ NO NATURE OF RELATIONSHIP: The Bank has repeatedly used or required borrowers to use services of one of these providers within the last 12 months.
TELEPHONE: (626) 966-0616

ITEM NO. 804 NAME/ADDRESS
CHASE CREDIT, 6350 LAUREL CANYON BLVD, NORTH HOLLYWOOD CALIFORNIA 91606
EXPERIAN, 701 EXPERIAN PARKWAY, PO BOX 2002, ALLEN TEXAS 75013-0036
EQUIFAX INC., 1600 PEACHTREE ST NW, ATLANTA GEORGIA 30309
RELATIONSHIP? ☒ YES ☐ NO NATURE OF RELATIONSHIP: The Bank has repeatedly used or required borrowers to use services of one of these providers within the last 12 months.
TELEPHONE: (818) 762-6262 1-888-397-3742 (404) 885-8000

® = Estimate, based on the current interest rate for the type of loan for which you have applied. Your actual rate may vary and will be established based on the terms of your specific transaction. In the case of an adjustable rate mortgage, the figures represent the rate for the initial adjustment period.
These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your lender.

| PREPARED BY: FRED ROOMIANI | DATE: 01-09-2002 |
|---|---|

I certify that I have received copies of: (1) this document; (2) the HUD Booklet (Real Estate purchase transactions only).

| APPLICANT SIGNATURE: | DATE: |
|---|---|

BORROWER COPY

# Fire Loss Details

## Losses Paid

| Cause of loss: | Amount Paid | Subrogated Amount |
|---|---|---|
| Water Damage or Freezing - Building | 72,750.56 | 0.00 |
| Water Damage or Freezing - Personal Property | 1,009.00 | 0.00 |
| Additional Living Expenses - Time Element | 9,823.96 | 736.00 |
| Total | 83,583.52 | 736.00 |

From: Dwight Hill
Sent: Tuesday, March 28, 2023 8:05 AM
To: Maribel Hill <maribelhill@gmail.com>
Subject: all claims on 4647 Elsby Ave Dallas, TX 75209

Maribel,
Here is a list of all the claims State Farm has on the home policy at 4647 Elsby Ave.
Dwight

1

DLH-004539

| Date | Claim No. | | Type | Status | Amount |
|---|---|---|---|---|---|
| 06-09-2019 | 43-9534-F09 | No | WIND/HAIL BLDG | CLOSED | 0.00 |
| 09-13-2015 | 43-746N-928 | Yes | MYST/DISAPPEAR | CLOSED | 3,525.00 |
| 01-19-2001 | 43-B787-251 | Yes | WAT/DMG/FRZ BD | CLOSED | 83,583.52 |

**From:** Maribel Hill <maribelhill@gmail.com>
**Sent:** Monday, March 27, 2023 10:22 AM
**To:** Dwight Hill <dwighthill1003@gmail.com>; Dwight Hill <dwight.hill.cffk@statefarm.com>
**Subject:** [EXTERNAL] 4647 Elsby Ave Dallas, TX 75209

Good morning Dwight,

I need the claims history and file history of my property 4647 Elsby Ave., Dallas, TX 75209 since its inception being insured with State Farm. This includes you as agent, since 1998.
I was a client with state farm under my old married name, Maribel Haas as well... and this home was included in that under another agent.

Thank you.


Peace,

Maribel Hill
c: 214-727-5754
www.maribelhill.com

DLH-004540



# EXHIBIT F

# FUQUA REPORT VALUING BUSINESS AT $ 728,000 AS OF 2022

## FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



# DWIGHT HILL INSURANCE AGENCY INC.

## FAIR MARKET VALUATION ANALYSIS OF 100% INTEREST IN

## DWIGHT HILL INSURANCE AGENCY INC.

## AS OF DECEMBER 31, 2022

The services performed in connection with this engagement do not constitute an audit, review, or compilation of the Company's historical financial statements in accordance with auditing standards generally accepted in the United States of America, nor do they constitute an examination of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants. The services also do not address the effectiveness of internal controls over financial reporting under Section 404 of the Sarbanes-Oxley Act. Also, except for ascertaining that certain information in tabulations and reports received from the Company agreed with the accounting records, we performed no procedures to evaluate the reliability or completeness of the information obtained. Accordingly, we express no opinion or any form of assurance on the historical or prospective financial statements, management representations or other data from the Company included in, or underlying, the accompanying information. While we believe the information obtained is substantially responsive to our requests and analyses, we are not in a position to assess its sufficiency for your purposes.

EXHIBIT

P-26

exhibitsticker.com

DLH.SF-002855

## FARMER, FUQUA & HUFF P.C.
Accountants and Consultants

2445 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Dwight Hill Insurance Agency Inc.

## Valuation Analysis as of 31st December 2022

### Conclusion of Value

| Valuation Indication by Method | Indicated Value | Weight | 1=Considered & Used<br>2=Considered & Rejected<br>3=Not Considered & Rejected | |
|---|---|---|---|---|
| Book Value Method | 0 | 0% | 2 | Considered & Rejected |
| Capitalization of Earnings Method | 728,000 | 100% | 1 | Considered & Used |
| Market Data Method - Bizcomps | 748,600 | 0% | 2 | Considered & Rejected |
| Subtotal | 728,000 | | | |
| Personal Goodwill Discount | 80.00% | | | |
| Calculated Conclusion of Equity Value | 145,600 | | | |
| | | | | |
| SELECTED CONCLUSION OF EQUITY VALUE | 145,600 | | | |

1

DLH.SF-002856

## FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*



2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007

## Historic Income Statements

| | Year Ending December 31, 2019 | Year Ending December 31, 2020 | Year Ending December 31, 2021 | Year Ending December 31, 2022 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Service Sales | 331,790 | 329,888 | 335,274 | 371,474 |
| Total Revenues | 331,790 | 329,888 | 335,274 | 371,474 |
| **Operating Expenses** | | | | |
| Advertising | 15,801 | 5,347 | 5,318 | 13,977 |
| Automobiles | 15,952 | 9,080 | 21,065 | 22,843 |
| Bank Charges | 426 | 350 | 292 | 225 |
| Employee Benefits | 19,933 | 21,110 | 26,122 | 21,268 |
| Insurance | 10,584 | 11,072 | 10,002 | 14,418 |
| Legal and professional | 1,665 | 1,751 | 1,818 | 2,130 |
| Depreciation | 32,425 | 19,290 | 66,215 | 925 |
| Office Expense | 1,735 | 1,320 | 6,512 | |
| Rent | 14,109 | 14,383 | 15,962 | 16,370 |
| Repairs & Maintenance | 3,646 | 1,917 | 1,489 | 3,209 |
| Officers' Compensation | 77,867 | 95,062 | 76,335 | 73,724 |
| Salaries and Wages | 8,460 | 8,464 | 5,333 | 10,088 |
| Utilities | 970 | 1,608 | 625 | 3,279 |
| Taxes and Licenses | 99 | 8,408 | 8,280 | 3,339 |
| Pension, profit-sharing, etc., plans | 400 | | | |
| Customer Response Center | 1,137 | 1,137 | 1,135 | 1,134 |
| Dues and Subscriptions | 536 | 615 | 140 | 849 |
| Meals | 5,414 | 4,642 | 7,282 | 7,049 |
| Petty Cash | 3,558 | 2,500 | | |
| Postage | 86 | 171 | 34 | 399 |
| Security | | 50 | 266 | |
| Supplies | 9,848 | 7,939 | 7,864 | 16,880 |
| Telephone | 5,070 | 3,916 | 5,339 | 3,986 |
| Training and Education | 7,816 | 4,833 | 3,412 | 1,541 |
| Travel | 458 | 2,436 | 1,637 | 1,570 |
| Payroll | | | 1,673 | 3,316 |
| Business Expense | | | | 270 |
| Total Operating Expenses | 237,995 | 227,401 | 274,150 | 222,789 |
| **Operating Profit** | 93,795 | 102,487 | 61,124 | 148,685 |
| **Other Income/(Expense)** | | | | |
| Other Income | 14,952 | | 19,535 | |
| Total Other Income/(Expense) | 14,952 | 0 | 19,535 | 0 |
| **Net Income/(Loss)** | 108,747 | 102,487 | 80,659 | 148,685 |

2

DLH.SF-002857

# FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Adjusted Income Statements

| | Year Ending December 31, 2019 | Year Ending December 31, 2020 | Year Ending December 31, 2021 | Year Ending December 31, 2022 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Service Sales | 331,790 | 329,888 | 335,274 | 371,474 |
| Total Revenues | 331,790 | 329,888 | 335,274 | 371,474 |
| **Operating Expenses** | | | | |
| Advertising | 15,801 | 5,347 | 5,318 | 13,977 |
| Automobiles | 8,540 | 8,540 | 8,540 | 8,540 |
| Bank Charges | 426 | 350 | 292 | 225 |
| Employee Benefits | 10,000 | 10,000 | 10,000 | 10,000 |
| Insurance | 10,584 | 11,072 | 10,002 | 14,418 |
| Legal and professional | 1,665 | 1,751 | 1,818 | 2,130 |
| Depreciation | 7,000 | 7,000 | 7,000 | 7,000 |
| Office Expense | 1,735 | 1,320 | 6,512 | |
| Rent | 14,109 | 14,383 | 15,962 | 16,370 |
| Repairs & Maintenance | 1,000 | 1,000 | 1,000 | 1,000 |
| Officers' Compensation | 0 | 0 | 0 | 0 |
| Salaries and Wages | 107,650 | 107,650 | 107,650 | 107,650 |
| Utilities | 970 | 1,608 | 625 | 3,279 |
| Taxes and Licenses | 99 | 8,408 | 8,280 | 3,339 |
| Pension, profit-sharing, etc., plans | 0 | | | |
| Customer Response Center | 1,137 | 1,137 | 1,135 | 1,134 |
| Dues and Subscriptions | 536 | 615 | 140 | 849 |
| Meals | 5,414 | 4,642 | 7,282 | 7,049 |
| Petty Cash | 0 | 0 | | |
| Postage | 86 | 171 | 34 | 399 |
| Security | | 0 | 0 | |
| Supplies | 9,848 | 7,939 | 7,864 | 16,880 |
| Telephone | 5,070 | 3,916 | 5,339 | 3,986 |
| Training and Education | 7,816 | 4,833 | 3,412 | 1,541 |
| Travel | 458 | 2,436 | 1,637 | 1,570 |
| Payroll | | | 0 | 0 |
| Business Expense | | | | 0 |
| Total Operating Expenses | 209,944 | 204,118 | 209,842 | 221,336 |
| **Operating Profit** | 121,846 | 125,770 | 125,432 | 150,138 |
| **Other Income/(Expense)** | | | | |
| Other Income | 0 | | 0 | |
| Total Other Income/(Expense) | 0 | 0 | 0 | 0 |
| **Income Before Taxes** | 121,846 | 125,770 | 125,432 | 150,138 |
| Income Taxes | 0 | 0 | 0 | 0 |
| **Net Income/(Loss)** | 121,846 | 125,770 | 125,432 | 150,138 |

3

DLH.SF-002858

## FARMER, FUQUA & HUFF P.C.
*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Common Size Adjusted Income Statements

| | Year Ending December 31, 2019 | Year Ending December 31, 2020 | Year Ending December 31, 2021 | Year Ending December 31, 2022 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Service Sales | 100.00% | 100.00% | 100.00% | 100.00% |
| Total Revenues | 100.00% | 100.00% | 100.00% | 100.00% |
| **Operating Expenses** | | | | |
| Advertising | 4.76% | 1.62% | 1.59% | 3.76% |
| Automobiles | 2.57% | 2.59% | 2.55% | 2.30% |
| Bank Charges | 0.13% | 0.11% | 0.09% | 0.06% |
| Employee Benefits | 3.01% | 3.03% | 2.98% | 2.69% |
| Insurance | 3.19% | 3.36% | 2.98% | 3.88% |
| Legal and professional | 0.50% | 0.53% | 0.54% | 0.57% |
| Depreciation | 2.11% | 2.12% | 2.09% | 1.88% |
| Office Expense | 0.52% | 0.40% | 1.94% | |
| Rent | 4.25% | 4.36% | 4.76% | 4.41% |
| Repairs & Maintenance | 0.30% | 0.30% | 0.30% | 0.27% |
| Officers' Compensation | 0.00% | 0.00% | 0.00% | 0.00% |
| Salaries and Wages | 32.45% | 32.63% | 32.11% | 28.98% |
| Utilities | 0.29% | 0.49% | 0.19% | 0.88% |
| Taxes and Licenses | 0.03% | 2.55% | 2.47% | 0.90% |
| Pension, profit-sharing, etc., plans | 0.00% | | | |
| Customer Response Center | 0.34% | 0.34% | 0.34% | 0.31% |
| Dues and Subscriptions | 0.16% | 0.19% | 0.04% | 0.23% |
| Meals | 1.63% | 1.41% | 2.17% | 1.90% |
| Petty Cash | 0.00% | 0.00% | | |
| Postage | 0.03% | 0.05% | 0.01% | 0.11% |
| Security | | 0.00% | 0.00% | |
| Supplies | 2.97% | 2.41% | 2.35% | 4.54% |
| Telephone | 1.53% | 1.19% | 1.59% | 1.07% |
| Training and Education | 2.36% | 1.47% | 1.02% | 0.41% |
| Travel | 0.14% | 0.74% | 0.49% | 0.42% |
| Payroll | | | 0.00% | 0.00% |
| Business Expense | | | | 0.00% |
| Total Operating Expenses | 63.28% | 61.87% | 62.59% | 59.58% |
| **Operating Profit** | 36.72% | 38.13% | 37.41% | 40.42% |
| **Other Income/(Expense)** | | | | |
| Other Income | 0.00% | | 0.00% | |
| Total Other Income/(Expense) | 0.00% | 0.00% | 0.00% | 0.00% |
| **Income Before Taxes** | 36.72% | 38.13% | 37.41% | 40.42% |
| Income Taxes | 0.00% | 0.00% | 0.00% | 0.00% |
| **Net Income/(Loss)** | 36.72% | 38.13% | 37.41% | 40.42% |

4

DLH.SF-002859

## FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Capitalization of Earnings Benefit Stream

|  | Year Ending December 31, 2019 | Year Ending December 31, 2020 | Year Ending December 31, 2021 | Year Ending December 31, 2022 |
|---|---|---|---|---|
| Adjusted Pretax Income | 121,846 | 125,770 | 125,432 | 150,138 |
| Add Depreciation/Amortization and Other Non-Cash Expenses | 7,000 | 7,000 | 7,000 | 7,000 |
| Total | 128,846 | 132,770 | 132,432 | 157,138 |
| Weight | 2 | 3 | 4 | 5 |
| | | | | |
| Ongoing Earning Power | | | | 140,816 |
| Less Ongoing Depreciation/Amortization | | | | 7,000 |
| Taxable Base | | | | 133,816 |
| Less Estimated State Income Taxes - Effective Rate: | | | | 0.00% |
| Before Federal Taxes | | | | 133,816 |
| Less Federal Taxes | | | | 0 |
| Subtotal | | | | 133,816 |
| Depreciation/Amortization | | | | 7,000 |
| Adjust for Working Capital Requirements | | | | |
| Adjust for Capital Expenditure Requirements | | | | -7,000 |
| Adjust for Long Term Debt Requirements | | | | |
| Calculated Ongoing Benefit Stream | | | | 133,816 |
| | | | | |
| SELECTED ONGOING BENEFIT STREAM | | | | 133,800 |

5

DLH.SF-002860



# FARMER, FUQUA & HUFF P.C.
*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007

## Capitalization of Earnings - Capitalization Rate

BUILDUP CAPITALIZATION RATE

| | | |
|---|---|---|
| Risk-Free Rate of Return | 4.14% | |
| Equity Risk Premium | 7.17% | |
| Small Stock Risk Premium | 10.99% | |
| Plus/Minus Industry Risk Premium | -2.37% | |
| Company Specific Premium | 2.00% | |
| Net Cash Flow Discount Rate | 21.93% | |
| Discount Rate | | 21.93% |
| Sustainable Growth | | 3.00% |
| Capitalization Rate To Apply To Next Year Stream | | 18.93% |
| | | |
| Selected Rate | | 18.93% |

6

DLH.SF-002861

# FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Capitalization of Earnings Indicated Value

| | | |
|---|---|---|
| Selected Ongoing Benefit Stream | 133,800 | |
| Sustainable Growth Rate | 3.00% | |
| Benefit Stream | | 137,814 |
| Capitalization Rate | | 18.93% |
| Indicated Equity Value | | 728,019 |
| | | |
| SELECTED EQUITY VALUE | | 728,000 |

DLH.SF-002862

# FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007





| ID | SIC | NAICS | Business Description | Revenue | SDE | Price | Price / Revenue | Price / SDE | State | Sale Date |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Comparable Transactions Method – Bizcomps Selected Transaction** | | | | | | | |
| 07874 | 6411 | 524210 | Health Insurance | 510 | 210 | 340 | 0.67 | 1.62 | FL | 1/31/2016 |
| 07841 | 6411 | 524210 | Insurance Administrator | 263 | 263 | 378 | 1.44 | 1.44 | FL | 9/1/2017 |
| 07913 | 6411 | 524210 | Insurance Administrator | 259 | 134 | 400 | 1.54 | 2.99 | FL | 3/16/2012 |
| 07885 | 6411 | 524210 | Insurance Agency | 325 | 125 | 285 | 0.88 | 2.28 | FL | 5/31/2015 |
| 07890 | 6411 | 524210 | Insurance Agency | 450 | 220 | 1,040 | 2.31 | 4.73 | FL | 12/31/2014 |
| 07899 | 6411 | 524210 | Insurance Agency | 558 | 281 | 960 | 1.72 | 3.42 | CA | 8/6/2013 |
| 07838 | 6411 | 524210 | Insurance Agency | 200 | 70 | 480 | 2.40 | 6.86 | FL | 9/30/2017 |
| 07831 | 6411 | 524210 | Insurance Agency | 597 | 268 | 1,350 | 2.26 | 5.04 | GA | 5/30/2018 |
| 07823 | 6411 | 524210 | Insurance Agency | 447 | 179 | 1,033 | 2.31 | 5.77 | FL | 11/29/2018 |
| 07824 | 6411 | 524210 | Insurance Agency | 447 | 226 | 1,033 | 2.31 | 4.57 | FL | 10/31/2018 |
| 07826 | 6411 | 524210 | Insurance Agency | 332 | 72 | 565 | 1.70 | 7.85 | VT | 9/14/2018 |
| 07875 | 6411 | 524210 | Insurance Agency | 365 | 91 | 380 | 1.04 | 4.18 | FL | 1/31/2016 |
| 07876 | 6411 | 524210 | Insurance Agency | 778 | 453 | 1,300 | 1.67 | 2.87 | FL | 1/15/2016 |
| 07870 | 6411 | 524210 | Insurance Agency | 283 | 69 | 410 | 1.45 | 5.94 | PA | 3/31/2016 |
| 07873 | 6411 | 524210 | Insurance Agency | 413 | 97 | 475 | 1.15 | 4.90 | FL | 2/6/2016 |
| 07851 | 6411 | 524210 | Insurance Agency | 234 | 117 | 550 | 2.35 | 4.70 | FL | 4/30/2017 |
| 07853 | 6411 | 524210 | Insurance Agency | 202 | 101 | 440 | 2.18 | 4.36 | FL | 3/31/2017 |
| 07854 | 6411 | 524210 | Insurance Agency | 265 | 105 | 585 | 2.21 | 5.57 | FL | 2/28/2017 |
| 07855 | 6411 | 524210 | Insurance Agency | 302 | 197 | 585 | 1.94 | 2.97 | FL | 2/28/2017 |
| 07864 | 6411 | 524210 | Insurance Agency | 687 | 93 | 280 | 0.41 | 3.01 | TX | 7/18/2016 |
| 07877 | 6411 | 524210 | Insurance Agency-Auto | 365 | 91 | 380 | 1.04 | 4.18 | FL | 1/8/2016 |
| 07882 | 6411 | 524210 | Insurance Agency-Auto | 357 | 205 | 755 | 2.11 | 3.68 | FL | 10/1/2015 |
| 07881 | 6411 | 524210 | Insurance Broker | 347 | 205 | 755 | 2.18 | 3.68 | FL | 10/31/2015 |
| 07840 | 6411 | 524210 | Insurance General | 245 | 70 | 484 | 1.98 | 6.91 | FL | 9/11/2017 |
| 07867 | 6411 | 524210 | Insurance General | 218 | 66 | 400 | 1.83 | 6.06 | FL | 6/26/2016 |
| 07856 | 6411 | 524210 | Insurance General | 424 | 268 | 780 | 1.84 | 2.91 | FL | 2/22/2017 |
| 07822 | 6411 | 524210 | Insurance General | 447 | 179 | 800 | 1.79 | 4.47 | FL | 11/29/2018 |
| 07891 | 6411 | 524210 | Insurance General | 339 | 159 | 635 | 1.87 | 3.99 | FL | 10/31/2014 |
| 07915 | 6411 | 524210 | Insurance General | 428 | 304 | 525 | 1.23 | 1.73 | FL | 2/13/2012 |
| 07868 | 6411 | 524210 | Insurance-Administrator | 558 | 93 | 380 | 0.68 | 4.09 | FL | 6/13/2016 |
| 07858 | 6411 | 524210 | Insurance-Auto | 226 | 172 | 450 | 1.99 | 2.62 | FL | 12/1/2016 |
| 07819 | 6411 | 524210 | Insurance-Auto | 575 | 320 | 700 | 1.22 | 2.19 | FL | 1/30/2019 |
| 07820 | 6411 | 524210 | Insurance-General | 667 | 417 | 2,000 | 3.00 | 4.80 | FL | 12/13/2018 |
| 07821 | 6411 | 524210 | Insurance-General | 447 | 226 | 1,033 | 2.31 | 4.57 | FL | 11/29/2018 |
| 07816 | 6411 | 524210 | Insurance-General | 377 | 209 | 610 | 1.62 | 2.92 | FL | 7/1/2019 |
| 07828 | 6411 | 524210 | Insurance-General | 224 | 69 | 300 | 1.34 | 4.35 | FL | 7/26/2018 |
| 07825 | 6411 | 524210 | Insurance-General | 690 | 460 | 2,070 | 3.00 | 4.50 | FL | 9/28/2018 |
| 07832 | 6411 | 524210 | Insurance-General | 227 | 130 | 450 | 1.98 | 3.46 | FL | 5/1/2018 |
| 07835 | 6411 | 524210 | Insurance-General | 280 | 188 | 150 | 0.54 | 0.80 | FL | 1/17/2018 |
| 07837 | 6411 | 524210 | Insurance-General | 229 | 92 | 410 | 1.79 | 4.46 | FL | 11/7/2017 |
| 07839 | 6411 | 524210 | Insurance-General | 375 | 205 | 1,220 | 3.25 | 5.95 | FL | 9/29/2017 |
| 07842 | 6411 | 524210 | Insurance-General | 265 | 65 | 133 | 0.50 | 2.05 | FL | 8/31/2017 |
| 07846 | 6411 | 524210 | Insurance-General | 424 | 144 | 800 | 1.89 | 5.56 | FL | 6/26/2017 |
| 07859 | 6411 | 524210 | Insurance-General | 797 | 160 | 1,200 | 1.51 | 7.50 | FL | 11/30/2016 |
| 07865 | 6411 | 524210 | Insurance-General | 584 | 53 | 400 | 0.68 | 7.55 | FL | 6/30/2016 |
| 07866 | 6411 | 524210 | Insurance-General | 584 | 53 | 400 | 0.68 | 7.55 | FL | 6/30/2016 |
| 07871 | 6411 | 524210 | Insurance-General | 274 | 115 | 250 | 0.91 | 2.17 | FL | 2/29/2016 |
| 07872 | 6411 | 524210 | Insurance-General | 273 | 115 | 250 | 0.92 | 2.17 | FL | 2/29/2016 |
| 07916 | 6411 | 524210 | Insurance-General | 360 | 198 | 375 | 1.04 | 1.89 | FL | 1/5/2012 |
| 14223 | 6411 | 524210 | Insurance-General | 660 | 426 | 2,170 | 3.29 | 5.09 | FL | 2/9/2021 |
| 14279 | 6411 | 524210 | Insurance-General | 217 | 147 | 470 | 2.17 | 3.20 | FL | 1/14/2021 |
| 14351 | 6411 | 524210 | Insurance-General | 221 | 114 | 220 | 1.00 | 1.93 | FL | 6/4/2021 |
| 14902 | 6411 | 524210 | Insurance-General | 468 | 226 | 1,226 | 2.62 | 5.42 | FL | 9/28/2021 |
| 14903 | 6411 | 524210 | Insurance-General | 226 | 156 | 324 | 1.43 | 2.08 | AZ | 7/15/2021 |
| 14904 | 6411 | 524210 | Insurance-General | 420 | 245 | 475 | 1.13 | 1.94 | FL | 6/30/2021 |
| 07896 | 6411 | 524210 | Insurance-General | 208 | 137 | 60 | 0.29 | 0.44 | FL | 12/2/2013 |
| 07897 | 6411 | 524210 | Insurance-General | 329 | 157 | 700 | 2.13 | 4.46 | FL | 11/1/2013 |
| 07906 | 6411 | 524210 | Insurance-General | 362 | 59 | 375 | 1.04 | 6.36 | FL | 10/31/2012 |
| 07907 | 6411 | 524210 | Insurance-General | 275 | 149 | 300 | 1.09 | 2.01 | FL | 9/19/2012 |

DLH.SF-002863

# FARMER, FUQUA & HUFF P.C.

*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## BIZCOMPS Indicated Value

|  | Revenue Multiple | SDE Multiple |
|---|---|---|
| Base | 346,600 | 140,800 |
| Multiple | 2.23 | 5.23 |
| Subtotal | 772,918 | 736,384 |
| Weight | 1 | 2 |
| | | |
| Additions: | | |
| Cash | 0 | |
| Accounts Receivable | 0 | |
| Inventory | 0 | |
| Real Estate | 0 | |
| Other Current | 0 | |
| Net Intangible | 0 | |
| Other Non-Current | 0 | |
| Subtractions: | | |
| Accounts Payable | 0 | |
| Short Term Notes Payable | 0 | |
| Current Portion of LT Debt | 0 | |
| Other Current Liabilites | 0 | |
| Long Term Debt | 0 | |
| Other Non-Current Liabilites | 0 | |
| Excess/Non-Operating Assets | 0 | |
| Indicated Equity Value | 748,562 | |
| | | |
| SELECTED EQUITY VALUE | 748,600 | |

9

DLH.SF-002864

## FARMER, FUQUA & HUFF P.C.
*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Personal Goodwill Calculation

| Factor | Importance Score | Importance Weight | Entity Component | % | Personal Component | % | Total | Weighted Entity % | Weighted Personal % |
|---|---|---|---|---|---|---|---|---|---|
| Operations | 1.0 | 6.7% | Systems and Processes | 100% | | 0% | 100% | 6.7% | 0.0% |
| Trade name and marketing assets | 1.0 | 6.7% | Business name | 0% | Personal business name | 100% | 100% | 0.0% | 6.7% |
| Location & Facilities | 0.0 | 0.0% | Business location(s) | 0% | | 0% | 0% | 0% | 0% |
| Protective & Required contracts | 0.0 | 0.0% | Franchise, license, territory, payor, vendor, etc. | 0% | | 0% | 0% | 0% | 0% |
| Intellectual Property | 1.0 | 6.7% | Business IP | 100% | Personal IP | 0% | 100% | 6.7% | 0.0% |
| Reputation | 2.0 | 13.3% | Business reputation | 25% | Personal reputation | 75% | 100% | 3.3% | 10.0% |
| Contract & recurring revenues | 1.0 | 6.7% | Customer contracts, customer relationships | 51% | Personal customer relationships | 49% | 100% | 3.4% | 3.3% |
| Workforce | 0.0 | 0.0% | Workforce | 0% | Work habits | 0% | 0% | 0% | 0% |
| Business development | 3.0 | 20% | Salespersons and company marketing efforts | 0% | Personal referrals and marketing efforts | 100% | 100% | 0.0% | 20% |
| Employment agreements | 3.0 | 20% | Presence of agreements | 0% | Absence of agreements | 100% | 100% | 0.0% | 20% |
| Skills & abilities | 3.0 | 20% | Other employee's skills abilities | 0% | Personal skills abilities | 100% | 100% | 0.0% | 20% |
| Total | 15.0 | 100.0% | | | | | | 20% | 80% |

10

DLH.SF-002865

## FARMER, FUQUA & HUFF P.C.
*Accountants and Consultants*

2435 N. Central Expy, Suite 700
Richardson, Texas 75080

P. 214.473.8000
F. 214.473.8007



## Valuation Assumptions

1. Market Approach: Comparable Transaction Method (Bizcomps)

   Dwight Hill Insurance Agency Inc. is a Property and Casualty Insurance Agency. Since Property and Casualty Insurance Agencies are typically more profitable than other Insurance Agencies in general, the Valuator selected the 65th Percentile transaction multiple from the selected comparable transactions.

2. The Valuator opines that 80% of the success of Dwight Hill Insurance Agency Inc. is attributable to Mr. Dwight Hill's skills, abilities, and reputation. In this light, the Valuator selected an 80% Personal Goodwill Discount in the Valuation of Dwight Hill Insurance Agency, Inc.

11

DLH.SF-002866



# EXHIBIT G

# RESTORE AGREEMENT – COMMUNITY JOINT VENTURE

9/7/17

I, Dwight Hill & Maribel Hill
agree that all of the proceeds
from the Sale of 111 Nesmith
Surfside Beach Tx 77541 will
go to Restore entertainment LLC
as investment monies for which
each person is 50% investor
All investment monies are
joint personal community
property.

x _Dwight Hill_____    9-7-17
                                 _____
                                 Date

x _____    9·7·17
                                 _____
                                 Date

EXHIBIT
W 14



# EXHIBIT H

# DHIA ARTICLES OF INCORPORATION

FILED
In the Office of the
Secretary of State of Texas

MAR 18 2002

Corporations Section

ARTICLES OF INCORPORATION
OF
DWIGHT HILL INSURANCE AGENCY, INC.

### ARTICLE I
### NAME

The name of the corporation is Dwight Hill Insurance Agency, Inc.

### ARTICLE II
### DURATION

The period of duration is perpetual.

### ARTICLE III
### PURPOSE

The purpose for which the corporation is organized is the transaction of any and all lawful business for which corporations may be incorporated under the Texas Business Corporation Act.

### ARTICLE IV
### CAPITAL STRUCTURE

The aggregate number of shares which the corporation shall have authority to issue is ONE MILLION (1,000,000) of the par value of ONE CENT ($.01) each.

### ARTICLE V
### COMMENCEMENT OF BUSINESS

The corporation will not commence business until it has received for the issuance of its shares consideration of the value of ONE THOUSAND DOLLARS ($1,000), consisting of money, labor done or property actually received.

### ARTICLE VI
### BOARD OF DIRECTORS

The number of directors constituting the initial board of directors of the corporation is one (1), and the name and address of the person who is to serve as director until the first annual

Produced 11.30.2022

EXHIBIT
W 15

DLH-000095

meeting of the shareholders or until his successor is elected and qualified is:

> Mr. Dwight L. Hill
> 10222 Midway Road
> Dallas, Texas 75229

## ARTICLE VII
## REGISTERED OFFICE AND AGENT

The street address of the corporation's initial registered office is 10222 Midway Road, Dallas, Texas 75229, and the name of its initial registered agent is Dwight L. Hill.

## ARTICLE VIII
## INCORPORATORS

The name and address of the incorporator is:

> Mr. Dwight L. Hill
> 10222 Midway Rd.
> Dallas, Texas 75229

DATED:    March 8, 2002.

_____
Dwight L. Hill

Produced 11.30.2022



# EXHIBIT I

# Note showing Respondent as Vice President of DHIA

# Uniform Residential Loan Application

_Dwight L. Hill_     _Co-Borrower_

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for | VA | X Conventional | Other (explain) | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|
| | FHA | USDA/Rural Housing Service | | | |

| Amount | Interest Rate | No. of Months | Amortization Type | X Fixed Rate | Other (explain) |
|---|---|---|---|---|---|
| $116,000.00 | 6.250 % | 360 | | GPM | ARM (type) |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state & ZIP): 4447 ELSBY AVE, DALLAS, TX 75209    No. of Units: 1

Legal Description of Subject Property (attach description if necessary): Lot 12 Block B/5680, Linwood Place    Year Built: 1936

| Purpose of Loan | Purchase | Construction | Other (explain) | Property will be |
|---|---|---|---|---|
| X Refinance | Construction-Permanent | | X Primary Residence / Secondary Residence / Investment |

Complete this line if construction or construction-permanent loan

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | made / to be made |
|---|---|---|---|---|---|
| 1995 | $80,000.00 | $ | Cash-Out/Other | Cost $ | |

Title will be held in what Name(s): DWIGHT L HILL & MARIBEL L. HILL    Manner in which Title will be held: SEE TITLE REPORT    Estate will be held in: X Fee Simple / Leasehold

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain): Checking/Savings

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name | DWIGHT L HILL | MARIBEL L. HILL |
| Social Security Number | 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 | 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 |
| Home Phone | (214) 478-3150 | (214) 478-1150 |
| DOB (MM/DD/YYYY) | 10/29/1968 | 12/08/1969 |
| Yrs. School | 16 | 16 |

Borrower: X Married   Separated   Unmarried    Dependents (not listed by Co-Borrower) no. 2, ages 12 yrs, 7 yrs
Co-Borrower: X Married   Separated   Unmarried    Dependents (not listed by Borrower) no. 2, ages

Present Address (street, city, state, ZIP): X Own   Rent   No. Yrs. 15
4447 ELSBY AVE
DALLAS, TX 75209

Present Address (street, city, state, ZIP): X Own   Rent   No. Yrs. 15
4447 ELSBY AVE
DALLAS, TX 75209

## IV. EMPLOYMENT INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Name & Address of Employer | DWIGHT HILL INSURANCE AGENCY, INC. — 4245 W SIVERS LN, DALLAS, TX 75209 — X Self Employed — Yrs. on this job: 25 — Yrs. employed in this line of work/profession: 25 | DWIGHT HILL INSURANCE AGENCY, INC. — 4245 W SIVERS LN, DALLAS, TX 75209 — X Self Employed — Yrs. on this job: 12 — Yrs. employed in this line of work/profession: 12 |
| Position/Title/Type of Business | PRESIDENT, INSURANCE | VICE PRESIDENT, INSURANCE |
| Business Phone | (214) 727-5351 | (214) 352-7404 |

Uniform Residential Loan Application
Freddie Mac Form 65 7/05 (rev. 6/09)

Page 1 of 5

Fannie Mae Form 1003 7/05 (rev. 6/09)

PLAINTIFF'S EXHIBIT
W 18

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 7,992.37 | $ 7,992.37 | $ 15,984.74 | Rent | $ | $ |
| Overtime | | | | First Mortgage (P&I) | 1,600.00 | $ 1,532.33 |
| Bonuses | | | | Other Financing (P&I) | 450.00 | |
| Commissions | | | | Hazard Insurance | | 176.08 |
| Dividends/Interest | | | | Real Estate Taxes | 750.00 | 716.91 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income" below) | | | | Homeowner Association Dues | | |
| | | | | Other | | |
| Total | $ 7,992.37 | $ 7,992.37 | $ 15,984.74 | Total | $ 2,750.00 | $ 2,425.32 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Describe Other Income**   Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed [X] Jointly [ ] Not Jointly

| ASSETS Description | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by | $ | Name and address of Company | $ Payment/Months | $ |
| List checking and savings accounts below | | See Continuation Sheet for Schedule of Liabilities | | |
| Name and address of Bank, S&L, or Credit Union  COMPASS | | Acct no | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct no 0010368752 | $ 5,795.68 | | | |
| Name and address of Bank, S&L or Credit Union | | Acct no | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct no | $ | | | |
| Name and address of Bank, S&L, or Credit Union | | Acct no | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct no | $ | | | |
| Name and address of Bank, S&L, or Credit Union | | Acct no | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct no | $ | | | |
| Stocks & Bonds (Company name/number & description) | $ | Acct no | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ 0.00 | | | |
| Face amount $ 0.00 | | | | |
| Subtotal Liquid Assets | $ 5,795.68 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 1,435,000.00 | Acct no | | |
| Vested interest in retirement fund | $ 0.00 | Name and address of Company | $ Payment/Months | $ |
| Net worth of business(es) owned (attach financial statement) | $ 0.00 | | | |
| Automobiles owned (make and year) | $ | Acct no | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to | $ | |
| Other Assets (itemize) | $ | Job Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 6,052.70 | |
| Total Assets a. | 2,440,795.68 | Net Worth (a minus b) ► $ 1,212,973.81 | Total Liabilities b. | 227,821.81 |

Uniform Residential Loan Application
Freddie Mac Form 65  7/05 (rev. 6/09)

Page 2 of 8

Fannie Mae Form 1003  7/05 (rev. 6/09)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if Sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance Maintenance Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| See Continuation Sheet for Schedule of Real Estate Owned | Totals | $ | $ | | $ | $ | $ |
| | | 1 455 000 00 | 299 874 82 | 0 00 | 3 391 00 | 1 122 14 | 0 00 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s)

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

<table>
<tr><td colspan="2"><strong>VII. DETAILS OF TRANSACTION</strong></td><td colspan="5"><strong>VIII. DECLARATIONS</strong></td></tr>
</table>

| VII. DETAILS OF TRANSACTION | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 160 677 36 |
| e. Estimated prepaid items | 355 10 |
| f. Estimated closing costs | 7 010 41 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 168 033 87 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) Other equity | 512 00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 116 000 00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 116 000 00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 168 033 13 |

**VIII. DECLARATIONS** — If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

|  | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | | X | | X |
| b. Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. Are you a party to a lawsuit? | | X | | X |
| e. Have you directly or indirectly been obligated on any loan... | | X | | X |
| f. Are you presently delinquent or in default on any Federal debt... | | X | | X |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| h. Is any part of the down payment borrowed? | | X | | X |
| i. Are you a co-maker or endorser on a note? | | X | | X |
| j. Are you a U.S. citizen? | X | | X | |
| k. Are you a permanent resident alien? | | X | | X |
| l. Do you intend to occupy the property as your primary residence? | X | | X | |
| m. Have you had an ownership interest in a property in the last three years? | | X | | X |

**IX. ACKNOWLEDGMENT AND AGREEMENT**

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that...

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Dwight L. Khol* | | X *signature* | |

**X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES**

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which this lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER ☐ I do not wish to furnish this information | CO-BORROWER ☐ I do not wish to furnish this information |
|---|---|
| Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino | Ethnicity: ☐ Hispanic or Latino ☐ Not Hispanic or Latino |
| Race: ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White | Race: ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White |
| Sex: ☐ Female ☐ Male | Sex: ☐ Female ☐ Male |

To be Completed by Loan Originator

| Loan Originator's Signature X | Date 4/15/2013 |
|---|---|
| Loan Originator's Name (print or type) Aaron Class | Loan Originator's Phone Number (including area code) |
| Loan Origination Company's Name Prospect Bank | Loan Origination Company's Address 1920 Glade Road, Colleyville TX 76034 |



# EXHIBIT J

# DHIA/STATE FARM CONTRACT

# STATE FARM AGENT'S AGREEMENT

State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Company, and State Farm General Insurance Company, collectively referred to in this Agreement as "State Farm," or "the Companies," insurance corporations organized and existing under the laws of the State of Illinois, with their principal offices located at Bloomington, Illinois, and State Farm County Mutual Insurance Company of Texas, an insurance corporation organized and existing under the laws of the State of Texas with its principal office located at Dallas, Texas, appoint DWIGHT HILL INSURANCE AGENCY, INC., a corporation organized and existing under the laws of the State of Texas, with its office located at , Texas referred to in this Agreement as "the Agent," to represent the Companies in Texas, while properly licensed so to act, in accordance with the provisions of this Agreement. The chief executive officer of the Agent shall be the President. Schedule of Payments Forms AS4, CMS2, FS3, GS2, HS5, LLS1, LS5a, and LS8 applicable to the respective company as indicated, hereto attached, constitute a part of this Agreement. This Agreement is to become effective August 1, 2002, and shall continue until terminated as herein provided.

## PREAMBLE

The purpose of this Agreement is to reduce to writing the objectives, obligations, and responsibilities essential to the relationship between the Corporate Agent, its officers and employees, and State Farm. It is to our mutual interest to satisfactorily serve the insuring public, to comply with all applicable laws, to increase business commensurate with the available potential, and to maintain the Companies' operations on a profitable basis in order to assure the necessary financial strength to protect the policyholders' interest.

Insurance is a closely regulated business. The Companies and the agents must deal equitably with policyholders as to rates and claims, be trustworthy in handling money, avoid false advertising and unfair practices, and refrain from any action that would result in violation, by State Farm or any agent, of any applicable law or regulation.

The Companies do not seek and will not assert control over the Agent's officers or licensed sales representatives, but expect them to exercise their own judgment as to the time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this Agreement.

State Farm will make available to the Agent the experience and technical knowledge acquired and developed over the years in respect with selling, underwriting, and servicing insurance. The Companies will designate specific employees of the Companies to guide and advise the Agent's officers and licensed sales representatives. The Agent's officers and licensed sales representatives will also be invited to attend meetings conducted by the Companies for the purpose of introducing new products, ideas, services and procedures, promoting sales, and provide assistance, guidance, and consultation to better enable the Agent to carry out the provisions of this Agreement.

The Companies and the Agent expect that by entering into this Agreement, and by the full and faithful observance and performance of the obligations and responsibilities herein set forth, a mutually satisfactory relationship will be established and maintained.

To these ends, the Companies, the Agent and the President agree that:

## SECTION I - MUTUAL CONDITIONS AND DUTIES

A. The Agent will solicit applications for insurance, collect initial premiums, membership fees and charges, countersign and deliver policies, reinstate and transfer insurance, assist policyholders and cooperate with adjusters in reporting and handling claims, avoid conflicts of interest, and cooperate with and advance the interests of the Companies, their agents, and the policyholders.

B. The Officers and licensed sales representatives of the Agent have full control over their daily activities, with the right to exercise independent judgment as to time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this Agreement.

PLH-000808

C. State Farm will furnish the Agent, without charge, manuals, forms, records, and such other materials and supplies as the Companies may deem advisable to provide. All such property furnished by the Companies shall remain the property of the Companies. In addition, the Companies will offer at the Agent's expense such additional materials and supplies as the Companies feel may be helpful to the Agent.

D. Information regarding names, addresses, and ages of policyholders of the Companies; the description and location of insured property; and expiration or renewal dates of State Farm policies acquired or coming into the Agent's possession during the effective period of this Agreement, or any prior agreement, except information and records of policyholders insured by the Companies pursuant to any governmental or insurance industry plan or facility, are trade secrets wholly owned by the Companies. All forms and other materials, whether furnished by State Farm or purchased by the Agent, upon which this information is recorded shall be the sole and exclusive property of the Companies.

E. The expense of any office, including rental, furniture, and equipment; signs; supplies not furnished by the Companies; the salaries of the Agent's employees; telegraph; telephone; postage; advertising; and all other charges or expense incurred by the Agent in the performance of this Agreement shall be incurred by the Agent at the Agent's discretion and paid by the Agent. We anticipate that in the location or relocation of the Agent's office there will be no undue infringement on the established office location of any other agent. The Agent will not establish any office in addition to the Agent's principal office without the prior written approval of the Companies.

F. The Companies will advertise, provide promotional materials, and participate in the cost of the Agent's advertisements in accordance with policies determined from time to time by the Companies. The Agent will not use any advertisements referring to or identifying the Companies in any way without the prior written approval of the Companies.

G. The Agent shall provide at least one licensed sales representative whose principal occupation will be the fulfillment of the Agent's obligations established by this Agreement. The fulfillment of the Agreement shall be the Agent's principal business and neither the Agent nor any licensed sales representative employed by the Agent will directly or indirectly write or service insurance for any other Company, other than a State Farm subsidiary or affiliate or through any governmental or insurance industry plan or facility, or for any agent or broker, except in accordance with the terms of any written consent the Companies may give the Agent.

H. The Companies will leave in the Agent's account all automobile policies credited thereto so long as the policyholder resides within a 25-mile radius of the Agent's principal place of business and within a state in which the Agent is duly licensed, except that the Companies may, after prior written notice to the Agent, transfer any automobile policy to the account of another State Farm agent when the policyholder makes a bona fide request in writing. The Agent will respect the rights and interests of other agents in policies credited to their accounts by refraining from raiding or otherwise diverting policies from their accounts to the Agent's account.

I. All moneys collected on behalf of the Companies shall be held in trust by the Agent as the absolute property of the Companies, and the Agent will be responsible for these moneys until they are safely transmitted to the Companies. The Agent agrees to maintain in a bank or similar financial institution, a premium fund account, which the Companies may audit at any time, in which the Agent will promptly deposit all cash collected for premiums, membership fees, and charges. The Agent further agrees to transmit promptly to the Companies the moneys so deposited, through checks drawn upon this premium fund account, along with all insurance applications received and all checks collected on behalf of the Companies.

J. Any amount (exclusive of premiums due on policies issued to the Agent and the President) at any time owing by the Agent to any of the Companies, their subsidiaries and affiliates, shall be a first lien on any payment due or thereafter becoming due the Agent under any of the provisions of this Agreement, and the Companies are authorized to deduct such indebtedness from any such payment due or thereafter becoming due to the Agent from any of the Companies.

K. If any application is rejected or any policy is surrendered or cancelled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to the Agent, the compensation paid to the Agent on the amount returned or credited to the policyholder or the amount overpaid to the Agent shall be charged to the Agent and shall constitute an indebtedness of the Agent to the Companies.

L. The Companies retain the right to prescribe all policy forms and provisions; premiums, fees, and charges for insurance; and rules governing the binding, acceptance, renewal, rejection, or cancellation of risks, and adjustment and payment of losses.

M. The Agent will not represent itself as having any powers except those authorized by this Agreement, and subject to any applicable law. Without limiting the foregoing, the Agent shall not have authority to extend the time of payment of any premium, or to alter, waive, or forfeit any of the Companies' rights, requirements, or conditions in any policy of insurance, or otherwise obligate the Companies in any way except as stated in this Agreement or expressly authorized under the rules and regulations of

DLH-000808

the Companies or as otherwise authorized in writing by the Companies.

## SECTION II - COMPENSATION

A. Each Company will make payments to the Agent as set forth in the applicable Schedule of Payments.

B. As additional compensation, State Farm will maintain insurance upon the life of the President, payable to the beneficiary selected by the Agent, so long as this Agreement has not been terminated and the President has not attained age 65; provided, however, that in no event will such insurance be maintained in force during a period commencing thirty-one days after the President has begun active duty as a member of the military, naval, or air forces of any country or international organization and ending with termination of such duty. The amount of insurance during any calendar year shall be equal to the Agent's gross compensation received from the Companies in the preceding calendar year, exclusive of compensation based on policies issued by the Companies pursuant to any governmental or insurance industry plan, pool or facility, or $10,000, whichever is the greater, but in no event shall such insurance be more than $50,000.

C. Each Company reserves the right to fix and determine the amount, extent, and conditions of any bonuses, awards, prizes, and allowances.

## SECTION III - TERMINATION OF AGREEMENT

A. The Agent or State Farm have the right to terminate this Agreement by written notice delivered to the other or mailed to the other's last known address. The date of termination shall be the date specified in the notice, but in the event no date is specified, the date of termination shall be the date of delivery if the notice is mailed. Either party can accelerate the date of the termination specified by the other by giving written notice of termination in accordance with this paragraph.

B. After termination of this Agreement, the Agent agrees not to act or represent itself in any way as an agent or representative of the Companies.

C. Within ten days after the termination of this Agreement, all property belonging to the Companies shall be returned or made available for return to the Companies or their authorized representative.

D. For a period of one year following termination of this Agreement, neither the Agent, the President, nor any of the licensed sales representatives, will either personally or through any other person, agency, or organization (a) induce or advise any State Farm policyholder credited to the Agent's account at the date of termination to lapse, surrender, or cancel any State Farm insurance coverage or (b) solicit any such policyholder to purchase any insurance coverage competitive with the insurance coverages sold by the Companies. In the event the "period of one year" conflicts with any statutory provision, such period shall be the period permitted by statute.

## SECTION IV - TERMINATION PAYMENTS

A. In the event this Agreement is terminated, the respective Companies will, subject to the conditions set forth in subparagraph A-5 and paragraph B of this section, pay the Agent, less any deductions for commission charge backs, the following termination payments:

1. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay:

   (a) For the first twelve (12) months following the date of termination the lesser of the amounts computed in (1) and (2):

      (1) twenty percent (20%) of the service compensation on "personally produced" policies by the licensed sales representative(s) designated by the Agent pursuant to Section VI.A(3), earned under the Schedule of Payments For Other Than Health Insurance Policies in the twelve (12) preceding months, or twenty percent (20%) of the service compensation on "personally produced" policies credited to the Agent's account, as of the date of termination, which remain in force in the same state during the first twelve (12) months following the date of termination, whichever is greater, or

      (2) thirty percent (30%) of the service compensation on "personally produced" policies credited to the Agent's account as of the date of termination, which remain in force in the same state during the first twelve (12) months following the date of termination.

   In the event thirty percent (30%) of the service compensation as specified in (2) is less than the greater amount of the service compensation as computed in (1) and if the number of such "personally produced" policies in force at the end of the first twelve (12) months following the date of termination is equal to or greater than seventy-five percent (75%) of the number of the "personally produced" policies in force at date of termination, the Agent will be paid the amount provided for in (1).

   (b) For the first twelve (12) months following the date of termination the lesser of the amounts computed in (1) and (2):

DLM-000807

(1) twenty percent (20%) of the service compensation the Agent earned on health insurance policies under the Schedule of Payments For Health Insurance Policies in the twelve (12) preceding months, or twenty percent (20%) of the service compensation on health insurance policies credited to the Agent's account at date of termination which remain in the same state and in force during the first twelve months following the date of termination, except those policies which became available in the same state for assignment to an agent as a result of the termination of an agreement between the Company and an agent, or as a result of an agreement between an agent and the Companies pursuant to the applicable paragraph of Section IV of a State Farm Agent's Agreement, on which one year has not elapsed since date of termination; whichever is greater, or

(2) two percent (2%) of the second and subsequent policy years net premium collections received and recorded in the twelve (12) months following date of termination on health insurance policies which remain in the same state, credited to the Agent's account as of the date of termination, except those policies which became available in the same state for assignment to an agent as a result of the termination of an agreement between the Company and an agent, or as a result of an agreement between an agent and the Companies pursuant to the applicable paragraph of Section IV of a State Farm Agent's Agreement, on which one year has not elapsed since date of termination.

In the event two percent (2%) of the net premium collections as specified in (2) is less than the greater amount of the service compensation as computed in (1) and if the number of policies in force at the end of the first twelve (12) months following the date of termination is equal to or greater than seventy-five percent (75%) of the number of policies in force at date of termination, the Agent will be paid the amount computed in (1).

(c) The payments provided for in (a) and (b) shall be made in estimated monthly installments equal to twenty percent (20%) of the service compensation earned in the twelfth (12th) preceding month subject to appropriate adjustments following a determination of the net premium collections as specified in (a)(2) and (b)(2) and the number of policies in force, where applicable.

(d) For each of the succeeding forty-eight (48) months the Agent will be paid an amount equal to one-twelfth (1/12th) of the total amount payable in the first twelve (12) months after termination.

2. STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM GENERAL INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS each will pay:

(a) For the first twelve (12) months following date of termination the lesser of the amounts computed in (1) and (2):

(1) twenty percent (20%) of the commissions the Agent was paid on "personally produced" policies by the licensed sales representative(s) designated by the Agent pursuant to Section VI.A(3), for those lines of insurance classified by the Companies in paragraphs 1-A, B and C of the applicable Schedule of Payments, in the twelve (12) preceding months, or twenty percent (20%) of the commissions on such "personally produced" renewal premiums, which would have been paid under the applicable Schedule of Payments, if this Agreement had not been terminated, in the twelve (12) months following the date of termination on such "personally produced" policies, which remain in the same state, for those lines of insurance designated above and credited to the Agent's account as of the date of termination; whichever is greater, or

(2) thirty percent (30%) of the commissions on such "personally produced" renewal premiums which would have been paid under the applicable Schedule of Payments, if this Agreement had not been terminated, in the twelve (12) months following the date of termination on those "personally produced" policies designated in (1) and credited to the Agent's account as of the date of termination.

In the event thirty percent (30%) of the commissions as computed in (2) is less than the greater amount computed in (1) and if the number of such designated "personally produced" policies in force at the end of the first twelve (12) months following date of termination is equal to or greater than seventy-five percent (75%) of the number of such designated "personally produced" policies in force at date of termination, the Agent will be paid the amount provided for in (1).

DLH-000808

(b) The payments provided for in (a) shall be made in estimated monthly installments equal to twenty percent (20%) of the commissions paid on the designated "personally produced" policies in the twelfth (12th) preceding month subject to appropriate adjustments following a determination of the commissions specified in (a)(2) and the number of such "personally produced" policies in force, where applicable.

(c) For each of the succeeding forty-eight (48) months the Agent will be paid an amount equal to one-twelfth (1/12th) of the total amount payable in the first twelve (12) months after termination.

3. STATE FARM LIFE INSURANCE COMPANY will pay on business written before January 1, 1982:

(a) An amount equal to the same compensation, for the second and subsequent policy years as would have been due and payable to the Agent for the first five years following the date of termination on all State Farm life policies personally written by the licensed sales representative designated by the Agent pursuant to Section VI.A(3), or assigned to the Agent by the Company for compensation, under the terms of the applicable Schedule of Payments attached hereto, if this Agreement had not been terminated.

(b) The payments provided for in (a) shall be made in monthly installments for each of the sixty (60) months which would have been due and payable to the Agent for that month if this Agreement had not been terminated.

4. STATE FARM LIFE INSURANCE COMPANY will pay on business written during the existence of this Agreement and on or after January 1, 1982:

(a) On life policies personally written by the licensed sales representative designated by the Agent pursuant to Section VI.A(3), an amount equal to the writing compensation, for the second and subsequent policy years as would have been due and payable to the Agent under the terms of the applicable Schedule of Payments attached hereto if the Agreement had not been terminated.

(b) On life policies in the Agent's account on which two percent (2%) servicing compensation is being paid to the Agent at the time of termination of this Agreement, an amount equal to one and one-half percent (1 1/2%) of one-twelfth (1/12) of the annualized premium of the policies shall be paid in monthly installments for each of the sixty (60) months after termination of this Agreement.

(c) On Flexible Premium Retirement policies in the Agent's account on which the Agent is eligible for servicing compensation at the time of termination of this Agreement, an amount equal to three-fourths of one percent (3/4 of 1%) of an average monthly premium of the policies shall be paid in monthly installments for each of the sixty (60) months after termination of this Agreement, except that no amount shall be paid on those policies made available for assignment by the termination of an agreement between the Company and an agent or by a release of policies pursuant to the applicable paragraph of Section IV of a State Farm Agent's Agreement. The average monthly premium of a policy shall be calculated by dividing the total premium paid on the policy by the number of full months elapsing between its Policy Date and termination of this Agreement.

5. GOVERNMENTAL OR INSURANCE INDUSTRY PLAN OR FACILITY. All policies, premium collections and compensation the Agent receives thereon, issued by the Companies pursuant to any governmental or insurance industry plan or facility, shall be excluded from the calculations and provisions for termination payments.

6. CESSATION OF BUSINESS. In the event the respective Company discontinues doing business in the state in which the agent is licensed as a representative of the Company, that Company agrees to pay the agent the following payments in lieu of the termination payments provided for in this section and Section V of this Agreement, subject to the mutual conditions herein set forth:

(a) For the first twelve (12) months following the date of termination STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay the amount computed in A-1 based on your earnings under the applicable Schedule of Payments in the twelve (12) preceding months as provided for in A-1-(a)(1) and A-1-(b)(1).

(b) For the first twelve (12) months following the date of termination STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM GENERAL INSURANCE COMPANY, and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS will pay the amount computed in A-2 based on the commissions you were paid under the applicable Schedule of Payments in the twelve (12) preceding months as provided for in A-2-(a)(1).

(c) For each of the succeeding forty-eight (48) months you will be paid by that Company an amount equal to one-twelfth (1/12th) of the amount payable in the first twelve (12) months after termination.

DLH-000509

(d) The foregoing payments are to be made only on your written acceptance of a termination date to be determined by the applicable Company.

(e) In the event of your written acceptance as provided for in (d) the applicable Company agrees to transfer to you all its rights and ownership in the property set forth in paragraph D of Section 1 of this Agreement.

B. Payments under paragraph A above shall be as follows:

1. If within ten (10) days following the date of termination, all property belonging to the respective Companies has been returned or made available for return to that Company or its authorized representative the Agent shall qualify for the first two (2) monthly installments from that Company as provided in paragraph A.

2. If the Agent has qualified for payments by the respective Companies under subparagraph B-1, and so long as the Agent, the President, and the licensed sales representative, have not, for a period of twelve (12) months following termination of this Agreement, either personally or through any other person, agency or organization, solicited or sold, either at renewal time or otherwise, to that Company's policyholders, which were credited to the Agent's account at the time of termination, any insurance coverage competitive with the insurance coverages sold by that Company, the Agent shall qualify for the remaining monthly installments from that Company as provided in paragraph A.

C. In the event the Agent and the Company enter into a written agreement, without the complete termination of this Agreement, to release at one time from the Agent's account for reassignment to other agents, at least twenty-five percent (25%) or five hundred (500), whichever number is less, of the automobile insurance policies credited to the Agent's account, and in addition all other State Farm policies held by policy-holders and members of the households of such policyholders whose automobile insurance policies are reassigned, the Companies with respect to the policies so released, will pay the Agent the termination payments in accordance with the provisions of paragraphs A and B, as those provisions may be applicable to each of the Companies.

## SECTION V - EXTENDED TERMINATION PAYMENTS

A. In the event the Agreement is terminated, and the Agent qualified for the termination payments set forth in Section IV-B-1 and 2, and at the time of termination of this Agreement:

(1) the President of the Agent is 62 years of age or older; and

(2) the President was a licensed agent for the Companies, or a licensed sales representative of the Agent, for a combined period of twenty (20) years or more, either under this Agreement or accumulatively under any prior State Farm Agent's Agreement (Form AA) or Local Agent's Appointment (Form LA); and

(3) the President had ten (10) years of combined continuous service as a licensed agent for the Companies, or a licensed sales representative of the Agent, immediately preceding the date this Agreement is terminated;

the respective Companies will pay the Agent monthly payments beginning on the last day of the 61st month following termination and continuing until the last day of the month in which the death of the President occurs, either

- if the President is 65 years of age or older at termination of this Agreement, an amount equal to the following,

or

- if the President is 62, 63, or 64 years of age at termination of this Agreement, a lesser amount based on the following adjusted by an actuarial equivalent factor based upon the President's age at termination of this Agreement:

1. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY will pay an amount equal to the monthly payment by this Company as provided for in subparagraph A-1-(a) of Section IV.

2. STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM GENERAL INSURANCE COMPANY and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS will pay amounts equal to the following:

(a) That portion of the monthly payments by these Companies as provided for in subparagraph A-2 of Section IV based on "personal lines of insurance" so classified by the Companies in the applicable Schedule of Payments; and

(b) 50% of that portion of the monthly payments by these Companies as provided for in subparagraph A-2 of Section IV based on the "commercial lines of insurance" so classified by the Companies in the applicable Schedule of Payments. Provided, however, that these payments on such "commercial lines of insurance" shall be calculated on only the first $5,000.00 of net premium collections received by the Companies on any one risk or policy.

DLN-000510

3. **STATE FARM LIFE INSURANCE COMPANY** will pay an amount equal to the monthly payment by this Company as provided for in subparagraphs A-4-(b) and (c) of Section IV.

## SECTION VI - GENERAL PROVISIONS

A. This Agreement has been entered into by the Companies with the Agent in reliance upon the representations and agreements that:

(1) The following person(s) substantially participate(s) in the ownership of the Agent:

| NAME | ADDRESS | PERCENTAGE OF INTEREST |
|------|---------|------------------------|
| Dwight L. Hill | 10222 Midway Rd. Dallas, TX 75229-6231 | 100 |

(2) The President of the Agent, having full managerial authority and responsibility for the operating management of the Agent as provided for by its by-laws, shall be a person acceptable to the Companies. The Agent will advise the Companies, in writing, at least forty-five (45) days prior to the appointment of such President of the identities and qualifications of all candidates being considered for appointment as President. The Companies will be deemed to have approved those candidates with respect to which they have not notified the Agent of their unacceptability within thirty (30) days after receipt of the Agent's advice that the candidates are being considered for appointment.

(3) The person or persons designated by the Agent as licensed sales representative(s) of the Agent shall be acceptable to the Companies. The Agent will advise the Companies, in writing, at least forty-five (45) days prior to appointment of a licensed sales representative of the identities and qualifications of all candidates being considered for appointment as licensed sales representative(s). Unless the Companies, within thirty (30) days after receipt of such advice, notify the Agent that a candidate is unacceptable to the Companies, the Companies will be deemed to have approved such candidates.

All notices of the identities and qualifications of candidates for the position of President or licensed sales representative shall be sent to a Regional Vice President or Agency Vice President.

B. Since each party is relying upon the other or others to carry out the provisions of this Agreement, neither the Agreement nor any interest thereunder can be sold, assigned, or pledged; and no right in any sum due or to become due to the Agent hereunder can be sold, assigned, or pledged without the prior written consent of the Companies.

C. Each Company shall be bound by all the terms of this Agreement, except that the separate Schedule of Payments hereto attached, and those other provisions where the express language or context indicates that they are applicable to the individual Companies only; and the rights and duties of the Agent with respect to each Company shall be governed accordingly.

D. The President in his individual capacity shall be bound only by the terms of this Agreement that specifically refer to the President.

E. All payments for termination which otherwise might have become available to the Agent under the terms of prior agreements with any of the Companies are hereby waived by the Agent.

F. This Agreement shall supersede all prior agreements between the parties hereto, written or otherwise, and it shall constitute the sole and entire Agreement between the parties, and no change, alteration, or modification of the terms of this Agreement may be made except by agreement in writing signed by a Regional Vice President or an Agency Vice President of the Companies and accepted by the Agent.

DLH-000811

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in triplicate on their behalfs.

WITNESS:

DWIGHT HILL INSURANCE AGENCY, INC.

By: _____
                President

_____
Dwight L. Hill, Individually

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
STATE FARM LIFE INSURANCE COMPANY
STATE FARM FIRE AND CASUALTY COMPANY
STATE FARM GENERAL INSURANCE COMPANY
STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS

By: _____
    Authorized Representative
                    Vice President of Agency

KRISTI ROTH

AUG 0 5 2002

(Rev. 1/1/82)

Printed in U.S.A.

DLH-000812

# MEMORANDUM OF AGREEMENT

## (STATE FARM AGENT'S AGREEMENT - CORP. FORM AA4)

MEMORANDUM OF AGREEMENT by and between STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY, STATE FARM LIFE INSURANCE COMPANY, STATE FARM GENERAL INSURANCE COMPANY, and STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, hereinafter referred to as the "Companies", and DWIGHT HILL INSURANCE AGENCY, INC., and Dwight L. Hill, individually, hereinafter referred to as the "Agent".

WHEREAS, the Companies entered into an agreement with Dwight L. Hill effective the 1st day of August, 1990, known as the STATE FARM AGENT'S AGREEMENT, Form AA4(TX-1); and,

WHEREAS, the agent decided to terminate his STATE FARM AGENT'S AGREEMENT effective the 31st day of July, 2002; and execute the Corporate Agency Agreement effective the 1st day of August, 2002; and

WHEREAS, the Corporate Agency received no compensation during calendar year; and

WHEREAS, the Companies as a matter of policy will not enter into a contract with a Corporate Agency owned in whole or in part by an individual agent if the transaction would result in a substantial payment being made to the individual agent upon termination of the individual agent's contract;

NOW THEREFORE THIS AGREEMENT WITNESSETH AS FOLLOWS:

1. Subject to the other provisions of Section II, Paragraph B of the Corporate Agency Agreement, it is agreed that the amount of insurance provided under this section during 2002 shall be the sum of the gross compensation received as an individual agent, exclusive of compensation based on policies issued by the Companies pursuant to any governmental or insurance industry plan, pool or facility, during 2001, but in no event shall such insurance be more than $50,000. During the year of 2003 the amount of insurance shall be the sum of the gross compensation received as an individual agent, exclusive of compensation based on policies issued by the Companies pursuant to any governmental or insurance industry plan, pool or facility, during 2002, and the Corporation's gross compensation, exclusive of compensation based on policies issued by the Companies pursuant to any governmental or insurance industry plan, pool or facility, received during 2002, but in no event shall such insurance be more than $50,000. During the year of 2004 and thereafter the provisions in the Corporate Agency Agreement itself shall govern the amount of insurance.

2. Since the transfer of an individual agency into a Corporate Agency does not constitute termination of an individual agency contract within the meaning of the original contract, it is hereby mutually agreed and understood that all payments set forth in Section IV of the STATE FARM AGENT'S AGREEMENT heretofore in existence between the Companies and Dwight L. Hill which otherwise might have become payable to Dwight L. Hill under the terms of such Section IV are hereby waived by Dwight L. Hill.

3. In the event the Corporate Agency Agreement is terminated prior to the Agreement being in force at least twelve (12) preceding months, the computations for termination payments based on that portion of the formula with respect to earned service compensation in the twelve (12) preceding months pursuant to subparagraph A-1-(a)(1) and A-1(b)(1) of Section IV, and with respect to paid commissions in the twelve (12) preceding months pursuant to subparagraph A-2-(a)(1) of Section IV, shall be interpreted to include the months the licensed sales representative(s) was representing the Companies under an individual State Farm Agent's Agreement.

4. The foregoing agreement shall be effective as of the effective date of the Corporate Form of Agreement.

DLH-000813

IN WITNESS WHEREOF the parties hereto have executed this MEMORANDUM OF AGREEMENT this 29 day of July, 2002.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
STATE FARM FIRE AND CASUALTY COMPANY
STATE FARM LIFE INSURANCE COMPANY
STATE FARM GENERAL INSURANCE COMPANY
STATE FARM COUNTY MUTUAL INSURANCE COMPANY OF TEXAS

WITNESS:

By: _____ Vice President of Agency
Authorized Representative
North Texas Operation Center

DWIGHT HILL INSURANCE AGENCY, INC.

WITNESS:

By: _____
President

WITNESS:

_____
Dwight L. Hill, Individually

KRISTI ROTH

AUG 0 5 2002

DLN-000514

AA4(INC)(TX)

## AUTHORIZATION
## (DEDUCTIONS FROM EARNINGS)

DWIGHT HILL INSURANCE AGENCY, INC., a corporation organized and existing under the laws of the State of Texas, does hereby authorize the State Farm Insurance Companies to deduct from its earnings the same monthly deductions which were made from Dwight L. Hill's earnings prior to incorporation, and further authorize and ratify all future deductions from said earnings. Said authorization shall become effective concomitantly with the effective date of the AA4 Corporate Form, and shall remain in full force and effect while said corporation is properly licensed to act as an agent for the State Farm Insurance Companies unless otherwise directed by the President of the Corporation.

Dated ___7/29___ , ___02___

WITNESS:                              By:___Dwight L. Hill___
                                              President

DLH-000818

KRISTI ROTH
AUG 0 5 2002

DLH-000516



# EXHIBIT K

# TAX RETURN SHOWING SAMPLE K-1

# Schedule K-1
## (Form 1120S)

Department of the Treasury
Internal Revenue Service

**2017**

For calendar year 2017, or tax year

☐ Final K-1    ☐ Amended K-1

671117

OMB No. 1545-0123

beginning | / / 2017 | ending | / /

## Shareholder's Share of Income, Deductions, Credits, etc. ► See page 2 of form and separate instructions.

### Part I — Information About the Corporation

**A** Corporation's employer identification number

27-0017213

**B** Corporation's name, address, city, state, and ZIP code

DWIGHT HILL INSURANCE AGENCY INC
10300 N CENTRAL EXPY STE 296
DALLAS, TX 75231

**C** IRS Center where corporation filed return

E-FILE

### Part II — Information About the Shareholder

**D** Shareholder's identifying number

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

**E** Shareholder's name, address, city, state, and ZIP code

MARIBEL L HILL
4246 W LOVERS LN
DALLAS, TX 75209

**F** Shareholder's percentage of stock ownership for tax year.................... 50 %

F O R   I R S   U S E   O N L Y

### Part III — Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) 72,131. | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 | Alternative minimum tax (AMT) items |
| | | A | 349. |
| 11 | Section 179 deduction | 16 | Items affecting shareholder basis |
| | | C | 1,811. |
| 12 | Other deductions | | |
| A | 1,900. | D | 73,548. |
| | | 17 | Other information |

*See attached statement for additional information.

BAA For Paperwork Reduction Act Notice, see the Instructions for Form 1120S.

Schedule K-1 (Form 1120S) 2017

SHAREHOLDER 2

SPSA0412L  012/11/17



# EXHIBIT L

# Tex. Fam. Code § 7.001 (Vernon 2006)

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Tex. Fam. Code § 7.001 General Rule of Property Division

**Library:** Texas Statutes

**Edition:** 2025

**Currency:** Current through bills posted as of 6/25/2025 from the 2025 Legislative Session

**Citation:** Tex. Fam. Code § 7.001

**Year:** 2025

**Id. vLex Fastcase:** VLEX-1078275571

**Link:** https://fastcase.vlex.com/vid/tex-fam-code--1078275571

Downloaded from vLex by Marisol Lopez



In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.

**History:** Added by Acts 1997, 75th Leg., ch. 7, Sec. 1, eff. 4/17/1997.

**Cite as:** Tex. Fam. Code § 7.001



# EXHIBIT M

# Tex. Fam. Code § 8.051.
# (Vernon 2006)

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Tex. Fam. Code § 8.051 Eligibility For Maintenance

**Library:** Texas Statutes

**Edition:** 2025

**Currency:** Current through bills posted as of 6/25/2025 from the 2025 Legislative Session

**Citation:** Tex. Fam. Code § 8.051

**Year:** 2025

**Id. vLex Fastcase:** VLEX-1078361956

**Link:** https://fastcase.vlex.com/vid/tex-fam-code--1078361956

Downloaded from vLex by Marisol Lopez



In a suit for dissolution of a marriage or in a proceeding for maintenance in a court with personal jurisdiction over both former spouses following the dissolution of their marriage by a court that lacked personal jurisdiction over an absent spouse, the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and:

(1) the spouse from whom maintenance is requested was convicted of or received deferred adjudication for a criminal offense that also constitutes an act of family violence, as defined by Section 71.004, committed during the marriage against the other spouse or the other spouse's child and the offense occurred:

(A) within two years before the date on which a suit for dissolution of the marriage is filed; or

(B) while the suit is pending; or

(2) the spouse seeking maintenance:

(A) is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability;

(B) has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs; or

(C) is the custodian of a child of the marriage of any age who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning sufficient income to provide for the spouse's minimum reasonable needs.

---

**History:** Amended by Acts 2013, 83rd Leg. - Regular Session, ch. 242, Sec. 2, eff. 9/1/2013.
Amended by Acts 2013, 83rd Leg. - Regular Session, ch. 242, Sec. 1, eff. 9/1/2013.
Amended By Acts 2011, 82nd Leg., R.S., Ch. 486, Sec. 1, eff. 9/1/2011.
Amended By Acts 2005, 79th Leg., Ch. 914, Sec. 1, eff. 9/1/2005.
Amended by Acts 1999, 76th Leg., ch. 62, Sec. 6.05, eff. 9/1/1999; Acts 1999, 76th Leg., ch. 304, Sec. 1, eff. Sept. 1, 1999. Renumbered from Sec. 8.002 and amended by Acts 2001, 77th Leg., ch. 807, Sec. 1, eff. 9/1/2001.
Added by Acts 1997, 75th Leg., ch. 7, Sec. 1, eff. 4/17/1997.

**Cite as:** Tex. Fam. Code § 8.051



# EXHIBIT N

# Tex. Fam. Code § 8.052
(Vernon 2006)

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Tex. Fam. Code § 8.052 Factors In Determining Maintenance

**Library:** Texas Statutes

**Edition:** 2025

**Currency:** Current through bills posted as of 6/25/2025 from the 2025 Legislative Session

**Citation:** Tex. Fam. Code § 8.052

**Year:** 2025

**Id. vLex Fastcase:** VLEX-1078275582

**Link:** https://fastcase.vlex.com/vid/tex-fam-code--1078275582

Downloaded from vLex by Marisol Lopez



A court that determines that a spouse is eligible to receive maintenance under this chapter shall determine the nature, amount, duration, and manner of periodic payments by considering all relevant factors, including:

(1) each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage;

(2) the education and employment skills of the spouses, the time necessary to acquire sufficient education or training to enable the spouse seeking maintenance to earn sufficient income, and the availability and feasibility of that education or training;

(3) the duration of the marriage;

(4) the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance;

(5) the effect on each spouse's ability to provide for that spouse's minimum reasonable needs while providing periodic child support payments or maintenance, if applicable;

(6) acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property, joint tenancy, or other property held in common;

(7) the contribution by one spouse to the education, training, or increased earning power of the other spouse;

(8) the property brought to the marriage by either spouse;

(9) the contribution of a spouse as homemaker;

(10) marital misconduct, including adultery and cruel treatment, by either spouse during the marriage; and

(11) any history or pattern of family violence, as defined by Section 71.004.

---

**History:** Amended By Acts 2011, 82nd Leg., R.S., Ch. 486, Sec. 1, eff. 9/1/2011.
Added by Acts 1997, 75th Leg., ch. 7, Sec. 1, eff. 4/17/1997. Renumbered from Sec. 8.003 by Acts 2001, 77th Leg., ch. 807, Sec. 1, eff. 9/1/2001.

**Cite as:** Tex. Fam. Code § 8.052



# EXHIBIT O

# Tex. Fam. Code § 8.053 (Vernon 2006)

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Tex. Fam. Code § 8.053 Presumption

**Library:** Texas Statutes

**Edition:** 2025

**Currency:** Current through bills posted as of 6/25/2025 from the 2025 Legislative Session

**Citation:** Tex. Fam. Code § 8.053

**Year:** 2025

**Id. vLex Fastcase:** VLEX-1078275586

**Link:** https://fastcase.vlex.com/vid/tex-fam-code--1078275586

Downloaded from vLex by Marisol Lopez


(a) It is a rebuttable presumption that maintenance under Section 8.051(2)(B) is not warranted unless the spouse seeking maintenance has exercised diligence in:

   (1) earning sufficient income to provide for the spouse's minimum reasonable needs; or

   (2) developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending.

(b) Repealed by Acts 2011, 82nd Leg., R.S., Ch. 486, Sec. 9(1), eff. September 1, 2011.

**History:** Amended By Acts 2011, 82nd Leg., R.S., Ch. 486, Sec. 2, eff. 9/1/2011.
Amended By Acts 2011, 82nd Leg., R.S., Ch. 486, Sec. 9(1), eff. 9/1/2011.
Amended By Acts 2005, 79th Leg., Ch. 914, Sec. 2, eff. 9/1/2005.
Added by Acts 1997, 75th Leg., ch. 7, Sec. 1, eff. 4/17/1997. Renumbered from Sec. 8.004 by Acts 2001, 77th Leg., ch. 807, Sec. 1, eff. 9/1/2001.

**Cite as:** Tex. Fam. Code § 8.053



# EXHIBIT P

# Tex. Fam. Code § 8.054
# (Vernon 2006)

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Tex. Fam. Code § 8.054 Duration of Maintenance Order

**Library:** Texas Statutes

**Edition:** 2025

**Currency:** Current through bills posted as of 6/25/2025 from the 2025 Legislative Session

**Citation:** Tex. Fam. Code § 8.054

**Year:** 2025

**Id. vLex Fastcase:** VLEX-1078275585

**Link:** https://fastcase.vlex.com/vid/tex-fam-code--1078275585

Downloaded from vLex by Marisol Lopez



(a) Except as provided by Subsection (b), a court:

    (1) may not order maintenance that remains in effect for more than:
        (A) five years after the date of the order, if:
            (i) the spouses were married to each other for less than 10 years and the eligibility of the spouse for whom maintenance is ordered is established under Section 8.051(1); or
            (ii) the spouses were married to each other for at least 10 years but not more than 20 years;
        (B) seven years after the date of the order, if the spouses were married to each other for at least 20 years but not more than 30 years; or
        (C) 10 years after the date of the order, if the spouses were married to each other for 30 years or more; and

    (2) shall limit the duration of a maintenance order to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs, unless the ability of the spouse to provide for the spouse's minimum reasonable needs is substantially or totally diminished because of:
        (A) physical or mental disability of the spouse seeking maintenance;
        (B) duties as the custodian of an infant or young child of the marriage; or
        (C) another compelling impediment to earning sufficient income to provide for the spouse's minimum reasonable needs.

(b) The court may order maintenance for a spouse to whom Section 8.051(2)(A) or (C) applies for as long as the spouse continues to satisfy the eligibility criteria prescribed by the applicable provision.

(c) On the request of either party or on the court's own motion, the court may order the periodic review of its order for maintenance under Subsection (b).

(d) The continuation of maintenance ordered under Subsection (b) is subject to the procedural requirements for a motion to modify as provided by Section 8.057.

---

**History:** Amended by Acts 2023, Texas Acts of the 88th Leg.- Regular Session, ch. 443, Sec. 1, eff. 6/9/2023, app. to a motion to continue spousal maintenance under Subchapter B, Chapter 8, Family Code, that is made on or after the effective date of this Act, regardless of whether the original spousal maintenance order was rendered before, on, or after that date.
Amended By Acts 2011, 82nd Leg., R.S., Ch. 486, Sec. 3, eff. 9/1/2011.
Amended By Acts 2005, 79th Leg., Ch. 914, Sec. 3, eff. 9/1/2005.
Added by Acts 1997, 75th Leg., ch. 7, Sec. 1, eff. 4/17/1997. Renumbered from Sec. 8.005 and amended by Acts 2001, 77th Leg., ch. 807, Sec. 1, eff. 9/1/2001.

**Cite as:** Tex. Fam. Code § 8.054



# EXHIBIT Q

# Tex. R. CIV. P. 297

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Rule 297. Time to Send Findings of Fact and Conclusions of Law

| | |
|---|---|
| **Library:** | Texas Rules of Civil Procedure |
| **Edition:** | 2025 |
| **Currency:** | As amended through July 31, 2025 |
| **Year:** | 2025 |
| **Citation:** | Tex. R. Civ. P. 297 |

**Id. vLex Fastcase:** VLEX-1072477632

**Link:** https://fastcase.vlex.com/vid/rule-297-time-to-1072477632

Downloaded from vLex by Marisol Lopez



Within twenty days after a timely request is filed, the court must send its findings of fact and conclusions of law to the parties as provided in Rule 21(f)(10).

If the court fails to send timely findings of fact and conclusions of law, the party making the request must, within thirty days after filing the original request, file with the clerk and serve on all other parties in accordance with Rule 21a a "Notice of Past Due Findings of Fact and Conclusions of Law" which must be immediately called to the attention of the court by the clerk. Such notice must state the date the original request was filed and the date the findings and conclusions were due. Upon filing this notice, the time for the court to send findings of fact and conclusions of law is extended to forty days from the date the original request was filed.

---

**Cite as** Tex. R. Civ. P. 297

**History:** Amended August 7, 2023, effective 9/1/2023; amended September 8, 2023, effective 9/8/2023; amended May 28, 2024, effective 5/28/2024.

**Note:**

**Notes and Comments**

Comment to 1990 change: To revise the practice and times for findings of fact and conclusion of law. See also Rules 296 and 298.



# EXHIBIT R

# Tex. R. CIV. P. 298

Downloaded from vLex by Marisol Lopez



© Copyright 2025, vLex Fastcase. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Rule 298. Additional Or Amended Findings of Fact and Conclusions of Law

| | |
|---|---|
| **Library:** | Texas Rules of Civil Procedure |
| **Edition:** | 2025 |
| **Currency:** | As amended through July 31, 2025 |
| **Year:** | 2025 |
| **Citation:** | Tex. R. Civ. P. 298 |

**Id. vLex Fastcase:** VLEX-1072477619

**Link:** https://fastcase.vlex.com/vid/rule-298-additional-or-1072477619

Downloaded from vLex by Marisol Lopez



After the court sends original findings of fact and conclusions of law, any party may file with the clerk of the court a request for specified additional or amended findings or conclusions. The request for these findings must be made within ten days after the court sends the original findings and conclusions. Each request made pursuant to this rule must be served on each party to the suit in accordance with Rule 21a.

Within ten days after such request is filed, the court must send any additional or amended findings and conclusions to the parties as provided in Rule 21(f)(10). No findings or conclusions shall be deemed or presumed by any failure of the court to make any additional findings or conclusions.

---

**Cite as** Tex. R. Civ. P. 298

**History:** Amended August 7, 2023, effective 9/1/2023; amended September 8, 2023, effective 9/8/2023; amended May 28, 2024, effective 5/28/2024.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Marisol Lopez on behalf of Marisol Lopez
Bar No. 24050952
marisol@lawyerforu.com
Envelope ID: 104704041
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief Requesting Oral Argument
Status as of 8/22/2025 7:12 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Richard Osinger | | richard@ondafamilylaw.com | 8/21/2025 6:22:20 PM | SENT |
| Richard Osinger | | richard@ondafamilylaw.com | 8/21/2025 6:22:20 PM | SENT |
| Robert Epstein | 24065206 | robert@epsteinpc.com | 8/21/2025 6:22:20 PM | SENT |
| Marisol Lopez | | marisol@lawyerforu.com | 8/21/2025 6:22:20 PM | SENT |
| Marisol Lopez | | marisol@lawyerforu.com | 8/21/2025 6:22:20 PM | SENT |